## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CASHMAN                                        :
917 Maple Street, Royersford, PA 19468              :
        Plaintiff                  :
        v.                         :    Civil Action No. 05-02872
                                   :
CNA FINANCIAL CORP,                                 :
333 S. Wabash Avenue                                :
Chicago, Illinois 60685 and                         :
                                   :
CONTINENTAL CASUALTY COMPANY,                       :
401 Penn Street, Reading PA 19612                   :    **JURY TRIAL DEMAND**
                                   :
        Defendants.                :

## <u>COMPLAINT</u>

## <u>PRELIMINARY STATEMENT</u>

    1.   This Complaint sets forth claims arising from the employment discrimination of John Cashman (hereinafter "Plaintiff" or "Mr. Cashman"), by Defendant CNA Insurance Company also known as Continental Casualty Company (hereinafter "Defendant" or "Company") by their authorized representatives and in particular based on the facts and circumstances leading up to and surrounding the termination, refusal to retain and or forced retirement in whole or in part because of his age of 59 years, as defined by the ADEA, ADA, FMLA and PHRA.

    2.   This Complaint seeks equitable and monetary relief for Mr. Cashman, including but not limited to, back pay, front pay, benefits, pension benefits, negative tax damages, punitive damages, pre and post judgment interest, attorney's fees, costs of this suit and all other legal and equitable relief to which he is entitled for the denial of equal employment opportunity because of unlawful practices by Defendants including but not limited to the following:

(a)      Discrimination against Mr. Cashman with respect to the terms, conditions and privileges of employment because he is a person over the age of forty (40) years.

(b)      Limiting and otherwise creating conditions of employment which impaired Mr. Cashman's ability to continue and obtain job opportunities and which caused Mr. Cashman damages to his professional reputation and status as fraud case manager because of his age in violation of the ADEA, ADA, FMLA and the PHRA.

(c)      Discrimination against Mr. Cashman with respect to the terms, conditions and privileges of employment based on his disability, cancer in violation of ADA, ADEA, FMLA and PHRA.

3.  Mr. Cashman's federal claims arise under the Age Discrimination in Employment Act 29 U.S.C. § 621 et seq., as amended (hereinafter "ADEA");the Americans with Disabilities Act of 1990, 42 USC §12201 et seq. (hereinafter "ADA") and the Family Medical and Leave Act (hereinafter "FMLA").  Mr. Cashman asserts his claim under the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. (hereinafter "PHRA"), at the end of one year from the filing of his complaint, which was April 26, 2007.

**JURISDICTION STATEMENT**

4.  Jurisdiction of this Complaint is invoked pursuant to 28 U.S.C. §1331, 1332,1343.

5.  Jurisdiction of this Complaint is invoked pursuant to ADEA, 29 U.S. C. § 621 et seq.

6.  Jurisdiction of this Complaint is invoked pursuant to ADA, 42 USC § 12201 et seq. as amended and 42 USC § 1981 A.

7.  Jurisdiction of this Complaint is invoked pursuant to FMLA, 29 U.S.C. § 2601 et seq.

8.  This Court has pendent jurisdiction over Mr. Cashman's state statutory claims under the PHRA arising from the same underlying facts applicable to his ADEA and ADA claims and are inextricably related, falling within the pendent jurisdiction of this Court.

9.  Venue exists in the Eastern District of Pennsylvania because the acts which give rise to the cause of action which are the subject of the Complaint occurred in the Eastern District and because the Defendants are located in and/or regularly conduct business in the Eastern District of Pennsylvania, at all times relevant to this Complaint and Mr. Cashman's claims under the ADEA, ADA, FMLA and PHRA.

## PROCEDURAL PREREQUISITES MET

10.  All pre-conditions to the filing of this action pursuant to administrative remedies have been satisfied.  Mr. Cashman filed a timely charge of age discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") on April 26, 2007, bearing 530-2007-02530 against the Defendants.

