**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN CASHMAN** | : | |
| Plaintiff | : | |
| v. | : | **Civil Action No. 08-5102** |
| | : | |
| **CNA FINANCIAL CORP,** | : | |
| and | : | |
| **CONTINENTAL CASUALTY COMPANY,** | : | |
| Defendants | : | **JURY TRIAL DEMAND** |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION TO CHANGE DEPOSITION TESTIMONY
OF TIMOTHY WOLFE AND IN SUPPORT OF  PLAINTIFF'S MOTION TO STRIKE
DEFENDANTS' PROPOSED WOLFE'S ERRATA**

**I.**        **INTRODUCTION**

Plaintiff John Cashman ("Mr. Cashman")  hereby opposes Defendants' "Motion for

Permission to Review Deposition Transcript and File Errata Sheet and hereby moves this Court

for an order to strike the Wolfe errata sheet for the reasons contained in attached Memorandum

of Law, which is incorporated herein by reference.  Defendants' Motion and proposed "Errata

Sheet" must be stricken and disregarded to preserve the integrity of Rule 30 and the deposition

process.  Said proposed "errata" is hearsay, not corrections, but mere lawyerly fixing of

potentially problematic testimony for Defendants. They do not meet the requirements of Rule

30(e), have no legal basis, and provide no legitimate reason for changing Mr. Wolfe's testimony,

which needs no clarification.  Three counsel representing Mr. Wolfe did not request that the

witness read and sign at or before the end of the deposition.  Mr. Wolfe testified for several

hours on May 20, 2009 after attending Mr. Cashman's deposition May 19, 2009 as the

designated corporate representative of defendant Continental Casualty Co. The stenographic

record is accurate and must stand in its present form.  It would be a miscarriage of justice to

allow defendants to change Wolfe's testimony.

II.        **FACTS**

Mr. Cashman filed this suit alleging that defendants forced him to retire based on his age (59) and disability (cancer), retaliation, and interference with FMLA rights.  Mr. Cashman was hired in 1992 as a Claims Investigator of fraud cases. Prior to CNA, Mr. Cashman worked in the Philadelphia Police Department as a police officer and detective for about 24 years.   Mr. Cashman was a diligent employee, earned favorable reviews, increases and bonus throughout his employment.  He was promoted to Team Leader in 1997 and received above expectations ratings from 1993 through 2002.  In 2002, Stephen Lilienthal became the new CEO and Chairman.  Mr. Lilienthal spoke at a 2002 quarterly leadership meeting to challenge the company managers with the directive, "We need to get kids in here."

In 2004 Mr. Cashman was diagnosed with bladder cancer and required time off for surgery and treatment.  In September 2005 Mr. Timothy Wolfe became Mr. Cashman's supervisor in the Special Investigations Unit (SIU). Wolfe worked in San Francisco while Mr. Cashman worked in Reading PA.  Also in September 2005, Mr. Cashman suffered a first recurrence of cancer and required more surgery and chemotherapy. Mr. Cashman most of December 2005 off and returned to work in January 2006.  After September 2005 Mr.Cashman's work was more closely scrutinized than ever before.  Yet, in March 2006 Mr. Cashman received a  performance rating of "3" or "meets requirements"  and received a bonus incentive of $4300.  **Exhibit 14**, p. 76. Discovery revealed that Mr. Cashman had received a higher rating of "2" from his prior supervisor and that Mr. Wolfe changed that rating to a "3." **Exhibit 1 P. 10-11**.  In May 2006, Mr. Cashman advised his supervisor that he needed another course of chemotherapy throughout the month of June due to a second recurrence of the cancer. Also in May 2006 defendants requested more staff for the (SIU).  Mr. Cashman received

monthly reviews from Wolfe, which required a standard of compliance of 95%.  When Wolfe

was deposed he testified that he deleted his records, which showed how he rated Mr. Cashman's

spreadsheets showing how he measured the compliance standard and he also deleted those of

other investigators reporting to him. **Ex 1 p**. 27, 32, 54, 60.  Mr. Cashman contends that his

performance was acceptable. **Ex 1** p. 11.  In August or September 2006, a 39 year old employee

who had been laid off the year before, Douglas Breit, was interviewed for an SIU investigator

position, the same job Mr. Cashman held at the time.  On September 18, 2006, Wolfe

announced that Breit, then 39, was hired.  Breit received training for his position while Mr.

