IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN CASHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 8-5102 |
| | ) | |
| v. | ) | |
| | ) | Honorable Judge Arnold C. Rapoport |
| CNA FINANCIAL CORP., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CONTINENTAL CASUALTY COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

Defendants CNA Financial Corporation (herein "CNAF"),[1] and Continental Casualty Company (herein "CCC") (herein collectively "CNA"), hereby respond to the Motion to Compel (herein "Motion") filed by Plaintiff John Cashman (herein "Cashman"). This Court should deny the Motion for the reasons that follow.

I.    BACKGROUND

A.    Facts

In his Brief in Support of his First Motion to Compel (herein "Cashman's Brief"), Cashman has provided many of the so-called facts of this case with little or no support in the record. Additionally, much of the support he does provide is misleading. The facts, as supported by the record, are as follows.

---

[1] CNAF is a holding company, does not have employees and is not a proper defendant in this matter.

Cashman was born on February 7, 1947 and was hired in 1992 as a Claims Investigator in CCC's Special Investigations Unit (herein "SIU"). (Deposition of John Cashman (herein "Cashman Dep."), attached as Ex. A, 8:10-11) As an investigator for the SIU, Cashman personally conducted investigations and interviews for suspected fraudulent claims. *(Id.* 17:19 - 19:5)

In or around September of 2005, the SIU announced the implementation of a new model designed to improve the identification and detection of insurance fraud and optimize CCC's internal and external resources while maximizing claim outcomes related to suspected fraud. For the first time, the SIU was divided into four units: Major Investigations Team (herein "MIT"), which was managed by Marvin Barber; Fraud Case Management Team (herein "FCMT"), managed by Timothy Wolfe (herein "Wolfe"); Fraud Identification and Prevention Team (herein "FIPT"), managed by James Lumley; and SIU Intake, also known as the Triage Unit (herein "Triage"), which was managed by Murdoch Williams. (Plaintiff's Responses to CNA's First Request for Production of Documents (herein "Plaintiff's Responses"), attached as Ex. B, 88)

Cashman was assigned to the FCMT. (Cashman Dep. 8:10 - 17) As an SIU Consultant on the FCMT, Cashman reviewed and oversaw claims that were forwarded by adjusters to assess whether they involved fraud and whether he should send the investigation to one of four preapproved vendors. *(Id.* 14:9 – 15; 17:19-18:6; 18:24-19:5)

The other Investigators on the FCMT at that time were Walter McClarren, date of birth 1948; Susan Benson, date of birth 1950; Robert Lee, date of birth 1952; Kenneth Picard, date of birth 1957; and Dale Jackson, date of birth 1964. (CNA's Response to Cashman's First Set of Interrogatories (herein "CNA's Int. Responses") attached as Ex. C, pp. 8, 9) Jackson voluntarily

resigned from CCC in January, 2006, and Charles Skees, whose date of birth is 1948; joined the FCMT in 2006. (Deposition of Timothy Wolfe (herein "Wolfe Dep.", attached as Ex. D, 76:2 – 12)

Cashman had performance deficiencies from the start of his assignment to the FCMT. To name only a few examples, in September 2005, Wolfe notified Cashman that he improperly failed to take action on a claim. (CNA's Response to Cashman's First Request for Production of Document (herein "CNA's Doc. Responses"), attached as Ex. E, CNAJCDP 201) In late October 2005, Wolfe advised Cashman that he inappropriately rejected a file for investigation and the adjuster had disputed the rejection and escalated it to Wolfe's manager, James Bonk, then Director, SIU (herein "Bonk"). (*Id.* 198) In another instance, Wolfe received an e-mail from a claim representative who had complained that Cashman had rejected a file without consulting with her first. Wolfe discussed the complaint he had received with Cashman, instructed him to assign the case for investigation and, in the future, to confer with the claim representative before rejecting any file. (*Id.* 190-93)

In February, 2006, Wolfe notified Cashman that he attained an 84.38% compliance rating, and, because the acceptable standard is 95%, improvement was necessary. Wolfe also advised Cashman that the documentation in several of his files were missing sufficient detail and incorrect, and that he should be entering and/or attaching the investigative reports every time. (*Id.* 135-36) Wolfe counseled Cashman multiple times about these and other performance deficiencies. (*Id.* 56, 80, 90-92, 95-98,113).

In July and August, Wolfe received complaints about a claim which Cashman failed to evaluate and assign correctly; another case which he mistakenly rejected instead of setting up for investigation; and yet another instance in which Cashman failed to handle an urgent request properly. (*Id.* 41, 42,457, 459-60)

3

As a result of the deficient areas and the significant performance issues that had not been satisfactorily corrected, Wolfe placed Cashman on a Performance Improvement Plan (herein "PIP"), that is, CCC's process whereby an employee is given assistance to reach and maintain a level of performance. An employee may be put on a PIP if his or her work or adherence to Company rules is less than competent. The employee is notified in writing of performance deficiencies and the required actions needed to return to a competent level of performance. Failure to improve according to the terms of the PIP may result in further disciplinary action, up to and including termination. After conferring with Elizabeth Mansfield, Human Resources Director (herein "Mansfield"), and Bonk, Wolfe administered the PIP to Cashman on September 19, 2006. (CNA's Doc. Responses, CNAJCDP 887-88)

The next day, Cashman notified Wolfe of his decision to resign his employment and retire effective November 3, 2006. (Plaintiff's Responses, 111)

