**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN CASHMAN,** | : |
| Plaintiff, | : |
| | : Civil Action No. 08-5102 |
| v. | : |
| **CNA FINANCIAL CORP**. | : Hon. Thomas M. Golden |
| and | : |
| **CONTINENTAL CASUALTY CO**., | : Jury Trial Demand |
| Defendants. | |

**PLAINTIFF'S REPLY BRIEF TO DEFENDANT'S OPPOSITION TO**
**PLAINTIFF'S FIRST MOTION TO COMPEL**

**I. INTRODUCTION**

In opposing Plaintiff's First Motion to Compel defendants wrongly accuse Plaintiff of deliberately misleading the Court, inventing facts without basis in the record and seeking to "sully" the reputation of Mr. Cashman's former supervisor, Timothy Wolfe. Nothing could be further from the truth. Plaintiff must respectfully reply.

Defendants treat the motion to compel as a motion for summary judgment. This is not a dispositive motion. Plaintiff believes that the court should compel the discovery simply because it is reasonably calculated to lead to the discovery of admissible evidence.

**A. CNA's "10% Voluntary Turnover" Policy Is Relevant**

Defendant incorrectly claims that CNA's policy of 10% voluntary turnover is irrelevant to the case. The evidence clearly shows that both Timothy Wolfe and James Bonk received annual performance evaluations, which include a goal of Talent Management. **Exhibits 13 and 14** attached hereto. Each had a yearly goal of "10% voluntary turnover" in units they supervised: "control voluntary turnover through development and re-recruitment efforts expectation at or below 10% voluntary turnover."

Wolfe Performance Review 2005 and 2006 **Exhibit 13, 14** attached hereto (CNAJCDP02465, 2478).  The 2006 Wolfe review notes under this section that two employees voluntarily terminated in 2006 …one was placed on a PIP for poor performance, but decided to retire shortly thereafter…" Defendants cite Bonk's Deposition, at p. 59 of his deposition, where he claims CNA wanted to "maintain retention" of experienced employees by its turnover policy.  The performance appraisal clearly contradicts this statement. **Exhibit 14**. Bonk's review comments "maintained focus on performance management resulting in two performance improvement plans." (**Exhibit 15** CNAJCDP02549). Thus, the PIPs are part of the turnover process.

  Bonk supervised Wolfe, who supervised Mr. Cashman in 2005 and 2006.  Bonk was subpoenaed for deposition in Chicago in June 2009, and directed to produce documents.  He produced hundreds on the day of the deposition, which could not be analyzed at that time.  Bonk Deposition Exhibit 40 included an email dated January 9, 2004, from Bonk to Richard Carroll, then supervisor of Cashman. **See Exhibit 16** attached hereto. Carroll had been placed on a PIP and faced termination.  At p. 2 paragraph (d) of the Carroll PIP, Bonk directed Carroll to:

> **d. Ensure accuracy and integrity of billable time, expenses and savings . . . Over the last 2 years there have been literally thousands of files closed . . . Dozens of SIU investigators have left the organization within this timeframe and their respective pendings have been closed without Savings being captured . . . <u>The tenure of SIU investigators in the NE is the longest in the country. . . As we go forward I would anticipate we will see this trend continue until NE staff turnover (through RIF, retirements, etc.) results in a reduction in the overall tenure of staff . . .</u>**
>
>                  (emphasis added*)*

  Bonk states here the intent and purpose of the CNA turnover policy. Bonk was disingenuous at his deposition. Turnover policy is part of Performance Management and

2

Talent Management policies instituted after incoming CEO Lilienthal's August 2002 "get kids in here" speech. **Exhibit 17** attached hereto.  Bonk wanted Carroll to put Cashman on a PIP for termination in 2004, based on the false reason of mileage reimbursement. Carroll refused, and was fired on February 14, 2004.

Mileage reimbursement was used as a frequent basis for terminating older workers at CNA.  See, e.g., Delli Santi v. CNA Insurance Companies, 88 F. 2d 192 (3d Cir. 1996).  Delli Santi's jury verdict against CNA was upheld on appeal.  Here, as in Delli Santi, plaintiff argues that he was PIP'd for false reasons because the company desires a young workforce and not an older, experienced employee.  As such, the voluntary turnover policy is just a method for the defendants to accomplish its mission of changing the corporate culture by hiring young "kids" and is something a jury may consider.  **Exhibit 17**.