11.  More than sixty (60) days have passed since the timely filing of the Charge of unlawful acts of employment discrimination with the EEOC.  Mr. Cashman received a Right-to-Sue letter dated September 11, 2008, and this Complaint is filed within the required ninety (90) days from date of receipt.  See a true and correct copy of Mr. Cashman's charge of discrimination Exhibit "A" and Right to Sue letter attached, marked Exhibit "B" attached hereto. Mr. Cashman  timely cross-filed with the Pennsylvania Human Relations Commission (hereinafter "PHRC").

## IDENTITY OF THE PARTIES

12. The Plaintiff is John Cashman (hereinafter "Mr. Cashman"), residing at 917 Maple Street, Royersford, PA  19612.

13. Defendant, CNA Financial Company (CNAF or CNA) is a Delaware corporation maintaining its home office at 333 S. Wabash Avenue, Chicago Illinois 60685 doing business as CNA, a trade name for Continental Casualty Company. CNAF maintains offices at 401 Penn Street, Reading PA 19612. Defendant CNA Insurance Company acquired Continental Casualty Company in around 1995.

14. CNAF is the parent company of Continental Casualty Co. (CCC) and operates and manages CCC, setting policy and directly controlling personnel practices for approximately 10,000 employees nationwide, including Plaintiff John Cashman. Plaintiff Cashman was a CCC employee when the company was acquired by CNAF.

15. At all times relevant to the causes of action herein, Defendant has conducted business and affected commerce in the Commonwealth of Pennsylvania and the Eastern District of Pennsylvania and has employed at least twenty-five (25) persons over the last four (4) calendar quarters prior to the alleged discriminatory actions stated herein.

16. At all times relevant to the cause of action herein, the Defendant continuously employed and still employs employees engaged in commerce within the meaning of the ADEA, PHRA and the ADA.

17. At all times relevant to the cause of action herein, Mr. Cashman was an employee of Defendant within the intent and meaning of the ADEA, PHRA, FMLA and the ADA.

18. At all times relevant to the cause of action, the acts and events which form the basis of Mr. Cashman' claims described herein were done by Defendants, on behalf of each other, jointly and severally, by their authorized directors, officers, managers, employees, workmen, servants and agents within the scope of their authorization and duties.

4

**GENERAL ALLEGATIONS AND BACKGROUND**

19. Mr. Cashman was born February 7, 1947, graduated from Roman Catholic High School, and attended Temple University for approximately two years.

20. Mr. Cashman was employed by the Philadelphia Police Department from 1969 to 1992, a period of about twenty four years, and retired from the Police Department as Detective. His last assignment was in the Federal Insurance Task Force for about two years.

21. On July 15, 1992 Mr. Cashman applied for work with defendant.

22. In October 1992, defendant hired Mr. Cashman as a Claims Investigator.

23. Mr. Cashman was at all times a diligent, loyal and good employee. Mr. Cashman historically, based on his job performance, earned promotions, bonuses, wage increases, other forms of compensation, pension and benefits, 401 K benefits which increased substantially over the years, based on his good performance.

24. The year before his termination, Mr. Cashman was earning $78,000 which would have continued but for the unlawful age discrimination, together with a variety of compensation, including bonus incentive, pension, 401 (k), medical and dental benefits, disability and life insurance, all of which would have continued to increase in value had he not been unlawfully terminated.

25. Mr. Cashman, from the beginning of his employment always earned performance evaluations of meets, meets most or exceeds expectations and continuously received merit increases due to his good performance.

26. Mr. Cashman earned a promotion to Team Leader in 1997.

27. Mr. Cashman reported to Richard Carroll from around 1995 to 2004, almost ten years.

28. Mr. Carroll was pleased with Mr. Cashman's performance, rating him meets and sometimes exceeds expectations.

29. In July 2001, Mr. Stephen Lilienthal became the new President and Chief Executive Officer of CNA Property and Casualty Operations.  In August 2002, Lilienthal became the CEO of the CNA Financial Corporation (CNAF) and Chairman and CEO of CNA insurance companies.