Cashman did not.  The training involved new systems used by the SIU since the new model was

instituted in September 2005.  In September 2006 Mr. Cashman needed more cancer treatment

including surgery.  On September 19, 2006, suddenly and without warning, Wolfe placed Mr.

Cashman on a PIP or performance improvement plan for false reasons related to file

documentation.  The PIP was given to Mr. Cashman on the phone; Wolfe read it to him, and HR

official Betsy Mansfield was on the phone in Chicago while Leslie Curran, local HR attended

the phone conference in Reading.  The 95% compliance issue was not mentioned in the PIP, and

Mr. Cashman's cycle time was better than at least one younger employee.  When Breit assumed

the position, he stated he received only one monthly review when he first started and did not

receive monthly reviews as Mr. Cashman did.  On September 20, 2006 due to the pressure of

the PIP and his illness, Mr. Cashman believed his only viable option was to retire.  Yet

immediately after announcing his retirement, Mr. Wolfe stopped all criticism of Mr. Cashman's

work and told him to handle all cases as normal until further notice because he trusted him to

handle the files appropriately.  **Exhibit 1** p.180-1.  After undergoing treatment, in October 2006,

Mr. Cashman rescinded his retirement and complained of age and health discrimination.

Defendants refused to acknowledge his rescission and forced plaintiff to retire on November 3, 2006.  When Mr. Cashman asked about any other position, Wolfe told him there were no jobs for him. Also in discovery, Shelley Liapes testified that Mr. Cashman told her that Mr. Wolfe stated to him that it gets tough as you get older.  **Exhibit 15** P. 27.

On May 20, 2009, plaintiff deposed Mr. Timothy Wolfe, one of the decision-makers regarding defendants' discriminatory actions against plaintiff, Mr. Cashman.  **Exhibit 1**.  The deposition took place in Reading PA where defendants' offices are located.  Richard Antonelli Esquire, Rebecca Dick-Hurwitz, Esquire outside counsel; and Richard Kaminsky, in house counsel for the defendants, defended Mr. Wolfe.  The deposition started at 9:00 am and ended at 4:00 pm.  At the beginning of the deposition the court reporter asked if the parties agreed to the usual stipulations, which they did:

> It is hereby stipulated by and between counsel that the reading, signing, sealing, certification and filing are waived; and that all objections, except as to the form of the question, are reserved until the time of trial.

Wolfe Dep p 6 (**Ex 1**).  At the end of the deposition, the witness was excused and **none of Mr. Wolfe's three attorneys requested that he read and sign the transcript**.

> Ms. Alberts:  I thank  you very much.
> (Witness excused.)
> Whereupon the deposition concluded at 4:00 pm.  (**Ex 1** Wolfe Dep p. 249)

It was not until June 19, 2009, after receipt of the transcript that Mr. Wolfe's counsel, Ms. Rebecca Dick Hurwitz, inquired about the reading and signing of the deposition. **Exhibit 2**. However, defendants state that they received the Wolfe transcript on June 11, 2009 and did not immediately contact the court reporter.  (**Exhibit B** to defendant's motion). Moreover, the defense counsel had 8 days to confer with the witness about the changes desired for the deposition.

4

On June 22, 2009, Ms. Donna L. Abboud, Director of Litigation Support for Veritext, advised Mr. Antonelli that she reviewed the transcript and discovered that the reporter had listed in her stipulations on page 6 that the read and sign was waived.  Ms. Abboud contacted the Court Reporter assigned to this deposition (Ms. Fanini) and learned that Ms. Fanini's notes reflect that she asked if the usual stipulations would apply and all counsel said yes, and that there was no request to read and sign on behalf of the witness. **Exhibit 2**.