Soon afterwards, Wolfe, who had been analyzing the staffing and workload to determine whether Cashman should be replaced, sent Bonk his analysis and concluded that the current staffing was sufficient to handle the case load and that Cashman did not need to be replaced. Bonk agreed with Wolfe's conclusion. (CNA's Doc. Responses, CNAJCDP 524)

On October 23, 2006, almost five weeks after Cashman was placed on a PIP and had given his notice the following day to resign his employment and retire, and eleven days before his scheduled last day of employment, Cashman sent an email to Mansfield and Wolfe announcing his decision not to resign. In this e-mail, he alleged for the first time that he believed his PIP "may have been prejudicial in relation to [his] age and ongoing medical condition." Despite repeated counseling and warnings prior to receiving the PIP, he also claimed that he was

4

given no prior warnings or counseling by [his] Manager prior to the presentation of this plan." (*Id.* CNAJCDP 517-18)

Given Cashman's extremely poor performance prior to the implementation of the PIP; his behavior in submitting his resignation one day after receiving the PIP; the fact that almost five weeks had already passed since his announced resignation; the fact that CCC had already taken steps to reallocate its work flows and to transition his work and assignments to others and determined that the current SIU Consultants could handle the existing workload; CCC decided that it would not accept Cashman's "rescission" of his decision to resign his employment. (*Id.* CNAJCDP 521)

Cashman then asked to replace Steve Weiner (herein "Weiner"), an MIT Investigator who had announced his retirement. As explained more fully below, CCC did not hire anyone for the MIT until January, 2008, more than a year later. Therefore, Cashman's request was denied. Even if the position had been available, Cashman's performance and the fact that he was currently on a PIP made him ineligible for a transfer. (Plaintiff's Responses, 278-79)

Meanwhile, Wolfe had requested approval to hire an additional Fraud Case Manager in May, 2006. (*Id.* CNAJCDP 523-26) This request was approved in August, 2006. The decision to rehire Douglas Breit (herein "Breit") an SIU Investigator who had been laid off from CCC in September, 2005, was made in September, 2006, four months after Wolfe's request, and more than a week before Cashman submitted his voluntary resignation. Breit, who lived in Florida, returned to CCC's Maitland office. (Deposition of Gary Traina (herein "Traina Dep."), attached as Ex. F, 98:17 - 99:4)

Finally, in 2004, Cashman was diagnosed with bladder cancer. (Cashman Complaint attached as Ex. G, ¶ 32) He underwent treatment, but the cancer recurred in September, 2005.

(*Id.* ¶ 39). When Wolfe became aware that Cashman would undergo surgery, he relayed the fact to Bonk. Bonk's reaction was that Cashman's health came first, and that Cashman should not worry about missing a presentation in Chicago. Cashman was hospitalized in November 2005, and was out on short-term disability until January, 2006. (Cashman Complaint ¶ 43) He returned to work with no restrictions. (*Id.*)

## II.   ARGUMENT

### A.   Cashman Fails to Cite, or Incorrectly Cites, Evidence of Record

As an initial matter, Cashman either fails to cite, or incorrectly cites, evidence of record to support his Motion to Compel. This attempt is transparent and misleading. The more egregious examples follow.

- **The company used the PIP technique to achieve a 'voluntary turnover' by early retirement. The goal was 10% per year."**

(Cashman's Brief, p. 8) Cashman would have this Court believe that CNA had established a goal of forcing 10% of its employees to retire each year by placing them on performance improvement plans, because CNA set goals with respect to voluntary turnover. Such a nonsensical argument has no support whatsoever in the evidence in this case. Cashman's own counsel "testified" that CNA was not using PIPs to force early retirement:

> Q:   [U]nder talent management it states control – one of the goals here is control voluntary turnover through recruitment efforts, *expectation at or below 10 percent* voluntary turnover.

(Wolfe Dep. 166:25-167:5, emphasis added)

Wolfe confirms that CNA's goal was to limit, not increase, voluntary turnover of its workforce:

> Q:   It's my understanding that you had a responsibility to achieve a certain percentage turnover for the people you managed.

6

*   *   *

THE WITNESS: That was to be achieved ideally by ensuring that
we had adequate staffing to handle caseload and responsibilities
and also that employees were coached, made sure that, you know,
they were handling their responsibilities, they received the
appropriate level of feedback so that they could meet their goals,
and at the same time there was an employee relations aspect,
which, obviously, meant that, you know, if the manager establishes
a rapport with the employees who report to you and establish a
solid relationship, *then the employee will be less likely to become
disaffected in theory.*

(*Id.* 161:20 - 162:13, emphasis added)

Similarly, James Bonk, then Director of the SIU testified that the goal was to limit

turnover, not encourage it:

Q:    Was there a target of a voluntary turnover rate of 10%?

A:    I don't understand the question.

Q:    Was CNA looking for voluntary turnover of some
employees?

A:    *Just the opposite. We were trying to maintain retention.*

(Deposition of James Bonk (herein "Bonk Dep."), attached as Ex. H, 59:11 – 17 emphasis added.

See also *id.* 92:11 – 18)

As he does throughout his Brief, Cashman creates this allegation out of whole cloth.

Even a cursory review of the record makes it evident that CNA's stated goal was to retain current

employees, not force them out.