## B.  Cashman Is Entitled To Statistics Of The SIU Unit Where He Worked

Defendants contend that plaintiff is not entitled to the statistical information of his own employment group, the SIU (**Plaintiff's First Interrogatories 7,8,18**.)  Plaintiff responds that he is entitled to the information, as the information is relevant to show whether defendant treated younger employees in the SIU more favorably.  McDonnell Corp. v. Green, 411 U.S. 792 at 804-5 (1973) and Bruno v. WB Saunders, 882 F.2d 760, 766-7 (3d Cir. 1989), (statistical evidence may be used to bolster an age discrimination case of disparate treatment or a pattern or practice of discrimination).

Defendants incorrectly argue that the case law does not support plaintiff.  The case law is just the opposite and defendant wants this Court to ignore our own Third Circuit. First, defendant refers to Sprint v. Mendelsohn 128 S.Ct. 1140 (2008) for the

proposition that the evidence can be either per se admissible or per se inadmissible.  Rule 26 of the Federal Rules of Civil Procedures provides, "**Relevant information need not be admissible** at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." (emphasis added) This is discovery, which is the time to review the evidence to make such a determination. The time for a motion to exclude the evidence, if appropriate, would be prior to trial.

Defendants unsuccessfully attempt to distinguish Gaul v. ZEP Mfg. Co., 2004 WL 231298 (E.D. Pa. 2004), a discrimination case in which Judge Hutton held that plaintiff could obtain statistical discovery for the five-year period preceding the alleged violation. Id. at p.6.  Here plaintiff was placed on a PIP in September 2006, and plaintiff's request was for the preceding four-year period.  Defendant makes it sound like this is a totally new department, which it is not.  The only thing that changed is the manner in which the work is done (by vendors).  The SIU has been in existence since 1992 when Bonk became SIU Director. **Exhibit 18 Bonk Dep p. 33** Also, Cashman was hired in 1992 as an SIU Investigator.  While the structure changed to four teams, Mr. Cashman testified, "…my job essentially was relatively the same."  **Exhibit 19 Cashman Dep. p. 12.**

While defendants agree that their organizational chart shows the jobs of the SIU Unit under one director (Bonk), (**Plaintiff's Exhibit 7, attached to initial Brief**) Defendant resists statistical discovery of those 30 or so employees arguing that they are all under different supervisors (yet, they all report to Bonk) with different tasks and different evaluative criteria.  No evidence has been submitted of these alleged differences. Bonk and Wolfe's reviews have similar evaluation criteria.  See **Exhibits 13,**

**14, 15.** Such an argument does not preclude the requested discovery. The company organizational chart clearly depicts the SIU department. Id. **Plaintiff Exhibit 7** attached to initial brief). Defendant incorrectly interprets Sosky v IMS, 1995 US. Dist LEXIS 8507 (E.D.Pa.1995) where the court rejected the narrow sample suggested by defendant and allowed a larger, more reasonable pool. Here, plaintiff has already focused on the SIU unit, which consists of approximately 30 employees and not the narrow sample desired by defendants of six employees. Defendant wants to micro analyze and compartmentalize.

Defendants argue Cashman is comparing himself to employees who are not similarly situated. This is simply not so. All employees in the SIU report to one director, Bonk. **See Plaintiff Exhibit 7** (attached to initial brief). The entire department is involved in fraud investigations, the triage or intake, fraud case managers, major investigations, and fraud identification and prevention. In short, it is one unit reporting to one director and all involved in the same type of issue: fraud investigations. While defendants argue that Mr. Cashman did not report to Bonk, it is clear that **Bonk had power and authority to direct Mr. Cashman to be placed on a PIP by Wolfe**, when he sent Wolfe an email on August 18, 2006 stating "**We have been way too patient with this matter. Schedule a meeting with Betsy [Mansfield, HR] and let's move to a PIP.**" **Plaintiff's Exhibit 20** attached hereto.