30. Mr. Lilienthal spoke at a quarterly leadership meeting in August 2002.  Lilienthal issued a "challenge" to CNA leaders at a Quarterly Leadership Meeting (QLM) in Chicago attended by managers from across the U.S.  Following this meeting intranet messages went out all over the US including Reading PA, the facility where Plaintiff worked, stressing Lilienthal's directive, **"We need to get *kids* in here."**

31. On February 24, 2003, Mr. Cashman had a surgical procedure at University of Pennsylvania Hospital that required him to use short-term disability.  His managers were aware of this procedure. Subsequently in 2003, James Bonk, Director of SIU, suggested to Mr. Carroll that he place Mr. Cashman on a performance improvement plan (PIP).  Mr. Carroll reviewed the reasons given and believed that the PIP was not justified. Carroll did not place Mr. Cashman on a PIP.

32. In around April 2004, Mr. Carroll as well as other members of defendant's management and staff, learned that Mr. Cashman had been diagnosed with cancer.

33. Mr. Cashman required some time off for his disability and treatment.  He returned to work and was able to work without accommodation, and met the expectations of his employer.

34. Defendants' managers did not look favorably upon employees who had to take time off due to an illness or disability.

35. Mr. Carroll did not plan to place Mr. Cashman on a PIP based on performance. Nor did Mr. Carroll ever warn or discipline Mr. Cashman.

36. On   February 18, 2004, defendant terminated Mr. Carroll, then over 40 years old, after placing him on a performance improvement plan in the latter part of 2003. Mr. Cashman then reported to Gary Traina, SIU Manger. Mr. Traina never warned or disciplined Mr. Cashman at any time. Mr. Cashman then reported to Joseph Cunningham, SIU Manager. Mr. Cunningham never disciplined or warned Mr. Cashman at any time.

37. On March 15, 2005, Defendant rated Mr. Cashman's performance as "3" or meets expectations.  Manager Gary Traina completed the review. Mr. Traina stated in the overall summary:  "John is good at sharing ideas and suggestions with management as well as his peers and makes a valuable contribution to team objectives.  He does not mind spending time with new hires and co-workers to ensure that they develop team momentum, enthusiasm and pride in their own work ensuring that SIU and out business partners work as a team.  John is able to work with little or no direct supervision.  He has been with SIU since 10/1992 and remains a vital part of the organization."  The performance review states in the area of productivity improvement, "John was out for an extended amount of time during the year due to medical reasons…" Indeed, Mr. Cashman was diagnosed with cancer and had been undergoing chemotherapy and other medical treatment during 2004.   As a result of the satisfactory review, Mr. Cashman received a bonus of $4368.   Mr. Cashman did not believe that his job was in jeopardy after this review and bonus incentive.

38. In around October 2005, Mr. Cashman began to report to Mr. Timothy W. Wolfe, Fraud Case Management Manager located in San Francisco, CA.  Mr. Wolfe reported to James J. Bonk, Director of Special Investigations Unit (SIU).

39. On September 1, 2005, Mr. Cashman advised Mr. Wolfe that he needed to have surgery on September 19, 2005, due to recurrence of cancer.  Wolfe informed James Bonk, Director of SIU, of Mr. Cashman's cancer recurrence.

40. On September 20, 2005, Mr. Cashman sent Mr. Wolfe an e-mail advising him that he had a surgical procedure the day before and that his physician wanted him to start a course of chemotherapy on September 26, 2005.  Mr. Cashman further advised that his treating physician recommended no travel due to the side effect of the chemotherapy.  Mr. Cashman was not able to travel to a meeting in Chicago the following week.  Although he did not attend the meeting, his supervisor asked him to handle assignments that came in during the time of the meeting, which Mr. Cashman completed.  Mr. Cashman continued to advise his supervisor of his treatment including outpatient procedures and the effect of the medication.  Mr.Cashman informed his supervisor that he would soon undergo another one-day outpatient procedure at the hospital.