Also on June 22, 2009 the court reporting service, Veritext National Court Reporters, notified plaintiff's counsel that defendant wanted to read and sign the deposition. Plaintiff's counsel immediately objected to the witness reading and signing because it had been waived and no request was made to read and sign **during the deposition** by Mr. Wolfe's three attorneys on the record.  **Exhibit 3, Exhibit 9 at 17**.  On June 23, 2009, Mr. Antonelli wrote to Veritext to advise that "I did not waive signature. In fact, as a matter of practice, I never waive signature. Moreover, I specifically recall telling you that we would read and sign the deposition transcript."  **Exhibit 4**.  Veritext then wrote back to Mr. Antonelli that the court reporter's notes indicate that she asked if Mr. Antonelli wanted usual stipulations and all said yes, that there was no indication that read and sign was requested.  **Exhibit 5**.

Mr. John Cashman, plaintiff, attended the deposition.  Mr. Cashman affirms that he was deposed only the day before Wolfe, on May 19, 2009.  Mr. Cashman affirms that his counsel stated on the record, "Would you put on the record, we do want the witness to read and sign the deposition."  Cashman Affidavit, Par 5  **Exhibit 6** and **Exhibit 7** (Cashman Dep p 6).  He also affirms that Mr. Antonelli, Ms. Dick-Hurwitz and Mr. Kaminsky attended the deposition and none of them asked the court reporter to allow the witness to read and sign the deposition.  Mr. Cashman recalls that his counsel was surprised that defendant did not ask to read and sign the

5

deposition. He is a trained investigator having worked with the Philadelphia Police Department for 24 years, CNA for 14 years and now presently employed by the Attorney General's Task Force Against Gun Violence in Philadelphia.  He believes that the defendants are unhappy with Wolfe's testimony and want to change it.  **Exhibit 6**.

Ms. Anita Alberts, an experienced attorney with 31 years experience, was also present at the Wolfe deposition.  She affirms at no time on May 20, before, during or after Wolfe's deposition did defendants' three attorneys ask for review of the deposition.   She mentioned to Ms. Matos that Mr. Antonelli agreed to the usual stipulations and that he is an experienced defense litigation attorney, and is well aware of what that means.  She did not expect him to contend that he lacked basic knowledge of civil practice and is shocked that he is now doing so, finding this not credible. **Exhibit 8**.

On June 17 and 18, 2009 five depositions in this case took place in Chicago IL. During the deposition of Elizabeth Mansfield, an HR manager at CNA, plaintiff's counsel marked spreadsheets believed to have been prepared by Mr. Wolfe in 2006, as an exhibit. The spreadsheets contained metrics information on Mr. Cashman's performance during 2006 as well as the performance of his coworkers in Mr. Wolfe's unit, all of who still work at CNA.  The metrics conflicted with some of Mr. Wolfe's testimony on May 20. **Exhibit 8** at Para 7.

Wolfe testified HR approval was needed before he could place Mr. Cashman on a PIP for "poor performance."  **Ex. 1** p. 130.  Mansfield stated she relied on information provided to her by Mr. Wolfe when she approved Mr. Cashman's PIP for unsatisfactory work.  The PIP gave Mr. Cashman 30 days to improve and warned of termination.  Mansfield testified

she could not answer whether she would have approved the PIP if she had seen the spreadsheets before doing so in 2006.  **Exhibit 17** p 137-9.

Wolfe placed Mr. Cashman on a PIP in September 2006 without prior warning, at a time when Wolfe knew Mr. Cashman, then 59, was awaiting cancer surgery.  Suddenly confronted with the PIP on Sept. 19, 2006, Mr. Cashman wrote an email to Mr. Wolfe on Sept. 20, 2006 stating he would retire. After his surgery and recovery, Mr. Cashman rescinded his retirement decision but CNA refused to allow this and he was forced to retire on November 3, 2006. **Exhibit 8** Para. 9; **Ex 1** Wolfe Dep 186-188.

At Mansfield's deposition, Mr. Antonelli twice demanded that Ms. Matos tell him why she did not ask Wolfe those questions.  **Ex. 16** p. 142.  Ms. Alberts was sitting across the table and reminded him that she took Wolfe's deposition and if he had questions he could ask her, but that she wasn't going to tell him why. **Exhibit 8** at Para. 10.