- **"Defendants produced many presentations picturing the
  handing over of the baton in a relay race, emphasizing the
  corporate goal of achieving 10% 'voluntary turnover'
  annually."**

(Cashman's Brief, p. 12)

To demonstrate the absurdity of this allegation, CNA has attached one of the

"presentations" to this Brief because Cashman did not attach one to his.  Cashman

disingenuously references a photograph of a relay race on the cover of SIU Operations Reviews.
The photograph is captioned, "Focus on Performance   Positioned to Win." (CNA's Doc.
Responses, CNAJCDPA 00098)  Cashman's characterization of this photograph as indicative of
age discrimination defies common sense.  There is not even the slightest suggestion that this
photograph illustrates an attempt by CNA to achieve turnover, voluntary or otherwise.

Cashman has no "evidence" other than his unfounded and self-serving accusation that
CNA was attempting to force 10% of its employees, including him, to retire.  Rather, the
uncontradicted evidence is that its stated goal was to maintain its current workforce, avoid
voluntary employee turnover, and keep such voluntary turnover at or below 10%.

- **"When Mr. Cashman asked about any other position,**
  **Wolfe told him there were no other jobs for him, but later**
  **hired new younger investigators."**

(Cashman's Brief, p. 5)

Cashman alleges that CNA replaced Weiner with younger employees instead of allowing
him to do so.  He ignores Wolfe's testimony that no one was hired for such a position in the MIT
unit in which Weiner worked for over a year after Weiner left.  (Wolfe Dep. 248:7 to 249:3)
Further,

> [o]nly [Tracy] Crates and [Christian] Ubillus were hired by
> Continental Casualty Company before Cashman and Steven
> Weiner resigned in 2006.  Of the two of them, Crates was not hired
> to work in the SIU until March 2, 2009.  Ubillus was terminated in
> a reduction in force in 2005, and was not rehired until May 5,
> 2008.  [William] Greene was hired in January, 2009, [Laura]
> Palace in May of 2009, and [Shane] Riedman in January of 2008.

(CNA's letter from Richard J. Antonelli to Carmen M. Matos dated July 14, 2009 attached as Ex.
I)  CNA hired the first MIT employee more than a year after Weiner left.  The most recent hire was
more than two years after the fact.  CNA did not "replace" Weiner's position with anyone, let alone

younger employees, and Cashman knows it.[2] Finally, as noted above, because Cashman was on a

PIP, he was ineligible under CNA policy to transfer into another position.

- **"Discovery revealed that Mr. Cashman was given a higher rating of '2' from his supervisor Gary Traina who supervised him for 9 months in 2005 and that Wolfe, who supervised Cashman for less than two months in 2005, rated Cashman '3.'"**

(Cashman's Brief, p. 4)

As with Cashman's other allegations, he has no evidence that Wolfe deliberately

downgraded his 2005 review to encourage him to resign. Instead, Wolfe testified multiple times

that the 2005 evaluation was a single joint, collaborative effort. Wolfe testified that Traina authored

a draft based on Traina's supervision of Cashman during the first nine months of 2005; that he and

Traina discussed possible revisions based on Wolfe's assessment of Cashman's performance after

Wolfe became Cashman's supervisor for the last three months of 2005 under the reorganized SIU;

and that Traina agreed with Wolfe's assessment that Cashman should be rated an overall "3".

(Wolfe Dep. 37:18 - 38:21; 44:9-11; 79:18 - 81:2)  He never had any rating but a "3" for 2005.

Cashman does not offer evidence to support his claim.

- **"After September, 2005, Mr. Cashman's work was more closely scrutinized than ever before."**

(Cashman's Brief, p. 4)

Cashman had a new position in the reorganized SIU, as well as a new supervisor, Wolfe,

as of September, 2005.  Cashman provides no evidence whatsoever that even assuming Wolfe

did closely scrutinize his work more closely than his prior supervisor, Wolfe did not do the same

with the other members of the FCMT.  Cashman cannot sustain his contention that Wolfe was

singling him out in order to discriminate against him.

---

[2] CNA provided Cashman with the personnel files of the individuals he claims replaced Weiner: Crates, Greene, Palace, Riedman and Ubillus.  (CNA's Response CNAJCDP 11026 – 11307)  CNA has not attached the files because they are voluminous.  If the Court wishes to review them, CNA will provide them promptly.

- **"[When Cashman announced his decision to retire] Wolfe stopped all criticism of Mr. Cashman's work and told him to handle all cases as he usually did."**

(Cashman's Brief, p. 5)

Wolfe testified that after Cashman announced his resignation, Cashman was working out his notice period and that he trusted Cashman to continue to handle his assignments until his departure. (Wolfe Dep. 179: 25-180: 23). Further, because Cashman was leaving soon, Wolfe did not see the point in continuing to criticize him. (*Id.*, 180:24-181:6) This does not mean, as Cashman suggests, that Wolfe left him alone only after Wolfe was satisfied that Cashman was going to retire.

- **"On September 19, 2006, suddenly and without warning, Wolfe placed Mr. Cashman on a PIP or performance improvement plan for false reasons related to file documentation."**

(Cashman's Brief, p. 5)

Cashman has not provided support for the proposition that the PIP was either sudden or without warning, or that it was based on "false reasons". In fact, Wolfe counseled Cashman many times about performance deficiencies prior to placing him on a PIP, but Cashman's performance did not improve. His subpar performance and resulting PIP could not have been a surprise.