In Monaco v. American General Assurance, 359 F.3d 296 (3d Cir. 2004), in the context of a summary judgment motion, the Third Circuit held that an individual does not need to be situated identically to plaintiff. Id. at 305 (emphasis added). While plaintiff should not compare himself to lower level employees, the court examined several factors

to determine who might qualify as a similarly situated employee, including the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace. Yet, the court cautioned, "This determination requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner." Id., citing Pivorotto v. Innovative Sys. Inc., 191 F.3d 344, 357 (3d Cir 1999).

Defendants' reliance on Neely v USPS 307 Fed. Appx 681 (3d Cir. 2009) is misplaced.  First, the court should note the opinion is not precedent, and that Neely involved different factual circumstances because the supervisor was not involved in the discipline of the other employees. Id. at 684.  Here it is clear that Bonk was involved in the discipline of Cashman as stated in **Exhibit 20**, attached hereto, "…let's move to a PIP."

Defendants even concede that they keep statistical data, "these reports may be created from CNA's computer data base."[1]  Thus defendants admit they have the database from which such a document can be easily made.  Defendants have a duty to produce the underlying data. VP Nutley testified that defendants' database consists of

> "People Soft is our primary database of information about employees, so it will – when we hire someone, we enter them into People Soft which means we will enter their starting salary, their hire date, their address, whatever information we need about their benefits and then as they're career—as they move along in CNA, if they get a promotion, that gets entered into People Soft, their salary increases are entered …eventually it has you—almost all of your HR data"  Nutley Dep p 7-8, **Exhibit   21**

The database also includes performance ratings. **Exhibit 21** p. 10. Further, " PIPs are maintained into a different system and then fed to People Soft." **Exhibit 21**. at p. 11. Nutley stated that PIPs are now maintained electronically (Id.) but in 2006 were kept in

---

[1] Defendants" Opposition p. 13.

6

paper form.  **Exhibit 21** at p. 13.  Thus, defendants admittedly have the information requested, they simply don't want to produce it.

C. <u>**Plaintiff is Entitled to Discovery Regarding Salary Information**</u>

Defendant erroneously argues that salary information of the other SIU employees is not discoverable.  Defendant fails to distinguish <u>Donlin v. Philips Lighting of North America</u>, 364 F.3d 207 (3d Cir. 2009).  In <u>Donlin</u>, an age discrimination case, plaintiff won a jury verdict for defendant's failure to hire her as a full-time employee after she worked as a temporary employee.  The Third Circuit upheld liability but remanded for a new trial on damages.  The court held plaintiff's lay expert testimony about defendant's salary structure, advancement opportunities, pay raises, or employment patterns lacked foundation because plaintiff only worked at Philips for less than a year.  Thus the court found Donlin's testimony lacked foundation.  <u>Id</u>. at 215-216.  For example, the Court held that Donlin wrongly speculated Philips would give a 3% increase in calculating front pay, estimated pension value and present value of any award.  <u>Id. at 217</u>.  The Court found proper plaintiff's comparison to a fifteen-year tenured employee of defendant, and held, "the district court may determine Donlin's compensatory damages by comparing to Matusick <u>or any other Philips employee</u> with similar characteristics."  <u>Id</u>.at 224. (emphasis added).  Therefore, Mr. Cashman should be allowed to compare himself to other employees in SIU relating to salary and bonus.  Defendant improperly asks this Court to disregard our precedent.  While defendants urge this court to reach outside of this circuit, there is no need to do so, since the Third Circuit has clearly ruled on this point.  Defendant has the salary data, as VP Nutley testified in  People Soft. **Exhibit 21**. p.8. Defendants simply do not want to produce it.

7

**D.  CNA's Investigation Of Wolfe Is Properly Discoverable, And Relevant To His Credibility**

Timothy Wolfe's 2005 performance evaluation (written by James Bonk) included a reference to Wolfe's handling of a personal attack on his integrity by Christopher Taylor, an SUI investigator. Taylor made the report to Bonk, who interviewed Wolfe. **Exhibit 13 (2005 Review) and Exhibit 22:Wolfe Dep. p.168-170; 172-4**

This happened in August or September 2005, about the same time Wolfe became Plaintiff's supervisor -- also about the same time defendants now claim Plaintiff began to have "performance problems" according to Wolfe.  It is also the same time Plaintiff learned he had a recurrence of his cancer and needed chemo and surgery.