41. In October 2005, Mr. Cashman experienced side effects from treatment and was not able to make a presentation on October 4, 2005. Mr. Cashman advised Mr. Wolfe that he had to be out on October 4, 2005 due to his disability.

42. After advising his employer of his disability, defendant scrutinized Mr. Cashman's performance more closely than in the past 13 years of employment.

43. In November 2005, Mr. Cashman had to take time off for a hospital stay. Mr. Cashman applied for short-term disability benefits. Mr. Cashman was on short term disability from November 21, 2005 until January 3, 2006.  Mr. Cashman returned to work with no restrictions.

44. Effective October 27, 2005, the defendant instituted a new SIU Referral Process for claim center based referrals and non-claim center based referrals. The new model was

designed to accelerate positive outcomes for claims while optimizing resources and minimizing fraud. The transition to this new model was met with resistance by a large majority of the claims office.  Problems ensued almost immediately between some SIU and claims offices.  These problems required intervention from management and meetings to straighten out problems and non-compliance by claims. Many claims personnel were not aware of the changes and constant coaching was required to assure they knew the process.  Mr. Wolfe and Mr. Bonk were aware of these issues.

45. In March 2006, defendant rated Mr. Cashman's work performance for 2005 as "meets requirements."  It stated, "John adjusted well to changes of past year and implementation of the new model and has been a valued member of the Fraud Case management team."  Mr. Cashman received a bonus on March 13, 2006 in the amount of $4368.

46. On May 25, 2006, Mr. Cashman informed his then supervisor, Mr. Wolfe, that he would have to undergo another course of six chemotherapy treatments beginning June 5, 2006 once per week.  The treatments would take place on Monday afternoon. He also informed Mr. Wolfe that he may need surgery later in 2006.  Mr. Wolfe advised Mr. Cashman not to worry, that he understood and would take this into consideration with respect to his performance. Wolfe further stated, "I am sorry to hear that you need more treatments and I hope the outcome will be positive. Let me know if you need any special accommodations while you are attending these sessions."  Wolfe did not advise Mr. Cashman that his performance was "poor" or that he should consider taking Family Medical Leave. Mr. Cashman did not take time off for the chemotherapy treatment, but needed time off for surgery.

47. On June 2, 2006, Wolfe notified Mr. Cashman that he attained a 95.83% compliance rating on his file reviews for the month of April 2006.  Yet, Mr. Wolfe stated he found three files in which "issues" had been found.

48. On June 5, 2006, Mr. Cashman advised Wolfe that he was getting the first of the six treatments on an outpatient process. Mr. Cashman requested that he not be assigned any late rush assignments since he might be tired from the chemotherapy and requested to work remotely during the treatment.

49. Throughout June 2006, Mr. Cashman continued to receive chemotherapy, which affected him.  Mr. Cashman continued to perform his job. While his closure rate went under 95% in June, it was largely due to his medical condition.

50. Mr. Cashman had to take time off for medical treatment on June 20, 2006 related to his disability.

51. On June 30, 2006, Wolfe alleged that Mr. Cashman did not evaluate a claim correctly, because the claim was not assigned for surveillance.   Mr. Cashman explained the reason he did not initially assign the claim for surveillance, because it was sent as a "rush" assignment and it was not clear as to why the Claims Handler sent it as a "rush" and the required "checklist" did not appear to be completed properly. There was communication with Unit Managers and SIU Managers as to this issue and an explanation was given by Mr.Cashman. This type of issue and problem was not out of the norm for any Fraud case Manager.

52. On August 22, 2006, Mr. Wolfe, then SIU Manager stated that Mr. Cashman was doing a very good job based on Mr. Cashman's closure ratio of 111%, savings year to date of $680,387.

53. Mr. Wolfe complemented Mr. Cashman on numerous occasions for rejecting claims that did not fit the criteria for fraud, which would have wasted company assets on investigation.  Wolfe specifically advised Mr. Cashman that he "appreciated the fact that [Mr. Cashman] was not rubber stamping the investigations and was rejecting claims that did not fit the fraud criteria."   Yet, it was not unusual for a claims adjustor to disagree with the FCM.  In such case, often management ordered the FCM to assign the claim for investigation.  This did not indicate that the FCM was a poor performer in such a situation.