When Wolfe placed Mr. Cashman on a PIP, Wolfe was in his office in San Francisco CA and Cashman was at work in Reading PA.  The PIP was read to Mr. Cashman over the telephone by Wolfe, at CNA's Reading PA office in the presence of  HR representative Leslie Curran.  Mansfield was also on the  line but she did not announce herself at the start of the phone conference. **Exhibit 8** Para 11. **Exhibit 1** p**.** 225.  Mr. Wolfe testified that he believed Mr. Cashman may bring up his illness (cancer) as an excuse after getting the PIP "because he had taken some time off and gone through procedures, and that was my feeling at that time." **Exhibit 1** p. 230.  After the PIP, Wolfe continued to assign work to Mr. Cashman because he trusted him "I trusted him to handle the files appropriately in the time that he had left at CNA." **Exhibit 1** p. 180.

Wolfe spoke clearly on the telephone and was well understood by Mr. Cashman. (**Exhibit 6** at par 3).  Wolfe speaks English perfectly, having been born in England.  He has been in the U. S. about 20 years and does not have a marked accent.  During his deposition Mr. Wolfe spoke clearly and no one had any trouble understanding him.  There are a few typos in the deposition transcript but nothing material. **Exhibit 8** Para.12; **Exhibit 7**, Para.14.

Wolfe was promoted by CNA after he put Mr. Cashman on the PIP and obtained his retirement decision. Exhibit 1 p. 35, **Exhibit 8**, Para 13. In fact, "voluntary turnover" of his subordinates is one of the job duties for which Mr. Wolfe received an excellent performance review. **Exhibit 8** at Para 13; **Exhibit 1** p. 160-161, 183-186.

Ms. Alberts reviewed the proposed errata sheet for Mr. Wolfe's deposition and believes most of the items claimed to have been "misheard" or "misrecorded" by the stenographer are connected to disputed factual issues in this case, e.g. Plaintiff's satisfactory job performance  and his replacement by Douglas Breit, then 39, in September 2006.  This issue may be problematic for defendants' in their planned summary judgment motion. **Exhibit 8** at Para. 14.

Wolfe's deposition transcript should not be altered because it is an accurate transcription of what he said, under oath, as a corporate representative for defendants in this case.  Defense counsel is attempting to recast his testimony in seeking to "read and sign" and change words to better suit their defense of the case.  **Exhibit 8** at Para 15.

Ms. Matos, an attorney with 29 years of experience, affirms that none of the three defense counsel requested that the witness read and sign his deposition at any time. **Exhibit 9** Para 1-5, 10-12. She understands that the usual stipulations mean that deposition will not be read or signed by the deponent. **Exhibit 9** Para 6.   She defended Mr. Cashman's deposition

and explicitly requested the witness to review and sign.  **Exhibit 9**.  She expressed her

surprise to Ms. Alberts and her client regarding defendants' failure to ask for reading and

signing. **Exhibit 11** para 13. Defense counsel did not even contact her on the day they

received the Wolfe transcript to make a belated request for reading and signing.  **Exhibit 9** at

Para 15.  Ms. Matos reviewed other depositions attended by Mr. Antonelli and affirms that

no request to read and sign was made at the beginning or the end of the deposition including

two witnesses in this matter, Shelley Liapes VP of Employee Relations and Doug Breit, 39,

who replaced Mr. Cashman.  **Exhibit 9** Para 18, **Exhibits 10-14**.

In another matter where Mr. Antonelli defended CNA, he also did not ask Greg

Billstone, a key witness who terminated the plaintiff, to read and sign. **Exhibit 11.**  In

another matter, Mr. Antonelli also did not ask Robert Keith, CNA's Vice President, to read

and sign.  **Exhibit 12**.  In another case, Mr. Antonelli did not ask John Holladay, a party to

the case, to read and sign his deposition.  **Exhibit 13**  And, Mr. Antonelli did not ask Shelly

Liapes, VP of Employee Relations at CNA to read and sign her deposition in another case.