- **"When Wolfe was deposed he testified that he deleted the records on which plaintiff's compliance rating was based."**

(Cashman's Brief, p. 4)

Cashman is attempting to convince this Court that in the spring of 2007, Wolfe deliberately deleted Cashman's spreadsheets upon which his performance reviews were based in order to hide evidence of discrimination. As with his other allegations, Cashman is trying to

manufacture evidence.  Such a claim is completely unsupported by Wolfe's undisputed

testimony that after he used his spreadsheets to calculate certain performance measures, he did

not keep the spreadsheets for any of the employees in the FCM position:

> Q:    Did you keep the Excel spreadsheets for the other FCMs
> that you evaluated in 2006?
>
>     *   *   *
>
> A:    No.  I believe you asked me that question and I earlier
> responded no.
>
> Q:    You deleted – I thought that the question I asked you
> before was just for Mr. Cashman.
>
> A:    And I believe I responded to the general question for the
> four case managers, so my answer is no.
>
> Q:    And you deleted them all?
>
> A:    Yes.

(Wolfe Dep. 213:15 – 214:7)

   Wolfe also stated no fewer than six times that he did not know when he deleted the

spreadsheets from his hard drive.  (*Id.* 32:17 – 33:23; 54:10 – 24)  He could only estimate that it

was unlikely that it was before the end of 2006.  (*Id.* 54:10-15)  Nor has Cashman established

that Wolfe violated any CNA retention policy, or that any supervisor told Wolfe when the

spreadsheets could be deleted from his hard drive.  (*Id.* 60:17-24).  Wolfe also testified that:

> [N]ot only did I complete the spreadsheets, I also painstakingly
> provided each employee with details as to why they were deficient
> in certain areas, so the measurements were not taken from the
> actual Excel spreadsheets themselves.  They were just used to
> calculate the percentages.  The actual deficiency issues were
> shared with each employee in every case with specific details,
> claim numbers, deficiency issues, given to each of those
> employees, so there was really – there were really two separate
> aspects to the review process.

(*Id.* 33:10-23)

In sum, Cashman has known since Wolfe's deposition on May 20, 2009, that Wolfe deleted the Excel spreadsheets for everyone on the FCM team. Cashman also knows that Wolfe does not remember the exact date when he did so. Finally, there is no evidence that in deleting those spreadsheets, he violated any CNA record retention policy. Any inference that Wolfe intentionally deleted Cashman's spreadsheets in an attempt to hide evidence of discrimination is completely unfounded.

- **In March 2006 Mr. Cashman received a performance rating of "3" or "meets requirements."**

(Cashman's Brief, p. 4)

A "3" rating indicates "meets *most* requirements," not "meets requirements." (Wolfe Dep. 12:4 – 6, emphasis added)

- **"After 2002, Mr. Cashman's ratings were marked down to '3' or meets expectations."**

(Cashman's Brief, p. 3)

Cashman confirms that he was promoted sometime before 2005, and that there were added duties and a raise involved. (Cashman Dep. 8:16 – 24; 9:22 – 25) This is not indicative of any attempt by CNA to force him to resign after 2002.

**B.   CNA Is Not Obligated To Create Documents That Do Not Exist.**

Cashman demanded the following in his First Request for Production of Documents (herein "Cashman's First Doc. Request"):

61.   **All reports or documents showing employee turnover for 2005 to present for SIU.**

62.   **Termination Reports 2005 to present.**

63.   **New Hire Reports (2005 to present).**

Cashman bases this request on the "fact" that Mansfield allegedly "actually admitted that the information is available and accessible." (Cashman's Brief, p. 12)  CNA has already informed Cashman that after searching through electronic and hard copy storage, Mansfield does not have such documents in her possession, custody or control.  As Mansfield testified,

> Q:     Are these [reports] available – I mean are these – how is it that you come about seeing these?
>
> A:     For the businesses I'd support [I] might periodically pull that information.
>
> *     *     *
>
> Q:     Did you – do you have recollection [sic] of seeing any of these reports for the SIU department?
>
> A:     I don't remember.
>
> Q:     But these reports exist?
>
> A:     *They can be created.*
>
> Q:     And how can they be created?
>
> A:     Through our electronic system.

(Deposition of Elizabeth Mansfield, attached as Ex. J, 60:12 – 15; 23 - 61:15, emphasis added)

As Mansfield testified, these reports may be created from CNA's computer data base when she has specific questions or needs other specific information.  She did not testify that they currently exist in paper or electronic form, and Cashman has no evidence otherwise.

Moreover, despite Cashman's allegation that reports are "available and accessible," CNA is not obligated to create documents when none exist.  *Mon River Towing, Inc. v. Industry Terminal and Salvage Co.*, 2008 WL 2412946 (W.D.Pa. June 10, 2008) (Rule 34 does not require a party to create or generate responsive materials, but only to produce and allow inspection of "items in the responding party's possession, custody or control" citing Federal Rule of Civil Procedure 34(a)(1)); *In re Claims for Vaccine Injuries Resulting in Autism Spectrum Disorder*, 2007 WL 1983780 (Fed.Cl. May 25, 2007) (same); *Marchese v. Department of the Interior,* 2004 WL

2297465 (E.D.La. Oct. 12, 2004) ("Rule 34 does not require a party responding to discovery to create responsive materials, only to produce those in its possession, custody or control"); *Khyber Technologies Corporation v. Casio, Inc.,* 2003 WL 21696354 (D.Mass. March 31, 2003) (same); *Alexander v. Fed. Bureau of Inv.,* 194 F.R.D. 305 (D.D.C 2000) (same).  Thus, even if that information were available and / or accessible, the Federal Rules do not require CNA to compile it for production.