The timing of this investigation is crucial, because it may well have influenced Wolfe's treatment of Cashman.  Wolfe undoubtedly knew Bonk had fired Richard Carroll in 2004 after Carroll refused to put Cashman on a PIP for termination.

Defendants' **Exhibit "H"** to their opposition brief includes Wolfe's emails to Cashman regarding his work.  CNA document 80 dated April 25, 2006 claims Plaintiff's cycle time (file opening to closing) was **79 days** at the end of the first quarter (Q1) i.e. March 31, 2006.  Bonk looked stunned at deposition when shown SIU Productivity Records **(Exhibit 27** attached hereto) produced by defendants, stating Cashman's cycle time was actually **39 days at Q1, not 79** as Wolfe's emails had claimed. **Exhibit 18 Bonk dep. p.  87:19 - 90:18; Exhibit 27**.  Bonk was also surprised that Wolfe substantially misrepresented Cashman's performance metrics for June 2006 on which Bonk had based his August 22, 2006 directive to put Plaintiff on a PIP.  Metrics do not lie. **Exhibit 27**. Wolfe's emails are false. Plaintiff does not seek to "sully" Wolfe's character.  Wolfe himself raised this credibility issue. He cast Plaintiff in false light to

8

follow Bonk's PIP directive. **Exhibit 20**. And when Cashman was forced out, Wolfe claimed CNA had no job for him, without authority from Bonk. **Exhibit 18 Bonk p. 139:21-23.**

Accordingly, discovery relating to the Taylor investigation is appropriate.

### E.  Defendants Erroneously Ask This Court to Disregard CEO Age Biased Statements Made At Corporate Meeting As Part of Corporate Culture

In its attempt to narrow discovery, CNA wrongly claims that Judge Sanchez excluded the CEO speech. This is not so.  Attached as **Exhibit 23** is Judge Sanchez order of April 16,  2008 ordering "Defendants shall provide a transcript of Stephen W. Lilienthal's speech in August 2002…"  In Reif v CNA, 06-4761, defendant (also represented by Mr. Antonelli) resisted discovery as well, but plaintiff got the discovery with motions to compel.

CEO Lilienthal made the following comments at the August 2002 management meeting:
> …
> So I think that's something that I'm going to put a priority on.
> And I would also tell you that **we need to get some kids in here**….
> And I would also tell you that **we need to get some kids in here.** In an industry that has killed training and development in the interest of expense savings, which was the third decimal of an expense ratio.  And then now when we hire somebody we play headhunters and cannibalize other companies and create a totally fragmented **culture** that  --  **I would really like to see us get some kids in here.** So as we change leadership at the top and sort of driven it down through the organization.  The **kids**, if you look at them as **seedlings**, kind of grow up and meet in the middle, and they actually do believe us…..
> Anyhow, but I do believe **the kids** become part of the culture and that they actually grow up. And if you have built a place that is a place of choice to work, that you get to keep these kids, and does become –what Berny talked about, the **one face—the culture**.  There is the CNA way, which is what we're working towards, which we don't have right now…
> I said it a different way in a meeting a couple days ago and I provoked a response, but I would just say – for those of you who were there, I apologize.  I will never repeat this again.
> But the place is kind of tight, and tight—you're getting the drift of where I went with this.

9

But anyhow – this is on tape, isn't it. Is this admissible?…

See **Exhibit 17 pp 51-53** attached hereto.  Defendant erroneously argues that there is no connection between the Lilienthal comments and any of the decision-makers in this case.  Defendant ignores the testimony of its own Senior VP Nutley, who was involved in the termination.  Nutley testified that Mr. Cashman reached out to her on November 3, 2006, his last day, to complain of age and disability discrimination and to question the defendants' decision rejecting his rescission of retirement. **Exhibit 21 Nutley Dep p. 24**.  Nutley did not deny hearing Lilienthal's speech, but testified, "I don't recall that."  **Exhibit 21 Nutley Dep. p. 28**.  She said she typically attends the Quarterly Leadership meetings.  When shown the transcript of the speech where Lilienthal refers to hiring kids (pp 51-53, **Exhibit 21,** she was asked:

  Q. Did you-that's not anything you heard; is that your testimony?
  A. My testimony is it's **nothing that I recall hearing**.  Nutley Dep 43 **Exhibit 21**  .