54. On September 18, 2006, Mr. Wolfe announced the hire of Doug Breit as a new Fraud Case Manager.  Mr. Breit was 39 years old and substantially younger than Mr. Cashman, and did not have a disability.  Mr. Breit received training in Minneapolis while Mr. Cashman was not offered any formal training.

55. Mr. Cashman was clearly more qualified compared to the younger Doug Breit. The company refused to retain Mr. Cashman while it retained the younger and less qualified Breit.  Breit assumed Mr. Cashman's work after Mr. Cashman was forced to retire.

56. On September 19, 2006, suddenly and without warning, Mr. Wolfe placed Mr. Cashman on a Performance Improvement Plan (PIP) for false reasons relating to file documentation.  Mr. Wolfe, who was located in San Francisco, read the PIP to Mr. Cashman on the phone.  Mr. Wolfe did not advise Mr. Cashman that Human Relations Official Betsy Mansfield was also on the line.

57. Other substantially younger employees (Fraud Case Managers) were below 95% as shown in the Monthly Metric reports, but they did not receive a PIP.

58. The next day, September 20, 2006, Mr. Cashman announced his intention to retire based on his medical condition and the stress caused by management's decision to place him on

a PIP. Mr. Cashman spoke to HR Leslie Curran stating that he had medical issues. Her only advice was that he could go on Short Term Disability. She did not mention the Family Medical Leave Act (FMLA) leave. At that time Mr. Cashman did not sign any retirement papers.

59. On September 21, 2006, Mr. Cashman began receiving new file assignments, including a complicated Error and Omissions (E&O) claim. He hesitated to begin the investigation because it appeared this could run well past his expected retirement date. Mr. Cashman emailed Mr. Wolfe to express this concern. Mr. Wolfe instructed Mr. Cashman via return email, "John, please handle all cases as normal until further notice."

60. Also on September 21, 2006, Mr. Cashman again e-mailed Mr. Wolfe that he was receiving more assignments, while attempting to clean up his pending files. Mr. Cashman advised Mr. Wolfe that he would handle the files as usual but awaited further direction. Mr. Wolfe responded by email, stating "John, please continue handling until further notice. If your last working day will be Nov. 3 we have time to bring Doug [Breit] up to speed before we cut you off."

61. Further, on September 21, 2006, Mr. Cashman requested paid time off (PTO) for September 26, 2006 to undergo a surgical procedure and biopsies related to his disability at Methodist Hospital in Philadelphia, PA.

62. On September 22, 2006, Mr. Cashman became ill from chemotherapy, and requested PTO (paid time off). Mr. Wolfe left him a voice mail indicating that he believed Mr. Cashman did not want to handle certain cases. Mr. Cashman responded advising Mr. Wolfe his concern was that dropping complex cases on a new investigator in mid-stream could cause difficulties and negatively impact the outcome and the SIU. Mr. Wolfe responded by email at 6:39pm stating, "That is okay, John. We have a good six weeks until you retire, so there should

be plenty of time to handle the majority of your assignments. When we get nearer to Nov. 3, I will take you out of the queue and allow you time to transfer anything that is still pending."

63. Mr. Cashman understood Mr. Wolfe's response as management being satisfied with his performance, and business as usual.  There was no more mention of the PIP.

64. On September 25, 2006, Mr. Wolfe emailed Ms. Leslie Curran, then Human Resources, about the retirement process.  Ms. Curran advised him to call the corporate office at a toll free number for the paperwork.

65. On September 26, 2006, Mr. Cashman had a surgical procedure. As he recovered, he began to reevaluate the decision to retire as he was in need of medical benefits and work.  Mr. Cashman called the corporate office toll free number and spoke to several persons.  All of them assured him he could rescind the decision to retire at any time before signing the final papers. Mr. Cashman continued to work as usual.  There was no mention of the PIP.