**Exhibit 14.**

## III.   <u>LEGAL ARGUMENT</u>

### A.  <u>No Review Was Requested At The Deposition</u>

Rule 30(e) of the Federal Rules of Civil Procedure provides:

(1)  Review: Statement of Changes.  On request by the deponent or a party before the
deposition is completed, the deponent must be allowed 30 days after being notified by the
officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.  The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day review period.

Defendant offers no legal support for any of its arguments. While Mr. Antonelli and Mr. Kaminsky swear to this court that a review was requested, that is not so.  Three experienced attorneys attended the Wolfe deposition and none of them requested a review of the transcript. **Exhibit 1, 2, 6-10**. The correspondence submitted to the court shows that the defendant received the transcript on June 11, 2009.  **Exhibit B** to defendant's motion.  At that time, defendants did not request the errata sheet.  It was not until June 19, 2009 that the defense contacted the court reporter to ask for the errata sheet. **Exhibit 2**.  Wolfe did not make the request either.  The Court Reporters involved, Veritext, responded to the defense that the usual stipulations were agreed to. **Exhibit 2**.  Veritext also contacted the reporter to make sure that the notes reflected the usual stipulations, which is correct.  **Exhibit 2**.  The court reporter, Fanini, confirmed there was no request to read and sign on behalf of the witness. **Exhibit 2**.  Undersigned counsel, Matos and Alberts, as well as plaintiff, Mr. Cashman, attended the deposition in Reading PA on May 20. They attest that no request to read and sign was made.  **Exhibits 6,7,8,9**.

## 2. Usual Stipulations Means Waiver of Read and Sign

Defense counsel clearly admits that they agreed to the usual stipulations. (Defendants' Brief p. 2). But, the defense argues that they "did not intend for the usual stipulations to include waiver of the right to read, sign, seal certify and file the transcript." Id.  Thus, Defendants argue that their understanding of the "usual stipulations" does not mean what it means. Defendant further argues that it would not make sense for any party to waive read and sign of a deposition before the deposition has taken place. Ms. Matos and Ms. Alberts attest to the contrary and have

50 years of combined experience. **Exhibits 8 and 9.**  The understand what "usual stipulations" really means.

While Mr. Antonelli conjures the argument that he never asks for read and sign until the end because this is his "usual practice" and he never waives read and sign, a review of  his work shows otherwise. Compare **Exhibit 4** to **Exhibits 10, 11, 12, 13, 14**.  Mr. Antonelli waived the reading and signing of Breit's deposition (Mr. Cashman's replacement) in this case. **Exhibits 10** He waived the read and sign for VP Liapes in another age discrimination case. **Exhibit 14**.  He waived reading and signing of VP Keith's deposition in another age discrimination case where he represented the same defendant. **Exhibit 12**. He also waived reading and signing of two key witnesses (Holladay, Billstone) where he represented CNA in another age discrimination case. **Exhibits 9**, para 18; **Exhibits 11,13.**  Thus, Mr. Antonelli's normal practice shows the opposite to be true.

Defendants provide no case law authority for this court to change Mr. Wolfe's deposition, other than whining because they simply did not ask for reading and signing.

3. __The Changes Requested Are Material and Should Not Be Allowed__

Under Agrizap, Inc. v. Woodstream Corporation, 232 F.R.D. 491 (E.D. Pa. 2006) the court held that a deponent or party must request review of the deposition **before its completion**.  See Rule 30 (e) F.R.C. P.  See also, Rios v. Bigler 67 F.3d 1543, 1551 (10th Cir. 1995).  In Agrizap, a deponent attempted to change his testimony by either contradictory or inconsistent statements as compared to his original testimony.  The deponent changed the testimony because it was a better representation of his recollection.  Id. at 492.  The court held that the change proposed ("I think" to "I don't think") was a material change to reflect that no offer was made.  The court agreed with defendant that such a change violates the procedural aspects of Rule 30 (e) F.R.C.