Cashman's Motion to Compel with respect to Interrogatories 61, 62 and 63 should be denied.

**B.      Cashman Is Not Entitled To Statistical Information About Other Employees Who Are Not Similarly Situated.**

Cashman argues that he is entitled to the following statistical information:

> **7.      Provide the name, date of birth, date of hire, job, of all exempt employees who were employed in the Special Investigations Unit from 2002 to present (reporting to SIU Director).**
>
> **8.      For each calendar year beginning January 1, 2002, to present, identify all SIU employees who were placed on a performance improvement plan (PIP) by name, date of birth, date of hire, job, status (whether active or inactive) and reason for separation if applicable.  Please identify those who were terminated as a result of the PIP.**
>
> **18.      Provide the name, date of birth and date of hire of each SIU Investigator employed by the defendant since 2002 to the present.[3]**

Cashman claims that this information constitutes "statistical evidence" which may be used to establish that CNA discriminated against its older employees.  The cases Cashman cites to support this proposition does not help him.  In fact, the cases contradict his arguments.

---

[3] Despite Cashman's contention that CNA "improperly limited the scope of discovery to Mr. Wolfe's 6 (six) SIU Consultants," (Cashman's Brief, p. 9), CNA did produce this information for all of the SIU Investigators on the 2005 organization chart.  CNA did not produce information for the non-management employees in the Triage Unit because they are not SIU Investigators, are nonexempt, and nonresponsive to Interrogatory No. 7.

For example, he cites *Sprint/United Mgmt. Co. v. Mendelsohn*, 128 S.Ct. 1140 (2008) for

the proposition that "[e]vidence that the defendant terminated other employees in the protected

age group in Plaintiff's department, is relevant to the issue of whether defendant [sic]

discriminated against plaintiffs [sic] due to their age [sic]." (Cashman's Brief, p. 6) This is an

obvious overstatement of *Mendelsohn's* holding that evidence of discrimination by other

supervisors in an ADEA case "*is fact based and depends on many factors, including how closely*

*related the evidence is to the plaintiff's circumstances and theory of the case.*"  *Mendelsohn*,

128 S.Ct. at 1147 (emphasis added).  Cashman asks this court to believe that *Mendelsohn* stands

for the proposition that statistical evidence is *per se* admissible, despite the language of the

Court's opinion. *Id.* at 1143.  He cannot do so, because the Supreme Court stated in

*Mendelsohn,* "We conclude that such evidence is neither *per se* admissible nor *per se*

inadmissible." *Id.*

Cashman further cites to *Gaul v. ZEP Mfg. Co.*, 2004 WL 231298 (E.D. Pa. Feb. 5, 2004)

to support his argument that he is entitled to information relating to SIU employees who were

placed on a PIP and were terminated as a result of a PIP back to 2002. (Cashman's Brief, p. 9)

Once again, Cashman has exaggerated the Court's opinion.  In *Gaul*, the court held that in a Title

VII case where the plaintiff alleges disparate treatment, the plaintiff may obtain discovery

regarding other employees but only those employees in positions that the plaintiff occupied or

into which the plaintiff requested promotions. *Id.* at *3 (*citing Hicks v. Arthur*, 159 F.R.D. 468

(E.D. Pa. 1995) (same).  Accordingly, the court in *Gaul* permitted the plaintiff to obtain

information about Branch Sales Managers but not Regional Sales Managers because plaintiff

never applied for nor worked as a Regional Sales Manager. *Id.*

15

Similarly, in *Sosky v. International Mill Service*, 1995 WL (E.D.Pa. Jun. 21, 1995), the

court was unable to make a ruling about the appropriate breadth of the interrogatory because the

parties did not provide information about the defendant's organizational structure. *Id.* at **3, 4.

Here, there exists an organizational chart which sets forth the positions of the employees in the

SIU as of 2005. (Plaintiff's Responses, 88)

In this case, the SIU Investigators in the MIT, FCM, FIP and Triage, had different tasks and

different supervisors who evaluated them using different criteria. The Third Circuit has held that, to

be similarly situated, all relevant aspects of employment need to be nearly identical. *Neely v.*

*U.S. Postal Service*, 307 Fed.Appx. 681 (3rd Cir. 2009), *citing Pierce v. Commonwealth Life Ins.*

*Co.,* 40 F.3d 796 (6th Cir. 1994) (same). See also, *Monaco v. American General Assurance Co.,*

359 F.3d 296 (3rd Cir. 2004) (in order to determine who might qualify as a similarly situated

employee we must look to the job function, level of supervisory responsibility and salary, as well

as other factors relevant to the particular workplace); *Red v. Potter*, 211 Fed.Appx. 82 (3rd Cir.

2006) (the Third Circuit affirmed summary judgment in favor of the defendant in part because

the plaintiff failed to establish that others were similarly situated, *citing Kosereis v. Rhode*

*Island,* 331 F.3d 207 (1st Cir. 2003) (a plaintiff must show that others similarly situated to him in

all relevant respects were treated differently by the employer) (internal quotation marks and

citations omitted).

The job functions and supervisors of the individuals in the SIU prior to the 2005

reorganization were entirely different from those in the four newly formed SIU Units. Moreover,

the four new units require distinctly separate tasks. (Cashman Dep. 18:15 - 19:5; 239:10-11;

CNA's Doc. Responses, CNAJCDP 384) In addition, Wolfe was Cashman's immediate

supervisor at the time of Cashman's resignation, it was Wolfe's evaluation of Cashman's

16

performance as Cashman's supervisor that led to Bonk, as Wolfe's manager, to get involved. Cashman nevertheless argues that Bonk's involvement entitles him to the information he seeks for the entire SIU organization. However, Bonk never directly supervised Cashman's performance and his involvement should not allow Cashman to extend discovery beyond those employees who were supervised and evaluated by the same supervisor he was, Tim Wolfe.