Further Nutley did not recall that she spoke to Robert Keith, Senior Vice-President about Lilienthal's speech in 2002**. Nutley Dep at 28**, **Exhibit 21**. Keith was deposed and testified as follows:

   A. So I asked the person who worked on the Employee Relations staff, her name is Debbie Nutley, I asked her how did the meeting go? And she said, Fine. But then she said, There was one statement that Mr. Lilienthal made that I have some concern could be misunderstood, could be misconstrued in terms of what he was saying….
   Did she say why she was concerned about it? Answer: No, she just – she basically said, you know, we've been talking about trainee programs and the word he said instead of, you know, we had been talking about trainee programs. And trainee programs to us means people without insurance experience, in particular underwriting and risk control experience. And that she said, Instead of referring to it as trainee program, meaning people who lack experience, he referred to it as kids.
   Q: And did you then at the time read the statement after you spoke to Debbie?
   A: I did
   Q. And did you confirm that she was correct as to his reference?

10

    A. Yes    **Nutley Dep p. 46-48 Exhibit 21**

CEO Lilienthal's speech and earlier remarks are admissible as an exception to the definition of hearsay. It is direct evidence of age bias.  FRE 801 (d)(2)(D) provides:

> (d) Statements which are not hearsay.  A statement is not hearsay if-(2) Admission by party –opponent.  The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity.

A statement is not hearsay if it is offered against the party who made it as an admission against interest. <u>Id</u>.  Lilienthal's speech was made directly by him as the then new CEO and Chairman. F.R.Evid. 801(d)(2)(D)  <u>Ryder v. Westinghouse Corp</u>., 128 F. 3d 128, 134 (3d Cir. 1997).  Second, Lilienthal was speaking as the CEO of CNA to CNA managers and/or executives about personnel matters and he set the new corporate culture, over which these executives exercised authority. Thus, he spoke as CNA's agent within the scope of his employment. See <u>Big Apple Inc. v. BMW of North America Inc</u>. 974 F.2d 1358, 1373 (3d Cir. 1992) (employer's representative making statement "within the scope of" his or her employment binds the employer under Rule 801(d)(2)(D) and does not require that a declarant have authority to bind its employer).   He has authority to approve bonus pool.  **Exhibit 24 Traina Dep pp 87-88.**

> Q: Isn't it true that the bonus pool is set by the CEO? (Objection…)
> A.  I believe that the CEO determines the – bonus pool for each, you know, organization within CNA.
> Q.  Including the Special Investigations Unit?
> A.  Yes.

 CNA's 2006 Annual Incentive Plan provides that "distribution of the final bonus pool will be determined by the CNA Chairman and CEO, the President & CEO…and others. **Exhibit 25** CNAJCDP02453.  This shows that CEO Lilienthal does exercise authority over employees of CNA, as to an important part of their compensation, the bonus

incentive. See also <u>United States v. Leal</u>, 781 F.2d 1108 (5th Cir. 1986) (taped conversations between the defendant and government witnesses were not hearsay, but were, rather, admissible).  The CEO comments are admissible as an admission against the interest of CNA.

The Lilienthal speech shows the incoming CEO's establishment of CNA's corporate culture, policy and strategy to change the face or image of its workforce to one of youth rather than experience. <u>Ryder v. Westinghouse Corp</u>., 128 F. 3d 128, 132.   In <u>Ryder,</u> the Third Circuit held ageist comments by unidentified Westinghouse executives a year after Plaintiff's termination by persons who were not involved, were admissible as statements of managerial attitudes. <u>Id</u>. at 132.  The  comments concerned older workers getting higher pay, and less opportunity for younger workers, so "blockers" need to be moved out of the way. Id. at 131.