66. On October 23, 2006, Mr.Cashman stopped all retirement procedures in Benefits Resources per instructions from the corporate office for rescinding the decision to retire. Mr. Cashman then emailed Mr. Wolfe and Ms. Mansfield, Corporate HR for the Central Region, advising he would not retire and would continue working.  Mr. Cashman stated he believed the PIP was discriminatory and related to his age and medical condition, and that he could continue to perform his duties as required without accommodation.  Mr. Cashman is aware of other employees who rescinded their retirement decision.

67. Mr. Wolfe responded that he needed to speak to Ms. Mansfield before responding to Mr. Cashman.

68. On October 27, 2006, a conference call took place attended by Mr. Cashman,  Mr. Wolfe in San Francisco and Betsy Mansfield, Human Resources from Chicago.  Mr. Cashman

asked why he could not continue to work in his job. Mr. Wolfe stated that his job was already filled. Mr. Cashman stated there was a job open as Manager of Investigative Team, which was previously held by Stephen Weiner, who had recently resigned. Mr. Cashman expressed interest in filling the position. Mr. Wolfe stated, "that position is not open for you either."

69. On October 30, 2006, Ms. Mansfield called Mr. Cashman and emailed him stating defendant "had honored your original decision to leave CNA" and "…your last day with CNA will be November 3."

70. Mr. Cashman responded by email stating he was being retaliated against and forced to retire involuntarily, and "I respectfully intend to remain on duty as an employee until I am instructed that I am no longer employed by CNA. If there is no position available to me, please clearly state this in your reply."

71. On November 1, 2006, Mr. Wolfe sent Mr. Cashman an email listing his 43 open files and instructing him to report the status of each one by noon the next day so he could reassign them.

72. On November 2, 2006, Mr. Cashman received a phone message from Mr. Wolfe instructing him to turn in his equipment, but without stating where, when or how, and without stating that Mr. Cashman was terminated. Also on November 2, 2006, Mr. Cashman emailed Ms. Mansfield again asking about his status stating, "I have chosen not to retire from CNA at present. If I am being terminated for any reason, please advise me of this fact…" Ms. Mansfield responded via email at 5:07 p.m. stating, "CNA has honored your original decision to leave CNA. Your last day will continue to be November 3."

73. On November 3, 2006, Defendant required Mr. Cashman to turn in the company laptop and ID card. This was done after Mr. Cashman was put in touch with Deborah Nutley, a

14

Senior Vice President, Human Resources at CNA, Chicago. Ms. Nutley ordered Mr. Cashman to turn in his equipment to Curran. Leslie Curran of Human Resources signed a receipt stating Mr. Cashman's separation was **not voluntary**.

74. Mr. Cashman believes that the unwarranted PIP of September 19, 2006 was a pretext, intended to induce him to retire early because of his age, 59 and because of his disability, cancer.

75. Mr. Cashman believes, based on Mr. Wolfe's email of September 21, 2006 that his work was reassigned to the substantially younger Doug Breit, then age 39, who assumed Mr. Cashman's responsibilities and work. Mr. Breit is still employed by the defendant.

76. In November 2006, after the forced retirement of Mr. Cashman, the following Fraud Case Managers were assigned to SIU: Susan Benson and Wally McClarren and Doug Breit in the East Zone; and Charles Skees, Robert Lee and Ken Picard in the West Zone. The Fraud Case Management Manager was Tim Wolfe, located in San Francisco. The SIU Director was not determined since Jim Bonk left CNA in November 2006 and a new Director was not yet assigned. Tim Wolfe was subsequently promoted to SIU Director some time later after serving as temporary Director.

77. Upon information and belief, defendant uses the performance improvement plan (PIP) process as a pretext to get rid of older exempt employees over age 40. Defendant's practice of placing employees on PIP is disproportionately applied to employees over the age of forty (40) as compared to under the age of 40. This practice saves the defendant from paying severance per its policies and procedures. This practice has a disparate impact on older employees over the age of 40.