P., holding that for the deponent to make a substantive change to his deposition, a party or the deponent <u>must request a review of his deposition before its completion</u> noted by the officer conducting the deposition on a certificate accompanying the transcript.  Then if the party requests the review, the deponent may submit changes to his deposition within thirty days after notice that the transcript is available.  Here, as in <u>Agrizap</u>, the defense is trying to make a material change to the transcript, which bears on the credibility of the witness as to the reasons for placing Mr. Cashman on a PIP. Ms. Alberts, an experienced attorney, notes that during the deposition of another witness, Ms. Mansfield, counsel for plaintiff showed Mansfield certain documents which conflict with Mr. Wolfe's testimony as to the metrics of the plaintiff's performance during 2006 when Wolfe supervised him and placed him on a PIP. **Exhibit 8**.  Ms. Mansfield gave HR's approval for the PIP and she relied on the information Wolfe provided to her.  (**Ex. 16** at 100.)  Mansfield was asked whether it would have made a difference if the information given to her by Wolfe was incorrect, and she answered that she did not know that anything was incorrect in what she was given.  When asked if other employees had longer cycle time than Mr. Cashman, a criteria used to measure his performance, her answer was "I can't answer that based on the limited facts that I have available." **Ex. 16** p. 138-9 **Exhibit 15**.

The change proposed by the defendants here is certainly a substantive one. A central issue in the case is Wolfe's motivation in giving a PIP to Mr. Cashman.  To change his testimony from, "No I was" to "No, I wasn't" in response to the question of whether the goal of the PIP was to get Mr. Cashman to retire is a substantive change as admitted by the defense.  Plaintiff does allege that the defendant uses the PIP as a pretext to get rid of older employees.  (Complaint Para 77). Wolfe's answer could be deemed an admission under Rule 801(d)(2)(D).  Because the defense counsel did not like Wolfe's answer they want this court to change it.  It is too late for

that. <u>Agrizap, Inc. v. Woodstream Corporation</u>, 232 F.R.D. 491; <u>Rios v. Bigler</u> 67 F.3d 1543,

1551. Actually, there is more harm to plaintiff in that plaintiff brought this case and claims to be

a victim of discrimination.  He is the one who will be more likely to suffer if his case is

dismissed.

   In <u>Hall v. Clifton Precision</u>, 150 FRD 525 (E.D. Pa. 1993), the late Judge Gawthrop

explained the purpose of the deposition process:

> One of the purposes of the discovery rules in general, and the deposition rules in particular, is to elicit the facts of a case before trial. Another purpose is to even the playing field somewhat by allowing all parties access to the same information, thereby tending to prevent trial by surprise. **Depositions serve another purpose as well: the memorialization, the freezing, of a witness's testimony at an early stage of the proceedings, before that witness's recollection of the events at issue either has faded or has been altered by intervening events, other discovery, or the helpful suggestions of lawyers.**
>
> The underlying purpose of a deposition is to find out what a witness saw, heard, or did -- what the witness thinks. A deposition is meant to be a question-and-answer conversation between the deposing lawyer and the witness. There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer and helping the witness to formulate answers. The witness comes to the deposition to testify, not to indulge in a parody of Charlie McCarthy, with lawyers coaching or bending the witness's words to mold a legally convenient record. It is the witness -- not the lawyer -- who is the witness. As an advocate, the lawyer is free to frame those facts in a manner favorable to the client, and also to make favorable and creative arguments of law. **But the lawyer is not entitled to be creative with the facts. Rather, a lawyer must accept the facts as they develop**. <u>Id</u> at 528 (emphasis added).

   Pursuant to <u>Hall</u> and <u>Agrizap</u>, defendants should not be allowed to change the

transcript.  It would usurp the purpose of taking a deposition to freeze and  preserve

testimony. Moreover, the defense has had much time to confer with Wolfe about the changes.