Finally, as explained, Cashman was not hired to replace Weiner in the MIT because CCC did not hire anyone new for the MIT for more than a year. Even if Weiner had been replaced, according to CNA's personnel procedures, the fact that Cashman had been placed on a PIP prevented him from transferring to another position. (CNA's Doc. Responses, CNAJCDP 506-07) Cashman cannot, therefore, demonstrate that all of the SIU Investigators, except those in the same position he held and who reported to Wolfe, were nearly identical in all relevant aspects of their employment. Thus, they are not proper comparators. *Neely v. U.S. Postal Service*, 307 Fed.Appx. 681 (3d Cir. 2009). CNA nonetheless provided this information for the exempt employees on the 2005 organization chart. (August 14, 2009 letter from CNA to Cashman, attached as Ex. 5 to Cashman's Brief)

Because CNA has already provided more information than required, this Court should deny Cashman's Motion with respect to Interrogatories 7, 8 and 18.

## C.   Cashman Is Not Entitled To The Salaries Of Other Employees.

Cashman alleges that he is entitled to the salary information requested in Document Requests 5 and 32:

> **5.   The personnel records of other SIU employees including but not limited to performance reviews, salary history, bonus incentive, discipline, performance improvement plan, monthly file review results, monthly performance metrics for the time period of 2002 through August 2006.**

**32.**   **Any documents showing salaries and bonuses of SIU investigators from 2004 to present.**

As an initial matter, Cashman claims that "Defendant [sic] only responds that the salary of Mr. Cashman's co-workers is not relevant because Mr. Cashman did not make a claim for equal wages and simply avoids answering the remaining part of the interrogatory." (Cashman's Brief p. 10) The latter portion of his statement is simply not true. CNA's single-spaced response to Document Request No. 5 spans the better part of a page:

> CNA objects to Document Request No. 5 on the grounds that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Until September 2005, Cashman was working as a field investigator in the SIU. The SIU was reorganized in or around September, 2005 and Cashman was selected to be one of only six SIU Consultants on the newly formed Fraud Case Management Team ("FCMT") reporting to then Fraud Case Manager Timothy Wolfe ("Wolfe"). As a field Investigator for the SIU, Cashman investigated insurance claims. As an SIU Consultant on the FCMT, he became responsible for managing the vendors who had assumed responsibility for conducting field investigations; that is, analyzing and evaluating insurance claims for suspected fraud or arson through contact with insureds, claimants, witnesses and experts. Thus, information concerning "other SIU employees" from 2002 through August 2006 will not shed light on Cashman's claims. No employees other than the SIU Consultants on the FCMT who report to Wolfe and perform the same functions as Cashman have anything to do with Cashman's claims that in 2006 he was discriminated against on the basis of his alleged disability, cancer, and his age when he was placed on a PIP and was not allowed to rescind his decision to retire; and that he was retaliated against in violation of the Family and Medical Leave Act ("FMLA"). Finally, CNA objects to Document Request No. 5 because it is unduly burdensome. There were more than 89 SIU Investigators and Consultants in 2002 alone as well as employees in other positions. In order to provide the requested information, CNA would have to search through all of these files of employees who are not similarly situated to Cashman.
>
> Without waiving those objections, the personnel records of the SIU Consultants on the FCMT who report to Wolfe are attached at Tab L subject to the Stipulation on Confidentiality. Such documents are stamped "Confidential."

(CNA's Doc. Responses, attached as Ex. 1 to Cashman's Brief, pp. 4, 5)

Moreover, Cashman does not explain why he is entitled to the salaries of his co-workers. He says only that "salary information may lead to the discovery of admissible evidence as to damages." (Cashman's Brief, p. 10)  However, this is not a case where Cashman has alleged discrimination in wages based on age or disability, and the discovery Cashman seeks is inappropriate.

The cases Cashman cites in support of his position do not help him because he misstates two of the three of them and one is inapposite.  For example in *Northern v. City of Philadelphia* 2000 WL 355526 (E.D.Pa. April 4, 2000), the court simply held that the plaintiff was entitled to information about her own employment benefits had she not been fired (holding that the amount plaintiff would have received in pay increases and pension as well as other benefits are relevant to her damages claim).  The court did not hold that the plaintiff was entitled to the compensation information of other employees.

In *Hall v. Harleysville Ins. Co.*, 164 F.R.D. 406 (E.D.Pa. 1996), the court does not address a request for salary or compensation information.  Rather, the *Hall* Court held in a claim that an insurance company improperly used credit reports, that discovery requests for the reports, contracts between company and consumer credit reporting agency, records relating to fees paid, files of other claimants, files obtained by detective agency and defendant's claims manual were discoverable.  *Id.*  Nowhere in the case does the court hold, as Cashman suggests, that salary information about former co-workers is discoverable.