In <u>Abrams v. Lightolier Inc.,</u> 50 F. 3d 1204, 1214 (3d Cir. 1995) the Third Circuit held a supervisor's statement about a company's managerial policy is relevant to show the corporate culture in which employment decisions are made, and may be used to build a circumstantial case of discrimination. 50 F. 3d at 1214.  It is evidence of policy:

> When a major company executive speaks, 'everybody listens' in the corporate hierarchy, and when the executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it cannot compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman.

<u>Citing: Lockhardt v. Westinghouse Credit Corp.,</u> 879 F. 2d 43, 54 (3d Cir. 1989)

Lilienthal's strategy of  **"getting kids in here"** describes the corporate culture. When a top corporate executive such as CEO Lilienthal makes such comments, a

12

reasonable jury may find they are evidence of a corporate animus favoring the young and disfavoring the old. Ryder v. Westinghouse, 128 F. 3d at 132.

The Third Circuit held biased statements that blacks cost more, made by a president **five years prior** to a tenure denial decision may be relevant evidence of discrimination.  In Roebuck v. Drexel University, 852 F.2d 715 (3d Cir. 1988) the court held a jury may infer that a president of the University has significant influence on the attitudes of the decision makers and such comment was relevant evidence of bias or pretext.  Id. at 733.  Similarly, our Circuit holds that when the CEO of a company speaks, everybody is going to listen.  Lockhardt v. Westinghouse Credit Corp., 879 F. 2d at 54. Lilienthal clearly states that hiring kids is going to be part of CNA's culture.  **Exhibit 17**.

### F.  Plaintiffs Are Entitled To Unredacted Discovery

Defendants do not object to this part of the Motion to Compel, and therefore concede that they should be compelled to produce unredacted discovery documents. None of the redactions are claimed to involve privilege and the complete documents are therefore properly discoverable. These numerous redactions are blatantly improper and no excuse is offered. Indeed, defendants even attached exhibits with crucial redactions to their opposition brief:

**Ex. "H" p. CNA 113** Wolfe email (date redacted) including an entry "By John Cashman" on a claim where Wolfe criticizes  Plaintiff's handling -- there is no file number, indeed, there is no file name -- all identifying information has been redacted.  It is a criticism Plaintiff is entitled to answer, but cannot.  Without knowing what file it is Plaintiff cannot request it or respond to the criticism, which may be false.

13

**Ex "H" email string p. CNA 190-193** Again, there is an entry by John Cashman (p. 192) dated October 21, 2005 related to an unidentified claim file. This information has apparently been redacted.  We are asked to "assume" it is the same file referenced in the string a week later. The name and claim number of a file appears only on emails dated October 26 and 27, 2005, none of which were sent to or from Mr. Cashman.  On October 19, 2005 Patel sent an unnamed claim assignment to SIU without a claim number. A week later Patel emailed Bonk, Lumley, Peyton and McPike about a claim file -- name Covert, number E3127587 -- and Bonk contacts Wolfe, who claims to have spoken with Cashman, whom he criticizes.  We do not know whether the file named on October 26 was the file in Cashman's entry a week earlier, or whether he tried to reach her 10 times but she was out.

**Ex "H" p. CNA 198**  Another cut-and-paste email allegedly on the Covert file, this time sent to Plaintiff by Wolfe, asking him to call.  It is dated October 26.  In the prior email string at p. CNA p. 190-193 there are October 27, 2005 messages from Wolfe and Patel.  Wolfe says he understands Cashman's reasoning but will instruct him to accept the SIU referral.  *Wolfe says that going forward he will have SIU call on every claim prior to rejection -- an admitted change in procedure.* Cashman was following the procedure in effect when he analyzed this file -- if it indeed was the same file.  Even assuming it was, this is an unfair performance criticism and defendants present it to the Court anyway, to create the false impression of a "performance problem" in October 2005.  (**Cashman's rating for 2005 was a 3 or satisfactory, in any event.  He was not placed on a PIP in 2005 and he received a bonus for that year's performance**)**.**  These emails are falsely portrayed as performance issues.