78. By forcing Mr. Cashman to retire, defendant also saved the cost of higher retirement benefits, had he worked to the age of 65.  Mr. Cashman was pension eligible due to the combination of his age, 59 and service of 13 years, which met the Rule of 65 (age and service equals 65).

79. Upon information and belief, defendant employs few exempt employees as FCMs to the age of 65.

80. The reasons offered by the Defendant for Mr. Cashman's termination are false and a pretext to force Mr. Cashman to retire because of his age of 59 years and because of his disability, real or perceived, cancer.  Mr. Cashman has suffered damage to his reputation, lack of sleep, humiliation, embarrassment, mental distress and a loss of self-esteem because of this unlawful conduct.

81. Mr. Cashman believes and therefore avers that his age, 59 years and his disability were determinative or motivating factor in Defendants' decision to terminate him.

82. Mr. Cashman has, since the date of his unlawful removal from his position and termination, continuously attempted to reasonably mitigate his damages by seeking comparable employment.  In July 2007, he obtained employment as a Special Agent with the PA Office of Attorney General, Bureau of Criminal Investigation, assigned to Philadelphia Gun Violence Task Force, where he is presently employed, receiving lower wages.

**WILLFULNESS**

83. The actions of Defendant as described herein were done intentionally, recklessly and in knowing disregard for the rights of Mr. Cashman under the ADEA.  For several years, Mr. Cashman was a good performer and was placed on a performance improvement plan due to his

age, in an effort to force him to retire or leave the defendant's employ. Younger employees are treated more favorably than those in the protected age group.

## COUNT I :AGE DISCRIMINATION – ADEA

84. The allegation contained in paragraphs 1 through 83 are incorporated herein.

85. The Defendants, individually and in concert with each other, by and through their agents, workmen, servants, employees, officers and directors wrongfully violated the ADEA, resulting in the loss of the back pay, front pay, benefits and employment opportunity to Mr. Cashman' great detriment and loss.

## COUNT II :RETALIATION: ADEA

86. The allegations contained in paragraphs 1 through 85 are incorporated herein.

87. Mr. Cashman complained of unlawful discrimination to the defendant's Human Resources official, Ms. Mansfield as well as his supervisor. Defendant was aware of Mr. Cashman's age, 59. Defendant did not investigate the age complaint and instead retaliated against him by forcing him to retire because he engaged in protected activity or because he opposed unlawful employment practices.

## COUNT III: RETALIATION: FMLA

88. Allegations contained in paragraphs 1 through 87 above are incorporated herein by reference as if set forth in full.

89. The Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C § 2601 et. seq., requires all employers with 50 or more employees to provide up to 12 weeks of unpaid leave per year or intermittently to eligible employees to care for themselves without retaliatory discharge.

90. Defendants CNAF and CCC are employers under the Act and Plaintiff is an eligible employee under the FMLA.  Defendants CNAF and CCC are responsible for complying with

FMLA and prohibiting retaliation against employees, Plaintiff in particular, who take paid or unpaid intermittent leave under the Act.

91. Defendants CNAF and CCC violated Plaintiff's rights under FMLA when it placed Mr. Cashman on a Performance Improvement Plan (PIP) in an effort to force him to retire and denied him an available equivalent position, which was open.  Instead, Plaintiff was forced to retire in retaliation for taking intermittent time off without the job protection of FMLA during his chemotherapy, surgery and other treatment related to cancer, and was denied FMLA designation in order to create a false appearance of performance problems to force him to retire.

92. As a direct and proximate result of defendant employer's violation of Plaintiff's right to be free from retaliatory discharge for using intermittent FMLA leave to care for his cancer, Plaintiff has suffered severe emotional distress, significant loss of earnings and earning capacity, loss of insurance benefits for himself, humiliation, ridicule, sleeplessness, physical pain and suffering, anxiety, depression and mental anguish.

93.  The actions of Defendant as described herein were done willfully, intentionally, recklessly and in knowing disregard for the rights of Mr. Cashman under the FMLA.