In <u>Greenway v. Int'l Paper Co.</u>, 144 FRD 322, 325 (W.D. La 1992), the court did not allow

changes holding that **a deposition is not a take home examination**.  See also <u>Garcia v.</u>

<u>Pueblo Country Club</u>, 299 F.3d 1233, 1242 (10th Cir. 2002).  In <u>Paul Harris Stores Inc v.</u>

Pricewaterhouse Coopers, LLP, 2006 U.S. Dist. LEXIS 65840, 2006 WL 2644935 at *3 (S.D. Ind. 2006), the court held where it is "apparent to the Court that [a party] seeks to 'undo' testimony… by adding errata, the errata should be stricken as "really no more than 'lawyers' statements, attempting to deflect potentially detrimental testimony."  See also Eckert v. Kemper Fin Servs, Inc., 1998 U.S. Dist LEXIS 15788. 1998 WL 699656 *5 (N.D.Ill. 1998) (precluding wholesale changes to previous sworn testimony that was in fact a damaging party admission).  That is exactly what the defense is trying to do in the instant case, trying to deflect Mr. Wolfe's admission.  The court should not allow such a material abuse of the deposition process.

In Adams v. Allied Security Holdings, 236 FRD 651 (C.D. Cal. 2006), the court granted the employer's motion to exclude changes to the deposition testimony of former employee.  While the changes requested were timely made, the court noted held the proposed changes did not have a legitimate purpose because they substantially altered plaintiff's answer.  Id at p 652.  The same is true here.

In Wyeth v. Lupin Ltd, et al 252 FRD 295 (D.Md. 2008), the court granted plaintiff's motion to strike the errata sheet and prohibited defendant from relying on the errata sheet at trial.  The court found that the proposed corrections did not clarify but materially changed the answers and "they do indeed represent lawyerly fixing of potentially problematic testimony for Lupin."   The court reasoned that "rather than advancing the pursuit of truth in discovery, a policy of liberal 'amendments' and 'corrections' would encourage and intensify lawyer wordsmithing  and parsing." Id at 297.

4.      **<u>Defendants Are Not Prejudiced</u>**

It is Mr. Cashman who is the victim of age, disability, retaliation discrimination and FMLA interference.  As a victim of discrimination, it would be a miscarriage of justice if he Wolfe's errata sheet is allowed, especially after three very experienced attorneys did not ask for read and sign. Wolfe is a high level manager and is responsible for his actions and his words.  His testimony has been frozen, and that is exactly what a deposition is all about. <u>Hall</u>, <u>supra</u>.  However, to allow him to explain it by the errata is certainly prejudicial to plaintiff. <u>Wyeth v. Lupin Ltd</u>, et al 252 FRD 295.  The errata is an out of court statement which constitutes hearsay at this point, and is simply not admissible evidence.  His original testimony has to stand.  While the quality of the audio is not precise, the audio is not the genuine or authentic certified copy.  The transcript is certified. As the defense noted in their brief, they can explain to the jury at trial what Wolfe meant by his testimony.  Actually, they have a lot of explaining to do based on the facts of this case.

**IV.**     <u>**CONCLUSION**</u>

For all the above stated reasons, as well as the law cited herein, plaintiff hereby requests that this Honorable Court deny Defendants' Motion for Permission to Change the Deposition Transcript of Timothy Wolfe and to File an Errata Sheet, and grant Plaintiff's Motion to Strike Wolfe Errata.

/s/

Date:   7/9/09

_____
Carmen L. Rivera Matos, Esquire,
PA I.D. No. 32795
Anita Alberts, Esq. PA ID 28086
40 East Court Street, 3d Floor
Doylestown, PA 18901
215-345-8550
215-345-8551 fax
www.carmenmatoslaw.com
crm617@aol.com
afalawyer@comcast.net
Attorneys for Plaintiff, Mr. John Cashman

16

CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the following legal papers were served upon:


Richard Antonelli, Esquire
Babst, Calland, Clements & Zomnir PC
Two Gateway Center, Eighth Floor
Pittsburgh PA 15222


in the following manner:

Legal Papers:                          Plaintiff's Brief In Opposition To Defendants'
                                        Motion To Change Deposition Testimony
                                       Of Timothy Wolfe And In Support Of  Plaintiff's
                                       MotionTo Strike Defendants' Proposed Wolfe's Errata
                                       Certificate of Service


Manner:                                ECF
                                       Exhibits mailed 7/10/09

Date:   7/ 9 /09                       By:_____/S/_____
                                          Carmen R. Matos, Esquire
                                          Attorney for Plaintiff
                                          Mr. John Cashman