Finally, *Donlin v. Philips Lighting North America Corp.*, 564 F.3d 207 (3d Cir. 2009), which Cashman quotes at length, is distinguishable.  There, Plaintiff Colleen Donlin (herein "Donlin") was a temporary employee of Philips Lighting North America Corporation (herein

19

"Philips") who sued for sex discrimination when Philips did not hire her. *Id.* at 211. In determining her compensatory damages, the District Court allowed Donlin to compare the wages she received from her subsequent employer to the wages earned by a Philips employee. *Id.* at 224. The issue before the Third Circuit was whether the Philips employee Donlin selected was a proper comparator. *Id.*

In holding that the comparator was appropriate, the Third Circuit discussed *Simpson v. Kay Jewelers,* 142 F.3d 639 (3d Cir. 1998), in which it held that the plaintiff's choice of comparators was too narrow because she chose someone who was allegedly treated more favorably. The Court found that a plaintiff may not "pick and choose" a damages comparator, but must choose similar employees against whom to compare herself. 564 F.3d at 224. The Third Circuit did not, as Cashman contends, hold that salaries of Donlin's co-workers were relevant. To the contrary, the Court allowed Donlin to compare her current salary with those of a *Philips* employee, who held a comparable job, to establish what she might have earned had *Philips* hired her. *Id.*

It is evident that the salaries of Cashman's co-workers are not relevant to his claims. See, e.g., *Conti v. Universal Enterprises, Inc.*, 50 Fed.Appx. 690 (6th Cir. 2002) (Magistrate Judge denied the plaintiff's motion to compel because she "failed to make a showing of any degree of comparability between the position she held with the defendant and the positions held by the individuals as to whom she seeks financial information); *LaBarge v. Chase Manhattan Bank, N. A.*, 1997 WL 583122 (N.D.N.Y. Sept. 3, 1997) (because alleged comparators were not similarly situated, court denied the motion to compel salary information). Finally, Cashman has never alleged that he was discriminated against in wages due to age or disability. Thus, the Court should deny Cashman's Motion with respect to Document Request Nos. 5 and 32.

**D.      Cashman Is Not Entitled To Investigation Notes**

> **52.     Investigation Notes relating to Chris Taylor's complaint
> and any documents related to Mr. Taylor's complaint
> concerning Mr. Wolfe.  This would include any notes or
> report kept by Judy Hernandez, James Bonk or any
> defendant employee**

Cashman contends he is entitled to notes of an investigation of a complaint made against

Wolfe by a former employee named Chris Taylor, which complaint was determined to be baseless.

First, Cashman has attempted almost from the onset of this lawsuit to sully Wolfe's reputation.  This

effort is unprevailing; if anything, it is apparent that this is the only "evidence" Cashman has.

Wolfe testified that the complaint involved Taylor's allegation that he was encouraged by Wolfe to

fabricate personal mileage on expense reports, and that Wolfe was having an affair with a CNA

employee in another city and engaging in unnecessary travel in order to carry on the love affair at

CNA's expense.  (Wolfe Dep. 168:13-170:19).  Despite the fact that this complaint was investigated

by CNA and determined to be without any basis whatsoever, Cashman claims that CNA's objection

to Second Document Request No. 52 is "mere sarcasm."  (Cashman's Brief p. 12)  This is simply

not true.  CNA objected to Second Document Request No. 52.

> on the grounds that it is neither relevant nor reasonably calculated
> to lead to the discovery of admissible evidence.  Christopher
> Taylor's complaint concerning Timothy Wolfe (herein "Wolfe"),
> which CNA determined was wholly without merit, has nothing to do
> with Cashman's claims of alleged discrimination, of retaliation, of
> an FMLA violation, or anything else related to Cashman in any
> way.

(Cashman's Brief, Ex. 5)

Second, Cashman deletes a significant portion of CNA's entire response to the deficiency

letter regarding Document Request No. 52:

> Please see CNA's response to Interrogatory No. 7, above as well as
> CNA's response to Document Request No. 5.

> Further, your contention that you may be entitled to cross-examine
> Wolfe on credibility does not automatically bestow upon you
> unfettered access to any document of your choosing, regardless of its
> relevance to this case.

(Cashman's Brief, Ex. 5)  These responses, taken alone or together, do not amount to "mere
sarcasm."

Third, Taylor's claims were thoroughly investigated and found to be baseless.  (Wolfe
Dep. 169:18 – 170:5)  Much as Cashman would like to try to dirty Wolfe's reputation with such
matters by injecting them into this case, since Taylor's allegations did not involve any claims of
age or disability discrimination or any FMLA violation, and were investigated and found to be
without merit by CNA, any documents relating to Taylor's baseless claims and CNA's
investigation of those claims are neither relevant nor reasonably calculated to lead to the
discovery of admissible evidence in this dispute.  This Court should deny Cashman's Motion
with respect to Document Request No. 52.

### E.     Cashman's Reliance On Stephen Lilienthal's Comments Is Misplaced And Should Be Disregarded.

Cashman claims that comments made by Stephen Lilienthal (herein "Lilienthal") former
CNA CEO and Chairman, instituted a new policy of forcing out older employees.  (Cashman's
Brief, pp. 3, 7)  This is not the first time Cashman's Counsel has raised this argument.  In *Reif, et
al. v. CNA, et al.*, Civil Action No. 06-4761, Plaintiffs Michael and Tammy Reif (herein "the
Reifs") attempted to expand discovery to take Lilienthal's deposition as evidence of age
discrimination.  CNA argued that the Reifs did not have any evidence whatsoever that these
comments had any impact on CNA's practices.