**Ex "H" p. CNA 201**  Another partial, redacted email said to be from John Cashman on Sept. 26, 2005.  The file is unnamed.  No claim number.  We do not know whether Wolfe's Sept. 30, 2005 email involves the same claim.  No privilege is involved.  It does not show any performance problem, and again, his evaluation for 2005 was satisfactory.

**Ex "H" p. CNA 457, p. 459-460**  Email p. 457 is dated June 30, 2006 from Wolfe to Cashman.  Again, the name of the file is redacted, and there is no claim number anywhere.  We do not know whether Cashman looked at the unidentified file -- and there are spaces in the page describing the file, deleting names and dates so that Cashman could not respond to the criticism.  Note the last sentence stating John Cashman is away at the time and thus knew nothing about it.  The blank space at the top of the page indicates a related email message was redacted when copied.  At p. 459 there is another large blank space at top of the page indicating redaction of an email string.  The "May 2006 file review results" does not identify any of the files reviewed.  The numbers have all been redacted.  No privilege claimed.  Plaintiff is entitled to complete documents.

**Ex. "H" p. CNA 517**  This email dated October 23, 2006 is Plaintiff's rescinding of his retirement decision made the month before, one day after being hit with a PIP and one week before scheduled cancer surgery.  The PIP was delivered without warning (as admitted by Wolfe at his deposition) at this time despite Cashman's notice of surgery to Wolfe.  The large blank space at the top of this page also indicates redaction of an email related to this one.  There is no privilege claim and Plaintiff is entitled to an unredacted document.

**Ex. "H" p. CNA 521** The blank space above this October 30, 2006 email indicates redaction of a related message. No privilege is claimed. Plaintiff is entitled to production of the complete document.

In <u>Reif et. al. v. CNA et. al.,</u> E. D. Pa. No. 06-cv-4761, after a court hearing on plaintiffs' Motion to Compel, Judge Sanchez ordered CNA to un-redact and re-produce over 2,500 discovery documents in complete form, in September 2007, allowing redactions only for social security numbers and confidential medical information. **Exhibit 26** at Par. 6, attached hereto. In the present case, CNA redactions are even more extensive and impact Plaintiff's ability to properly prepare for trial. The total lack of any mention in defense opposition to Mr. Cashman's motion to compel unredacted documents demonstrates defendants' abandonment of any claim that its redactions are legitimate. There also is no claim of any privilege whatsoever. Plaintiffs are entitled to complete and unredacted discovery documents.

In addition to the list of redacted documents filed August 24, 2009 with this motion, (**Exhibit 12** to Plaintiff's Motion to Compel), plaintiff adds CNAJCP00113, 192, 193, 198, and 201 (produced by defendants under Tab B).

### III. CONCLUSION

For all the above stated reasons, plaintiff respectfully requests that this Honorable Court grant his Motion to Compel.

Date: 8/21/09

                Respectfully submitted,

                /s/

                _____
                Carmen R. Matos, Esquire, PA I.D. No. 32795
                Anita Alberts, Esq. PA ID 28086
                40 East Court Street, 3d Floor
                Doylestown, PA 18901
                215-345-8550
                215-345-8551
                crm617@aol.com
                afalawyer@comcast.net
                Attorneys for Plaintiff
                Mr. John Cashman

## CERTIFICATE OF SERVICE

      The undersigned certifies that a true and correct copy of the following legal papers were served upon:

| | |
|---|---|
| Richard J. Antonelli Esq. | Anita F. Alberts, Esq. |
| Rebecca Dick-Hurwitz, Esq. | 40 East Court St, 3d Floor |
| Babst, Calland, Clements & Zomnir PC | Doylestown, PA  18901 |
| Two Gateway Center, Eighth Floor | |
| Pittsburgh PA 15222 | |

in the following manner:

Legal Papers:                      Plaintiffs' Reply to Defendant's Opposition to Plaintiff's First Motion to Compel, Certificate of Service

Manner:                             ECF
                                         Exhibits by mail

                                         /s/
Date:   September 21,  2009     By:_____
                                         Carmen R. Matos, Esquire
                                         crmatoslaw@aol.com
                                         Attorney for Plaintiff
                                         Mr. John Cashman