## COUNT IV: ADA

94. The allegations contained in paragraphs 1 through 93 are repeated and are incorporated.

95. Mr. Cashman was diagnosed with the disability of cancer in 2004.  Mr. Cashman obtained chemotherapy, surgery and other treatment for his disability.

96. Mr. Cashman needed time off for treatments.

97. Mr. Cashman's performance was scrutinized more after he learned of his disability.

18

Defendant's managers were aware of Mr. Cashman's disability since sometime in 2004.

98. Management noted on Mr. Cashman's performance review for the 2004 year that he was out for an extended amount due to medical reasons. The reason for the absence was due to cancer and the necessary treatment.

99. In 2006, management placed Mr. Cashman on a performance improvement plan, during the time, which he was treating for cancer. Due to the pressure of the PIP, Mr. Cashman was forced to retire. Mr. Cashman rescinded his decision, but management would not allow him to remain employed. When Mr. Cashman expressed interest in another job for which he was qualified, management refused to place him in the other available position.

100. An individual with no known disability, Doug Breit, assumed Mr. Cashman's duties.

101. Defendant refused Mr. Cashman the accommodation of another available open position in violation of 42 U.S.C. §12112 et seq.

102. Defendants constructively terminated plaintiff unlawfully due to his disability or perceived disability, cancer, in violation of 42 U.S.C. §12112 et seq.

103. Defendants retaliated against plaintiff by intimidating and coercing him into retirement, in violation of 42 U.S.C. § 12203 (b).

## <u>COUNT V: PHRA: STATE LAW</u>

104. The allegations contained in paragraphs 1 through 103 are incorporated herein.

105. Defendants, CNAF and CCC, by and through their agents, workmen, servants, employees, officers and directors violated the PHRA as alleged in this Complaint based on Mr. Cashman's age, disability and based on reprisal, resulting in the loss of back pay, front pay, benefits and employment opportunity much to Mr. Cashman's great detriment and loss.

19

106.  Defendants, CNAF and CCC, by and through their agents, workmen, servants, employees, officers and directors knew or should have known that their conduct would and did cause Mr. Cashman harm to his reputation, humiliation, embarrassment, emotional distress, loss of self esteem, harm, pain and suffering, resulting in the damages described herein.

## DAMAGES – ALL COUNTS

107.  Mr. Cashman has been damaged by the foregoing actions by the Defendants, jointly and severally, in an amount which cannot presently be determined, but which exceeds One Hundred Fifty Thousand Dollars ($150,000.00).

108.  Mr. Cashman claims damages, which include lost compensation, compensatory damages, loss of earning capacity, fringe benefits, pension benefits, loss of 401(k), together with loss of back and front pay, liquidated damagers, negative tax consequences, and all other legal and equitable relief available by statute.

WHEREFORE, Mr. Cashman prays that this Court enter judgment for him and against Defendants, jointly and severally, as follows:

a.  Loss of compensation, loss of earning capacity, benefits, pension, negative tax consequences, loss of promotional opportunities from the date of his termination, back and front pay and benefits; in excess of $150,000.00, liquidated damages as allowed by law, compensatory damages; damages for pain and suffering as allowed by the PHRA.

b. Other legal and equitable relief including reinstatement, if appropriate;

c.  Mr. Cashman' reasonable attorney fees together with costs and interest;

d.  Such other relief as justice demands.

**JURY TRIAL DEMANDED**

      Plaintiff requests a jury trial on all questions of fact raised by this Complaint.


Date:  <u>October 22, 2008</u>               _____

                                     Carmen L. Rivera Matos, Esquire,
                                     PA I.D. No. 32795
                                     CR1355
                                     Anita Alberts, Esq. PA ID 28086
                                     AFA2128
                                     40 East Court Street, 3d Floor
                                     Doylestown, PA 18901
                                     215-345-8550
                                     215-345-8551 fax
                                     www.carmenmatoslaw.com
                                     crm617@aol.com
                                     afalawyer@comcast.net
                                     Attorneys for Plaintiff
                                     Mr. John Cashman