Judge Sanchez agreed.  In an Order dated February 21, 2008, he held that that
"Examining [the depositions taken in the case] reveals no connection between Lilienthal's
statement and the decision to terminate Michael Reif."  He also stated, "The Reifs have not

demonstrated a nexus between Lilienthal's statement and lower level management's decision to terminate them." (February 21, 2008, Order, Docket No. 81 attached as Ex. K, pp. 10, 12) Judge Sanchez reasoned that neither the Reifs' supervisor nor the decisionmaker had testified that these comments had any impact on their employment practices. (*Id.* p. 10)

The same holds true in this case. During Wolfe's deposition, he was not asked about Lilienthal's comments. Further, Bonk testified that he does not remember seeing an article that appeared on CNA's intranet mentioning the comment; that he has no recollection of Lilienthal making the "kids" comment; and that he never heard anyone talk about the comments or any references to hiring kids or younger employees. (Bonk Dep. 53:12 – 54:20; 55:8 – 10, 14 - 22) Other members of management, Traina, Mansfield, Curran, James Martin, Vice President of Liability Claims Strategy, Shelly Liapes, Vice President of Employee Relations, and Deborah Nutley, Senior Vice President Human Resources, testified that they did not hear the comment. Of course, none of them testified that the comment was reflective of an ageist environment.

Cashman will no doubt argue that Carroll agreed that CNA promoted an ageist culture. However, Carroll contradicted himself multiple times with respect to this contention:

> A.     We became very expense focused during the period of investigative options which sort of began in the 1997-1998 time frame.
>
> And as a result of the financial responsibilities we really inherited as the result of becoming a business unit within CNA, you were always examining and evaluating the expenses associated with this group and our tasks.
>
> One of the ways that - - it was determined that we could reduce our expense liability was to change our hiring model which had historically been really cookie cutter in the sense that the SIU hired ex or retired law enforcement personnel, experienced, savvy, intelligent - - we hired the best people we could find to do our work and that was really a cornerstone and a trademark of this group.

But as it transitioned into this business unit, one of the objectives was to reduce expenses and the model for hiring investigators also changed.  So we were - - directive is probably too strong a word, but in changing the model, we began to hire less experienced, less expensive SIU investigators.

Q.      And were they younger than the investigators you had previously hired?

A.      Yes.

Q.      Were they in their 20s and 30s?

                        *       *       *

THE WITNESS:        Perhaps not exclusively.  But as the result of what we offered in terms of a starting salary, you weren't going to hire our traditional cookie cutter SIU investigator for the forty-some thousand dollars that we were now offering new hires.

So it was more a goal at that point to hire less experienced, cheaper employees.

                        *       *       *

Q.      And were these employees younger than the ones who were there?

                        *       *       *

A.      Many times they were.

Deposition of Richard Carroll (herein "Carroll Dep."), attached as Ex. L, 39:12 – 25; 40:2 – 17, 20 – 25; 41:2 – 5, 7 – 8, 11 - 12)  Carroll also testified that there were higher, and reasonably so, expectations that the more senior employees were expected to perform better.  (*Id.* 83:16 – 24)

Moreover, as CNA stated in its response to Plaintiff's First Request for Production of Documents, the speech made by Lilienthal in 2002 has no bearing on Cashman's claims that in 2006 he was discriminated against on the basis of his alleged disability, cancer, and his age, when he was placed on a PIP and was not allowed to rescind his decision to retire; and he was retaliated against in violation of the FMLA.  The August 2002 remarks do not bear on CNA's alleged employment actions in 2006.  First, the remarks occurred more than four years prior to Cashman's termination.  Second, Lilienthal has never influenced any decisions ever made about

Cashman and did not play any part whatsoever in any of the actions Cashman challenges. Moreover, there were four levels of supervision between Lilienthal and Wolfe, and five levels of supervision between Lilienthal and Cashman. Finally, there is no indication that anyone, much less Wolfe, took any action because of any comments Lilienthal made in August, 2002 or at any other time. To the contrary, Wolfe decided to place Cashman on a PIP based on Cashman's performance issues. (CNA's Response, Cashman's Brief, Ex. 1, p. 14)

In sum, because Cashman has no evidence of record to support the contention that Lilienthal's 2002 comments had any bearing on Cashman's claims surrounding his departure from CNA, the Court should disregard any allegations to that effect.

## III    CONCLUSION

Cashman did not and cannot establish that he is entitled to any of the discovery he seeks. Thus, CNA respectfully requests that this Court deny his Motion to Compel in its entirety.


Date: September 10, 2009                  Respectfully submitted,

                                          BABST, CALLAND, CLEMENTS
                                          & ZOMNIR, P.C.

                                          /s/ Richard J. Antonelli
                                          Richard J. Antonelli
                                          PA ID No. 22121
                                          rantonelli@bccz.com
                                          Rebecca J. Dick-Hurwitz
                                          PA ID No. 62943
                                          rdick-hurwitz@bccz.com
                                          Two Gateway Center, 7th Floor
                                          Pittsburgh, PA  15222
                                          412-394-5400

                                          Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of September, 2009, I electronically filed the

foregoing **Defendants' Opposition to Plaintiff's Motion to Compel** with the Clerk of Court

using the CM/ECF system which will send notification to the following:

>Carmen L. Rivera Matos, Esquire
>Anita Alberts, Esquire
>40 East Court Street, 3rd Floor
>Doylestown, PA  18901
>
>afalawyer@comcast.net
>
>crm617@aol.com
>
>***Counsel for Plaintiffs***

>>*/s/ Rebecca J. Dick-Hurwitz*
>>Rebecca J. Dick-Hurwitz