## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOHN CASHMAN,** | : |
| Plaintiff, | : |
| | : Civil Action No. 08-5102 |
| v. | : |
| **CNA FINANCIAL CORP**. | : Hon. Thomas M. Golden |
| and | : |
| | : |
| **CONTINENTAL CASUALTY CO**., | : Jury Trial Demand |
| Defendants. | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

11/6/09

Carmen R. Matos, Esquire, PA I.D. No. 32795
Anita Alberts, Esq. PA ID 28086
40 East Court Street, 3d Floor
Doylestown, PA 18901
215-345-8550
215-345-8551
Attorneys for Plaintiff
Mr. John Cashman

1

TABLE OF CONTENTS

I.   STATEMENT OF FACTS……………………………………………………1

II.  APPLICABLE STANDARDS OF REVIEW……………………………………1
.
III. ARGUMENT……………………………………………………………3

   A. A Reasonable Jury May Infer That Plaintiff Has Established Age Discrimination….. 3

      1. Plaintiff Has Established An Inference Of Age Discrimination……………………3

         a.  Plaintiff Was "Replaced" By Breit, Age 39………………………………………..4

         b.  Plaintiff Was Qualified………………………………………………………..8

         c.  Plaintiff Suffered An Adverse Action…………………………………………9

      2. Defendants Alleged Non-Discriminatory Reason Is Not Worthy Of Credence…….10

      3. Mr. Cashman Presents Sufficient Evidence Of  Pretext……………………………..11

         a.  Wolfe's Age Based Comment Is Evidence Of Pretext…………………………11

         b.  CEO Lilienthal's Directive To Hire Kids Favors Youth………………………12

         c.  Wolfe's Deletion Of Spreadsheets He Allegedly Used Is Evidence Of Pretext…..15

         d.  The Irregularity Of The Pip Process Shows Pretext………………………………16

         e.  Wolfe's Subjective Criticism Is Errant Or Misplaced…………………………18

         f.   The Change In Plaintiff's Rating By Wolfe Is Evidence Of Pretext……………20

         g.  PIPing To Terminate Older Employees  Is Evidence Of Pretext……….……...21

         h.  Subsequent Hires Are Substantially Younger…………………………………22

         i.  Plaintiff's Prior Satisfactory Performance As A Fraud Investigator Is Evidence Of
            Pretextual Claim Of Sudden "Poor Performance"……………………………..22

         j.  Defendants' Argument That Weiner Was Not Replaced Is Misplaced…………..23

         k.  CNA's Turnover Policy Targets Retirement Due To Age And Seniority……....23

l. CNA Does Not Have To Discriminate Against All Members Of The Protected Group………………………………………………………………………..26

B. A Reasonable Jury May Infer That Plaintiff Has Established ADEA Retaliation ……27

   1. Plaintiff Has Established An Inference Of Retaliation ……………………………27

C. CNA Has No Legitimate Defense To Plaintiff's FMLA Claim ………………………31

   1. Cashman's Adverse Action Is Related To FMLA Leave…………………………32

   2. Aug. 2006: McClarren Returns To Work, The Cashman PIP And The Breit Hire…33

   3. Cashman Can Establish Prejudice Because The PIP Is False……………………..33

   4. Cashman Is Clearly Prejudiced By The Loss Of Employment And Medical Benefits …………………………………………………………………..…37

   5. CNA Does Not Favor Employees Who Need Time Off For Illness ……………38

D. A Reasonable Jury May Infer That Plaintiff Has Established ADA Discrimination, Intimidation And Retaliation…………………………………….……………………39

   1.   CNA Retaliated Against Cashman When He Requested Accommodation………39

   2.   Plaintiff Established An Inference Of ADA Discrimination……………………..41

      a. Mr. Cashman Was Regarded As Having A Disability…………………………44

      b.  Mr. Cashman's ADA Claim Is Also Based On Record Of Disability………...47

      c. Cashman Does Not Claim Constructive Discharge; He Was Fired…………..48

   3. ADA Retaliation Is Established In This Record………………………………….48

      a. CNA's Alleged Reason For The Retaliation Is Pretextual……………………..49

      b.  There Is A Causal Connection Between The Protected Activity And The Adverse Action………………………………………………………………50

      c.  Plaintiff Suffered A Material Adverse Action ………………………………...50

E. CNAF Is An Essential Party Defendant In This Case And Must Not Be Dismissed….51

IV.   CONCLUSION………………………………………………………………55

Table of Authorities

Abrams v. Lightolier Inc., 50 F. 3d 1204, 1217 (3d Cir. 1995)…………………………………14

Adams v. Rice, 531 F. 3d 936, 945-46 (D. C. Cir. 2008)…………………………………….…..47

Anderson v Consolidated Rail, 297 F.3d 242, 249 (3d Cir. 2002)…………………………….…5

Anderson v. Liberty Lobby, Inc., 477 U.S. 242,  255 (1986)………………………………..…..1,2

Andrews v. City of Philadelphia, 895 F.2d 469, 484 (3d Cir. 1990)…………………………..27

Ansell v. Green Acres Construction Company, 347 F.3d 515, 522 (3d Cir. 2003)…………..21,22

Barber v. CSX,  68 F.3d 694, 699 (3d Cir. 1995)……………………………………………..6,29

Bhaya v. Westinghouse,  832 F.2d 258, 262, cert denied, 488 U.S. 1004 (1989)……………….…3

Brewer v.  Quaker State Oil  72 F.3d 326 (3d Cir. 1995)………………………………8,10,18,20

Bruno v. WB Saunders 882 F.2d 760, 767 (3d Cir. 1988)…………………………………….....21

Burlington Northern and Santa Fe Railway Company v. White, 126 S.Ct. 2405, 2415
(2006)…………………………………………………………………………9,28,48,50,51

Capobianco v. City of New York, 422 F. 2d 47, 57 (2d Cir. 2005)…………………………….44

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)………………………………………….……...2

Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 899 (3d Cir.) (en banc), cert. dismissed, 483 U.S.
1052 (1987)…………………………………………………………………………………2,3

Cochran v. Feeko, 777 F. Supp. 1222, 1223 (E.D. Pa.) aff'd by, 947 F.2d 934 (3d Cir. 1991)….2

Corbin v. Southland Int'l Trucks, 25 F.3d 1545, 1550(11th Cir. 1994)…………………………7

Deane v. Poco Medical Center,  132 F.3d 138 (3d Cir. 1998)……………………………….42,43

Douglas v. Anderson, 656 F.2d 528, 533 (9th Cir. 1981)………………………………………7

Duffy v. Wheeling Pittsburgh Steel Corp. 738 F.2d 1393, 1395 (3d Cir. 1984)…..……………4

EEOC v. Hall's Motor Transit Co., 789 F.2d 1011, 1015 (3d Cir.1986)……………………...2

Emory v. AstraZeneca Pharms. LP,  401 F. 3d 174, 180 n. 4 (3d Cir. 2005)……………….45, 47

Eshelman v. Agere Systems Inc., 397 F. Supp. 2d 557 (E.D. Pa. 2005) affm'd 2009 U. S. App.
LEXIS 1947 (3d Cir. 2009)……………………………………………...…………………43,44

Fakete v. Aetna, Inc., 308 F.3d 335 (3d Cir. 2002)……………………………………………11,15

Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005)………………………………………………28

Fuentes v. Perksie, 32 F.3d 759 (3d Cir. 1994)…………………………………………3,11,38,39

Furnco Constr. Corp v. Waters, 438 U.S. 567 (1981)…………………………………………7

Goosby v Johnson &  Johnson  228 F.3d 313, 320 (3d Cir. 2000)……………………….7,26,27

Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564 (2d Cir. 1989) ……………………27

Gross v. FBL Financial Services, 129 S.Ct. 2343 (2009)………………………………….....4

Hazen Paper Co. v. Biggins, 507 US 604 (1993)……………………………………………4, 23

Hill v City of Scranton, 411 F.3d 118 (3d Cir. 2005)………………………………………..2

Jackson v. University of Pittsburgh, 826 F.2d 230, 232 (3d Cir. 1987), cert. denied, 484   U.S.
1020 (1988)…………………………………………………………………………………1

Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), cert denied, -- U.S. --,
110 S. Ct. 725 (1990)………………………………………………………………….28,48,49

Killen v. Northwestern Human Services Inc., 2007 U. S. Dist. LEXIS 66602
(E. D. Pa. Sept. 7, 2007)……………………………………………………………………51

Krouse v. American Sterilizer Co., 126 F.3d 494 (3d Cir. 1997)……………………………41

Lockhart v. Westinghouse Credit Corp. 879 F.2d 43, 54  (3d Cir. 1989)………………………14

Maxfield v. Sinclair, 766 F.2d 788, 791 (3d Cir 1985)……………………………………….....4

McDonnell Douglas Corp v. Green, 411 US 792, 804-805 (1973)……………………………21

Michael v. Caterpillar Financial Services Corp., 496 F. 3d 584, 596 (6th Cir. 2007),
*cert. denied* 128 S. Ct. 1657 (2008)…………………………………………………………51

Miller v. CIGNA, 47 F.3d 586, 598 (3d Cir. 1995)……………………………………………3

O'Connor v. Consolidated Caterers, 517 U.S. 308, 312 (1996). ………………………………3

Olson v. General Electric Aerospace, 101 F. 3d 947, 953 (3d Cir. 1996)………………………47

Pivirotto v. Innovative Systems, 191 F.3d 344, 347 (3d Cir. 1999)……………………………5

Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860 (3d Cir. 1986)……………………2

Price Waterhouse v. Hopkins, 490 US 228 (1989)……………………………………………4

Reeves v. Sanderson Plumbing, 530 U.S. 133 (2000)…………………………………7,15,27

Robinson v. Septa, 982 F.2d 892 (3d Cir. 1993)…………………………………………...…28,31

Ryder v. Westinghouse Corporation, 128 F.3d 128 (3d Cir. 1997)…………………13,14,15,38

School Board of Nassau County, Fla. v. Arline, 480 U. S. 273, 284-85 (1987)…………41,42,47

Sempier v. Johnson 45 F.3d 724, 729-730 (3d Cir 1995)……….………………………...6,7,8

Shaner v. Synthes, 204 F.3d 494 (3d Cir 2000)………………………………………………41

Shellenberger v. Summit Bankcorp, 318 F.3d183 (3d Cir. 2003)……………………………40

Sheridan v. DuPont, 100 F.3d 1061, 1071-72 (3d Cir.1996)…………………………………9, 28

Showalter v. University of Pittsburgh, 190 F.3d 231 (3d Cir. 1999)………………………...…5,6

Siegel v. Alpha Wire Corp, 894 F.2d  50,  55-56 (3d Cir. 1990)……………………………22,31

Smith v. City of Wilkensburg, 147 F.3d 272, 280 (3d Cir. 1998)……………………………27

Sprint v. Mendelsohn,- U.S.-, 126 S.Ct. 1140 (2008)…………………………………………21

Sutton v. United Air Lines Inc., 527 U. S. 471, 489 (1999)…………………………………45

Steward v. Sears, Roebuck & Company, 231  Fed. Appx. 201, 2007 (3d Cir. 2007)………4,5,12

Taylor v. Phoenixville School Dist., 184 F. 3d 296, 307 (3d Cir. 1999)…………………..…46

Tice v. Ctr. Area Transportation Auth., 247 F. 3d 506, 514 (3d Cir. 2001)……………………45

Torre v. Casio, 42 F.3d 925 (3d Cir. 1994)…………………………………………………1

Turner v. Schering-Plough Corp., 901 F.2d 335, 340-341 (3d Cir. 1990)………………………1

U.S. Postal Service v. Aikens, 460 U.S. 711 (1983)…………………………………………3

Vance v. Southern Bell Tel. and Tel.  Co., 863 F.2d 1503, 1510 (11th Cir. 1989)……………27

Versage v. Township of Clinton, 984 F.2d 1359, 1361 (3d Cir. 1993)…………………………2

Waldron v. SL Industries, 56 F.3d 491 (3d Cir. 1995)………………………………………11,16

Weiss v. Parker Hannifan Corp.,57 FEP Cases 216, 225 (D.N.J. 1990)…………………………27

Whittington v. Nordham Grp Inc., 429 F.3d 986, 993 (10thCir. 2005)…………..……6,7, 15,16

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN CASHMAN,** | : |
| Plaintiff, | : |
| | : Civil Action No. 08-5102 |
| vi. | : |
| **CNA FINANCIAL CORP**. | : Hon. Thomas M. Golden |
| and | : |
| **CONTINENTAL CASUALTY CO**., | : Jury Trial Demand |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

## I.  STATEMENT OF FACTS

Plaintiff, Mr. John Cashman, by his undersigned counsel, hereby opposes Defendants'

motion for summary judgment based on Plaintiff's Statement of Material Disputed Facts,

Plaintiff's Response to Defendant's Statement of Facts, Sections I and II and based on this

Memorandum of Law.    Plaintiff incorporates by reference the facts listed in Plaintiff's

Statement of Material Disputed Facts, Plaintiff's Response to Defendant's Statement of Facts,

Sections I and II

## II.  APPLICABLE STANDARDS OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure requires that the movant, provide through

"pleadings, depositions, answers to interrogatories, and admissions on file together with

affidavits . . . that there is no genuine issue of material fact" to obtain judgment as a matter of

law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). An issue is

genuine if a reasonable jury could return a verdict for the party opposing the motion. Id. at 248;

Torre v. Casio, 42 F.3d 925 (3d Cir. 1994); Turner v. Schering-Plough Corp., 901 F.2d 335, 340-

341 (3d Cir. 1990).  A fact is "material" if it "might affect the outcome of the suit under the

governing law."  Jackson v. University of Pittsburgh, 826 F.2d 230, 232 (3d Cir. 1987), cert.

1

denied, 484 U.S. 1020 (1988). In deciding a motion for summary judgment, a court must

construe all reasonable inferences in the light most favorable to the non-moving party. Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("credibility determinations, the weighing of

evidence, and the drawing of legitimate inferences from the facts are jury functions and not those

of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.  The

evidence of the non-moving party is to be believed, and all justifiable inferences are to be drawn

in his favor."); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Hill v City of Scranton, 411 F.3d

118 (3d Cir. 2005) (court does not have to believe testimony of interested witnesses at summary

judgment). Furthermore, "reasonable doubt as to the existence of a genuine issue of material fact

is to be resolved against the moving party." Cochran v. Feeko, 777 F. Supp. 1222, 1223 (E.D.

Pa.) (citations omitted), aff'd by, 947 F.2d 934 (3d Cir. 1991); Versage v. Township of Clinton,

984 F.2d 1359, 1361 (3d Cir. 1993).

     In order for a defendant employer to meet its burden on summary judgment, it "must

show that the plaintiff will be unable to introduce either direct evidence of a purpose to

discriminate, or indirect evidence of that purpose by showing that the proffered reason is subject

to factual dispute." Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 899 (3d Cir.) (en banc), cert.

dismissed, 483 U.S. 1052 (1987). Indeed, the proponent of a summary judgment motion must

foreclose any issue of fact that would properly be before the court.  See Anderson v. Liberty

Lobby Inc., 477 U.S. at 249. If the non-moving party does produce direct or indirect evidence of

discriminatory intent, then summary judgment is improper.  Pollock v. American Tel. & Tel.

Long Lines, 794 F.2d 860 (3d Cir. 1986); EEOC v. Hall's Motor Transit Co., 789 F.2d 1011,

1015 (3d Cir.1986).  A plaintiff in an employment discrimination case may defeat summary

judgment by pointing to evidence of inconsistencies and implausibilities, weaknesses,

incoherencies, contradictions in the employer's proffered reasons for discharge [which] reasonably could support an inference that the employer did not act for nondiscriminatory reasons.  Chipollini., 814 F.2d at 900; Fuentes v. Perksie, 32 F.3d 759 (3d Cir. 1994). Direct evidence is not required and circumstantial evidence is perfectly acceptable and sufficient to support a finding of intentional discrimination. U.S. Postal Service v. Aikens, 460 U.S. 711 (1983) since "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." Id. at 716.  In Bhaya v. Westinghouse,  832 F.2d 258, 262, cert denied, 488 U.S. 1004 (1989) the court held, "where the only evidence of intent is oral testimony, a jury could always choose to discredit it."

Plaintiff respectfully submits that there are clearly genuine issues of disputed facts which reviewed in light most favorable to the non-movants, plaintiffs, preclude summary judgment. Plaintiff can establish a prima facie case of age discrimination, and submit direct or indirect evidence to show that Defendant's articulated reasons for terminating plaintiffs are pretextual. Accordingly, summary judgment is not appropriate.

## III.  ARGUMENT

### A.   A Reasonable Jury May Infer That Plaintiff Has Established Age Discrimination

### 1.  Plaintiff Has Established An Inference of Age Discrimination

In a "pretext" case, the plaintiff can establish a prima facie case by showing 1) that he is over forty; 2) was performing at a level that met his employer's expectations; 3) suffered an adverse action; under circumstances giving rise to an inference of age discrimination. O'Connor v. Consolidated Caterers, 517 U.S. 308, 312 (1996); Miller v. CIGNA, 47 F.3d 586, 598 (3d Cir. 1995) (plaintiff need not prove age is the sole factor).  The Supreme Court has clarified that plaintiff in an ADEA case has to show that he suffered an adverse action because of age: that is,

that age played a role in the employer's decision-making process and had a determinative influence on the outcome.  Gross v. FBL Financial Services, 129 S.Ct. 2343 (2009); citing Hazen Paper Co. v. Biggins, 507 US 604 (1993).[1]

Plaintiff can establish a prima facie case of age discrimination under the pretext analysis as follows. (1) Plaintiff is protected by the ADEA, since he was 59 at the time of the PIP and forced retirement; (2) Plaintiff was qualified for his position, met the employer's expectations for 14 years, and (3) CNA PIPed and forced Mr. Cashman to retire under circumstances giving rise to an inference of age discrimination.   The record shows that Breit replaced plaintiff or that sufficiently younger employees were retained and assumed his duties.  Duffy v. Wheeling Pittsburgh Steel Corp. 738 F.2d 1393, 1395 (3d Cir. 1984); Maxfield v. Sinclair, 766 F.2d 788, 791 (3d Cir 1985)  Miller v. Cigna  47 F.3d 586 (3d Cir. 1995); Steward v. Sears, Roebuck & Company, 231  Fed. Appx. 201, 2007 U.S. App. LEXIS 19365 (3d Cir. 2007

**a.  Plaintiff was "replaced" by Breit, age 39**

Defendants argue that Mr. Cashman was not "replaced" but that his duties were distributed among Breit and other FCMs.  In Steward v. Sears, the exact same argument was presented by the defendant.  The Third Circuit found that a jury may consider the age of each individual who took over some portion of plaintiff's duties as well as what portion of plaintiff's duties each assumed.  Id at 209-210.  Wolfe, plaintiff's supervisor testified that Breit, then 39 years old, took over some of Mr. Cashman's and now claims it was only a small amount of files, **Wolfe testified "he did not remember exactly how he redistributed Mr. Cashmans's files; and that is not**

---

[1] In Gross, the Supreme Court rejected the mixed motive analysis under  Price Waterhouse v. Hopkins, 490 US 228 (1989) (Title VII) in an ADEA case. Here, Mr. Cashman proceeds under the traditional pretext analysis.

**documented anywhere." N.T. 239 line 24 to 240 (line 3).** Wolfe's Affidavit, Exhibit G to Defendant's Motion, ¶ 52 contains a "chart" purporting to show some files where "Cashman notes" were found. This proves absolutely nothing. Breit testified that he did assume some of Mr. Cashman's work, and he had no idea if there are any documents showing the files being assigned to any team member. **Ex B Breit N.T. 51**

Even if some of the files were assumed by other employees, as long as some of plaintiff's work was assumed by one or more substantially younger employee, that is sufficient to establish an inference of discrimination. Id at 210. In Steward, the Third Circuit held that the District Court erred in deciding whether to overturn the jury's verdict when it categorically measured the age difference between Steward and all of his replacements as 6.75 years to establish the fourth element of a prima facie case of age discrimination. CNA attempts the same deceptive tactic in this case.

Defendant relies on Anderson v Consolidated Rail, 297 F.3d 242, 249 (3d Cir. 2002). Anderson actually supports plaintiff's position, holding that in order to satisfy the fourth element of the prima facie case under the ADEA, a plaintiff must show that the employer retained sufficiently younger similarly situated employees. Id. at 249-250. Moreover, our Third Circuit has joined seven other circuits in holding that a plaintiff claiming discriminatory firing need not prove, to make out a prima facie case, that he was replaced by someone outside the protected class. Pivirotto v. Innovative Systems, 191 F.3d 344, 347 (3d Cir. 1999); Showalter v. University of Pittsburgh, 190 F.3d 231 (3d Cir. 1999).

The Third Circuit has also declined a bright-line rule as to the age difference between plaintiff and the person who assumed his duties, "there is no magical formula to measure a particular age gap and determine if it is sufficiently wide to give rise to an inference of

discrimination." <u>Barber v. CSX</u>,  68 F.3d 694, 699 (3d Cir. 1995)(eight year difference

sufficient to establish prima facie case).  Different courts have held that "a five year difference

can be sufficient but that a one year difference cannot." <u>Sempier v. Johnson</u> 45 F.3d 724, 729-

730 (3d Cir 1995)<u>; Showalter v. University of Pittsburgh</u>, 190 F.3d at 236; <u>Whittington v.

Nordham Grp Inc.</u>, 429 F.3d 986, 993 (10thCir. 2005)(five year difference sufficient)[2].  Here Mr.

Breit was 39 years old when he assumed Mr. Cashman's duties, and twenty years is clearly a

significant age difference.

      Mr. Cashman relies on the following evidence to show that Breit was indeed his

replacement and/or assumed his duties:

- ❑  In July or August 2006 Gary Traina, Manager of Major Investigations, informed Douglas Breit, then age 39, that a job would be open in the SIU for FCM investigator, that he should watch for a job opening on line. Breit had been laid off  by CNA on October 31, 2005. **Exhibit B (Breit)** N.T. 13,14. During conference calls regarding possibly hiring another investigator, Wolfe mentioned Doug Breit's name as a candidate. **Exhibit 1** @ 60

- ❑  On September 11, 2006, Douglas Breit, age 39 (DOB 1966) was hired to work in the CNA's Maitland, Florida office. (**Exhibit 65A** #299-300); **Exhibit 65B** at #309.

- ❑  A company SIU Organization chart dated September 15, 2006 has Mr. Cashman's name crossed out and Doug Briet's name with the date 9/18/06. **Exhibit 66**

- ❑  On September 18, 2006, Wolfe announced Breit would join the SIU. **Exhibit 67** (#89). This was the day before Mr. Cashman was PIPed.

- ❑  On September 21, 2006, Wolfe gave Mr. Cashman more assignments. It seemed like everything was fine, business as usual after Mr. Cashman said he would retire.  When Mr. Cashman questioned Wolfe, he responded, "John, please continue handling new assignments until further notice. If your last working day will be Nov 3 we have time **to bring Doug up to speed before we cut you off**." **Exhibit 76** (#91)

- ❑  Ms. Curran testified that Mr. Cashman's duties were spread out amongst the department, including Mr. Douglas Breit who was recently hired, although she was not aware of his name, "**But if he had been hired and was in the department, I'm sure he would have received some of the work**."      **Ex. E Curran N.T. 72**

---

[2] The Third Circuit Model Instruction 8.1.2 on Age Discrimination provide that five years is sufficient.

Nevertheless, defendant argues that other employees along with Breit (20 years younger), Picard (ten years younger);McClarren, Benson and Lee (close in age to plaintiff) also assumed some of plaintiff's duties. In <u>Sempier</u>, the court held that a jury may infer the prima facie case based on combined differences in age between plaintiff on the one hand and the persons who assumed his duties on the other is clearly sufficient to satisfy the fourth prong of the prima facie case by raising an inference of discrimination. <u>Id.</u> 45 F.3d at 730. In <u>Sempier</u>, the Court found that the district court erred in considering <u>only</u> the four-year age difference between Sempier and Carpenter, one of the persons who had taken over some of plaintiff's duties while not considering the age of Page, another employee well over 10 years younger, who took over other duties. <u>Id.</u> at 729-730 (we are not limited to considering only plaintiff's final replacement). <u>See</u> <u>also Corbin v. Southland Int'l Trucks</u>, 25 F.3d 1545, 1550(11th Cir. 1994) (finding of age discrimination upheld when a 53 year-old was treated more favorably than a 58 year-old employee); <u>Douglas v. Anderson</u>, 656 F.2d 528, 533 (9th Cir. 1981) <u>Whittington v. Nordham Grp Inc.</u>, 429 F.3d 986, 993)(five year difference sufficient).

Defendants' retention of older employees is not dispositive. <u>Reeves v. Sanderson Plumbing</u>, 530 U.S. 133 (2000). In <u>Reeves,</u> an age discrimination case, defendant argued that no inference of age discrimination should exist when defendant retained many managers over the age of 50. <u>Id.</u> The court found such evidence not dispositive, relying on <u>Furnco Constr. Corp v. Waters,</u> 438 U.S. 567 (1981) at 580 (evidence that employer's work force was racially balanced, while "not wholly irrelevant," was not "sufficient to conclusively demonstrate that [the employer's] actions were not discriminatorily motivated") <u>See also</u> <u>Goosby v Johnson & Johnson</u> 228 F.3d 313, 320 (3d Cir. 2000). "An employer does not have to discriminate against all members of a class to illegally discriminate against a given member of that class."

**b.  Plaintiff Was Qualified**

Defendants argue that Mr. Cashman was not qualified for the FCM job he was selected for in 2005.  Mr. Cashman had been a fraud investigator since he was hired in 1992.  This argument fails under  Sempier v. Johnson & Higgins, 45 F.3d 724 (3d  Cir. 1994) where the Third Circuit held that Plaintiff's satisfactory performance of duties over a long period of time leading to a promotion clearly established his qualifications for the job.  Defendant wants the Court to ignore Plaintiff's unblemished record in the SIU as a fraud investigator. **Exhibits 4-13,15,15A,16, 27,28.**  Even for the year 2005 when plaintiff received his last performance appraisal, CNA rated him as "3" or meets expectations and rewarded him with a bonus. **Ex 16, 27, 28**.  Traina rated Mr. Cashman higher, "2" or exceeds but Wolfe changed his rating to a "3" which is still a satisfactory rating which is required for a bonus. **Ex. 27,28**.

In Brewer v.  Quaker State Oil  72 F.3d 326 (3d Cir. 1995) as in the instant case, plaintiff received performance based bonuses and increases. As in Brewer, plaintiff here had favorable reviews for 14 years, achieved merit increases and bonuses from 1993 through 2002, based on performance that was more than satisfactory.  Carroll, former SIU Director, testified that "the quality of Mr. Cashman's investigative work was excellent." **Ex. C  at 51-21**.  Traina, former Manager who supervised Plaintiff in 2005 and rated him "2" or exceeds in January 2005, testified Mr. Cashman could work independently without supervision, was a good team worker, had the highest level of professionalism and overall was satisfied with his work.  **Exhibit J** Traina N.T. 69-70, **Ex. 27**. In 2005 and 2006, CNA rewarded Mr. Cashman with a bonus of $4368 for his good work. **Exhibit 15A, 16**.  Traina never warned or disciplined Mr. Cashman. Nor did he ever plan to put him on a PIP.  **Exhibit J Traina N.T. 114**.

8

### c.  Plaintiff suffered an adverse action

Defendants do not dispute that Plaintiff suffered an adverse action consisting of the PIP followed by CNA's refusal to allow the rescission of early retirement, forcing plaintiff out of work.  **Exhibit 1 ¶ 76-98**. Burlington Northern and Santa Fe Railway Company v. White, 126 S.Ct. 2405, 2415 (2006). (Plaintiff must show a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination).  See also Sheridan v. DuPont de Nemours & Co., 100 F.3d 1061, 1071-72 (3d Cir.1996).

Defendants' executives, HR, and Wolfe did not allow Mr. Cashman to rescind, despite Mansfield's query to Liapes asking "if we are obligated to accept his rescinding of his retirement notice…"  **Exhibit 80**. When Mr. Cashman inquired about the Major Investigative Team position, Wolfe told him "that position is not open for you either, there is no job for you at CNA."  **Ex. 1 ¶ 91**.  Even before giving the  PIP to Mr. Cashman, Wolfe responded to Curran's insightful question, "**that he did not expect him to make the plan, and that he would tell him there are no other jobs available**."  **Exhibit 70**.  After the PIP, the pressure was off because Wolfe already had decided there would be no job available for Mr. Cashman since he replaced him with Breit. Id, Ex. 76, Ex 1 ¶ **82**. Mr. Cashman then wrote to Wolfe, HR and defendants executives stating, "I will consider your insistence that Nov. 3d is my last day as an involuntary termination.  If there is a company regulation that states I must retire and cannot retract this decision, please advise…" **Exhibit 87**, **Ex 1 ¶96**.  HR Representative Mansfield instructed Wolfe to "go into the system and complete the termination paperwork. Ex 1 ¶ **97; Ex. 90**; **Ex. 3**. Wolfe ordered Mr. Cashman to turn in his equipment. **Ex 89**, **Ex 1 ¶ 97.**  VP Nutley ordered Mr. Cashman to turn in his laptop and other equipment because Nov.3d was his last day despite Mr.

Cashman's complaint of age and disability discrimination. **Ex I Nutley N.T 25  lines 14-15**

("Are you ordering me to leave? I [Nutley] said "yes.")  **Id**, **Ex. 91**, **Ex 1 ¶ 88, 98: Ex. 78**.

Curran signed a statement to the effect that "the return of the … equipment in no way indicates

any agreement of my voluntary separation or retirement..." **Ex. 92**.

 Throughout this case CNA has attempted to mischaracterize Mr. Cashman's email of

September 20, 2006 (**Ex.74)** as a "resignation" which it clearly was not. **Ex. 91**, **Ex 1 ¶ 88, 98:**

**Ex. 78**. CNA attempts to recast the forced early retirement decision as "voluntary" to legitimize

itself, but this fails. Wolfe was promoted to SIU Director in November 2006, after forcing

Cashman out.  **Ex. A Bonk N.T. 113**  At the precise time Cashman told upper management he

did not want to retire, Wolfe was already assuming Bonk's duties.

## 2.  Defendants Alleged Non-discriminatory Reason Is Not Worthy of Credence

 CNA presents the evidence of alleged legitimate, nondiscriminatory reason that Mr.

Cashman's performance was not up to par leading to a Performance Improvement Plan (PIP) and

it would not allow Mr. Cashman to rescind his decision.   Mr. Cashman has the burden to present

sufficient evidence from which a factfinder could reasonably either disbelieve the employer's

articulated legitimate reason or believe that an invidious discriminatory reason was more likely

than not a motivating or determinative cause of the employer's action.  Brewer v. Quaker State

Oil  72 F.3d at 331 (3d Cir. 1995). See **Exhibits 35A, B, and C**.  **Exhibit 35C** are the CNA

spreadsheets documenting performance of SIU FCMs including Cashman. **Exhibits 35A** and **B**

are summary charts based on the spreadsheets.  Mr. Cashman's performance's ratings have all

been exceeds and meets expectation.  In Brewer v. Quaker State Oil, 72 F.3d at 331, the court

held that an employee's testimony regarding specific examples of "errant or misplaced criticism"

is more than just a "subjective opinion of his performance" and is thus probative of whether or

not the reasons offered by the employer for the employee's discharge were pretextual.  Id.

CNA's own spreadsheets, which are the objective metrics of the SIU, disprove their claimed

defense. **Exhibit 35C**.

### 3.  Mr. Cashman Presents Sufficient Evidence of Pretext

Mr. Cashman has to show that the employer's stated reasons "demonstrate such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them

'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-

discriminatory reasons." Fuentes v. Perksie, 32 F.3d 759, 765 (3d Cir. 1994).  A plaintiff is not

required to "cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful

of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of

them, the plaintiff may not need to discredit the remainder. That is because the factfinder's

rejection of some of the defendant's proffered reasons may impede the employer's credibility

seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons,

even if no evidence undermining those remaining rationales in particular is available." Fuentes

32 F.3d at 764 n. 7.

### a.  Wolfe's Age Based Comment Is Evidence of Pretext

Mr. Cashman submits evidence of the age based comment by Wolfe "**it gets tougher**

**when you get old**" as evidence of age bias. **Ex 1 ¶42, 100, Ex. 94**. VP Liapes asked Mr.

Cashman about his discrimination claim when she called him on November 6. Ex. 94.  She noted

that this comment is "problematic." **Ex. F Liapes N.T. 27-28**  In Fakete v. Aetna, Inc., 308 F.3d

335 (3d Cir. 2002), this court held that a reasonable jury could view a supervisor's remark that

new management was looking for younger single people to work unlimited hours as evidence

that plaintiff's age was more likely than not a substantial factor in the termination even where

plaintiff was only three years older (56) than his replacement (53).  Id. As in Fakete, a reasonable

jury could infer that Wolfe's unrefuted remark just a few months before the discharge ("It gets

tougher when you get old") is evidence of age bias. In Steward v. Sears, 231 Fed. Appx. 201, the

Third Circuit disagreed with the lower court's opinion that  the supervisor's comment, "Hell, you

are old enough, you have been around long enough, you should handle this" could only mean

that plaintiff could perform the extra work assigned because of his experience[3].   The Court

disagreed and concluded that a reasonable factfinder could infer from this remark that the

supervisor was biased against plaintiff because of his age.  As in Sears, "The remark reflects [the

supervisor's] awareness of [plaintiff's] age, not merely his "experience" or time with the

company. The jury could have inferred from this evidence that [the supervisor] was more

impatient with [plaintiff] because of [plaintiff]'s age and held him to a different standard than his

coworkers because of his age." Id. at 211. Waldron v. SL Industries, 56 F.3d 491, 499-450. (3d

Cir. 1995) (requirement imposed upon an older worker but not on the younger worker suggests a

double standard or subjective criteria which is a pretext for age discrimination.)

**b.  CEO Lilienthal's Directive To Hire Kids[4] Favors Youth**

Mr. Cashman presents the evidence of CEO Lilienthal's directive to hire kids, or younger

employees. **Ex. 105[5]**. Two weeks after that speech the CNA Intranet announced the first in-house

training program for new hires, confirming Lilienthal's challenge,  **" we need to get kids in**

**here**" to CNA leadership at the August 8 Quarterly Leardership Meeting (QLM). **(Ex. 104)**

---

[3] Steward v. Sears, Roebuck & Co., 1006 US Dist. LEXIS 39034, 2006 WL 1648979 at *29.
[4] Websters Dictionary defines "kid" as a young goat, young individual, young person, often used
as  a generalized reference to one esp. younger or less experienced. Merriam Webster's
Collegiate Dictionary, 10th ed. 1993, p 641
[5] Hon. Judge Sanchez did order the speech to be produced in Reif v. CNAF et al. **Ex. 100**

…And I would also tell you that **we need to get some kids in here**….And I would also tell you that **we need to get some kids in here…** And then now when we hire somebody we play headhunters and cannibalize other companies and create a totally        fragmented **culture** that  --  **I would really like to see us get some kids in here…** The **kids**, if you look at them as **seedlings**, kind of grow up and meet in the middle, and they actually do believe us….. And if you have built a place that is a place of choice to work, that you get to keep these kids, and does become –what Berny talked about, the **one face—the culture**.  There is the CNA way, which is what we're working towards, which we don't have right now…– this is on tape, isn't it. Is this admissible?…**Ex. 105 (p. 51-53)**

Plaintiff submits the above evidence of the CEO's age based comments and attitudes directed at older workers as part of the defendants corporate culture, policy and strategy to change the image of their workforce to one of youth rather than experience.  Ryder v. Westinghouse Corporation, 128 F.3d 128 (3d Cir. 1997).  Lilienthal's statements, to the effect that "we need kids in here" or "the kids, if you look at them as seedlings" "you have built a place that is a place of choice to work, that you get to keep these kids, and does become…the one face- the culture..is the CNA way…" (**Ex. 104**) as expressed in the 2002 speech and intranet article (**Ex. 105**) shows the CEO's preference for kids or youth expressed through his authority as CNA executive and manager. Ryder v. Westinghouse, 128  F.3d at 132.

Defendant downplays the CEO's comments by alleging that its executives did not hear them remember them, or interpret the comments to mean something other than hiring young employees. A reasonable jury could find otherwise.  Id. Richard Carroll testified that Lilienthal was public about his strategy to hire kids, or young people in the company. **Ex. C Carroll N.T. 38**.  Reading Claims Director Beth Downs' told Stuart Hammel, former Reading Claims Manager, "what we need is **young blood**"(**Ex. 115 ¶ 7**).  Hammel affirms that upper management told him to manage out employees by giving them lower performance ratings. Id ¶ **7**. Former Claims Manager Godal remembered Lilienthal's speech that the future of the company was with

13

younger workers (**Ex. 112 ¶ 5**). This is evidence showing bias against older employees at the Reading CNA office.

Even Senior VP of Employee Relations, Robert Keith, an officer of the company, was advised by his colleague, VP Deborah Nutley (who incredulously does not recall the speech), that she heard Lilienthal's remarks, believed them inappropriate and was concerned about the statement. **Ex 113 Keith N.T. 82:3-25**. Keith did not personally hear the statement, but read a transcript of the remarks. **Ex 113 N.T. 79:15-18**; **81-82:2**.  Keith told his colleague, VP Lori Komstadius that "someone should mention to [Lilienthal] that he should use terms a little bit more accurate than he portrayed there." **Ex 113 N.T. 95:9-97:12**.  Keith could not say if the word "trainee" was used in the transcript, but he knows the word "kids" was. **Ex 113 N.T.103:9-24**.  Interestingly, Wolfe did not say in his affidavit that he did not hear the speech, but that he never heard of the policy of forcing older employees to retire. See Exhibit G to Defendant's Motion ¶ 74.

In <u>Ryder</u>, the Third Circuit held that ageist comments made by unidentified Westinghouse executives after the plaintiff's termination **by persons not involved** in the decision were admissible as supervisors' statements relating to formal or informal attitudes of corporate executives.  <u>Id.</u> at 132.  In <u>Ryder</u>, the age-biased comments related to the company's older workforce that got higher pay, and  the low growth businesses can strain opportunities for younger workers, and we have to get the "blockers" out of the way. <u>Id.</u> at 131.  (emphasis added).

Evidence of corporate culture is relevant to show age bias in an individual's discrimination suit, <u>Abrams v. Lightolier Inc.</u>, 50 F. 3d 1204, 1217 (3d Cir. 1995) citing, <u>Lockhart v. Westinghouse Credit Corp.</u> 879 F.2d 43, 54  (3d Cir. 1989) (When a major company executive speaks, "everybody listens" in the corporate hierarchy, and when an executive's

comments prove to be disadvantageous to a company's subsequent litigation posture, it can not compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman.)  CNAF's top executive, Steve Lilienthal, told management at a meeting in August 2002 that **"We need to get kids in here**," which was seen as a "challenge."  **Ex. 104**. Lilienthal's announced corporate strategy of getting kids in here demonstrates the corporate culture of CNA/CNAF.  <u>Reeves v. Sanderson Plumbing Company</u>, 530 U.S. 133 (2000); <u>Ryder v. Westinghouse</u>, 128  F.3d at 132 (comments made by management executives are relevant to corporate culture); <u>Fakete v. Aetna, Inc.</u>, 308 F.3d 335 (3d Cir. 2002),(a reasonable jury could view a supervisor's remark that new management was looking for younger single people to work unlimited hours as evidence that plaintiff's age was more likely than not a substantial factor in the termination).  Accordingly, the jury may consider the evidence of the corporate culture and summary judgment is not appropriate.

**c.  Wolfe's Deletion of Spreadsheets He Allegedly Used Is Evidence of Pretext**

Without legal support, defendants argue that Wolfe's deletion of spreadsheets he used to review plaintiff's performance and to give him a "compliance" score is not evidence of pretext. Plaintiff submits that a jury could consider such evidence as pretext.  <u>Whittington v. Nordham Gp.</u>, 429 F.3d at 994 (10th Cir 2006) (evidence of pretext may include, but is not limited to prior treatment of plaintiff; disturbing procedural irregularities e.g., falsifying or manipulating . . . criteria; and the use of subjective criteria).

Wolfe's deletion of the spreadsheets allowed him to falsify and manipulate data that he apparently used to do monthly file reviews.  For example in February 2006, Wolfe sent Mr. Cashman an email stating his January reviews "compliance" score was under 95%, but there is no document that explains the basis of the score. (See Defendant Exhibit CNAJCDP135-136).

15

Wolfe could not say how he arrived at the numerical score. Wolfe testified he deliberately deleted the spreadsheets from which he claims this data was taken. (**Exhibit K N.T. 27**)  Wolfe used these spreadsheets to determine that some of Mr. Cashman's files were not properly documented. This was not uncommon as other FCMs had similar file review results. **Exhibit 30** (CNAJCDP02386-2399 McClarren, 2401-2404,6,8 Picard); 2411-2, 2414-5 (Lee); 2419, 2424-7 (Benson); 2428-2437 (Skees). A reasonable jury could infer that Wolfe did not want anyone to see the alleged spreadsheets because he was using a different age-based standard to measure Mr. Cashman's performance. Waldron v. SL Industries, 56 F.3d 491 (3d Cir. 1995).

**d.  The Irregularity Of The PIP Process Shows Pretext.**

In Whittington v. Nordham Gp., 429 F.3d at 994 (10th Cir 2006) the court held evidence of pretext may include, but is not limited to prior treatment of plaintiff; disturbing procedural irregularities e.g., falsifying or manipulating . . . criteria; and the use of subjective criteria. Mr. Cashman submits that the PIP has certain false information regarding his productivity. Ex**. 35A, 35B and 35C**.   The PIP (**Ex. 72**) lowered Mr. Cashman's performance rating to "4" (Unacceptable) and gave him 30 days to provide *inter alia* status and updates on all files, do action plans, and get file cycle time to 30 days. Curran who testified that a PIP must have merit, value and substance, was present in Reading when Mr. Wolfe read the PIP to Mr. Cashman who did not know that Betsy Mansfield (HR Chicago) was also on the line.  **Exhibit E Curran N.T 43**. The PIP stated that Mr. Cashman's cycle time for June 2006 was **31** days, which conflicts with the SIU Spreadsheet (**Ex. 35C** CNAJCDP at p. 2573) showing his cycle time was **22** days. The PIP did not include any compliance percentages from the alleged spreadsheets Wolfe deleted.  Therefore, the PIP was based on false information according to the SIU's own objective

Productivity Report. **Ex. 35C**. A substantially younger employee (Picard's DOB 1957) cycle time was 32 days and he was not PIPed.  **Ex. 35A, 35B and 35C**.  VP Liapes testified:

> Q.   Okay. So a Performance Improvement Plan is supposed to help the employee to improve his performance?
> A.  Absolutely.
> Q.  And if the goal is to have him leave, would that be an improper goal?
> A.  That would be an improper goal, yes.
>
> **(Ex. F Liapes N.T. 25**, lines 17-23).

Just one day before giving plaintiff the PIP, Wolfe responded to Curran's three questions about the PIP stating he believed Mr. Cashman saw his discussions as **coaching**, he did not expect Mr. Cashman to make the plan, and he would tell Mr. Cashman there are no other jobs available if he asked about other positions.  He also stated that he thought Mr. Cashman would **bring up his illness as an excuse**, or say the workload was too high as there were periods when the unit was short-staffed. **Exhibit 70** (CNAJCDP849-851).  Wolfe's responses show that he did not want Mr. Cashman to make the plan, and he did not offer to help Mr. Cashman in any way, by providing training as he did the younger Breit or his handling of McClarrenload during medical leave. **Ex. 1 ¶ 56, 76**; **Ex. B**. **N.T. 39-41**.

The PIP policy provides "a warning should be distinguished from regular coaching and feedback. Warnings should always be reviewed by HR prior to implementation, a copy of the warning should be sent to the employee's personnel file."  **Exhibit 73**. HR Representative Curran explained that she asked Wolfe about coaching because:

> …**there is a big difference because managers meet with employees all the time and they discuss their performance where they are anticipating putting someone on a plan or getting more aggressive with that person in terms of their performance, its imperative that they change the tenor of the discussions and let the employee know that they are now being warned that their performance is not up to par. So as they draw people, we have to try to make that distinction because we never want an employee to be surprised at the fact they're being put on a plan because hopefully they will kind of know the way their managers have been speaking to them. That's why I asked that question.     (Exhibit E Curran N.T. 55-56)**.

While Defendant argues that a warning is not "required" by the policy, Curran's explanation of the difference between coaching and a warning supports plaintiff's argument that Wolfe <u>did</u> <u>not</u> <u>warn</u> or counsel him pursuant to the policy, that his job was in jeopardy. Wolfe admits he gave Mr. Cashman no written or verbal notice prior to the PIP because "**I saw fit to deliver the news at the time that I put him on the PIP**." **Ex K Wolfe N.T 233-234**.   Mr. Cashman did not see his emails as counseling about performance, but just normal day to day dealings, communication, coaching and nitpicking.   Mr. Cashman was shocked, stunned, devastated, scared by the PIP believing termination was imminent and he would lose medical benefits, face bankrupty or death. **(Ex. D, Cashman N. T. 60-62); Exhibit 1 ¶ 79**

**d. Wolfe's Subjective Criticism Is Errant Or Misplaced**

Mr. Cashman submits evidence that Wolfe's subjective criticism of his performance is errant or misplaced.   <u>Brewer v. Quaker State Oil</u>, 72 F.3d 326.  Most of Wolfe's criticism was due to Mr. Cashman's rejection of certain files for fraud investigation, which did not have the required red flags for fraud investigation, but Wolfe ordered Cashman to accept the files regardless of the SIU Compliance Policy:

□10/26/05: Wolfe initially agreed with Mr.Cashman's decision, then stated the procedure will change "going forward" which meant that the FCMs had to notify the adjuster when they reject a claim, something that was not required before. **Exhibit 21; Ex. 1 ¶ 17**

□ November 2005: Wolfe agreed with Mr. Cashman's rejection of a claim (1k812398 M Tejada) **Exhibit 22** because it did not have the "red flags" for fraud. Ex. 1 ¶ **18**

□ Other FCMs complained that they were "starting to get more of these non-actionable claims than [there were] legitimate ones" **Ex. 23**;  **Ex. 1 ¶ 19**

□11/22/05:  Mr. Cashman response for request to use prior firm for surveillance not on the approved SIU vendor list, requesting the firm's name and red flags pursuant to the CNA Compliance Policy which requires that "all surveillance assignment requests must specific red flag indicators…"   **Exhibit 25A; Ex. 1 ¶ 20**

◻ 12/5/05: Mr. Cashman informed Wolfe that he received 13 new assignments with due dates during time off after surgery **Ex. 1 ¶ 21; 25B**

◻ February 2006, Wolfe sent Cashman an email stating his January reviews "compliance" score was under 95%, but there is no document that explains the basis of the score. (Defendant Exhibit CNAJCDP135-136). Wolfe could not say how he arrived at the numerical score and testified he deleted the documents he used to arrive at the "compliance" scores. **Ex F Wolfe N.T. 27; Ex. 1**. **¶28**. Other FCMs had reviews with documentation issues.  **Ex. 30**

◻ In February 2006, Mr. Cashman asked Wolfe a question about coding because he had been out due to cancer treatment and he requested training.  (**Exhibit 31**) Wolfe offered Mr. Cashman no training. **Ex. 1 ¶29**

◻ 3/13, 2006, Mr. Cashman miscoded a rejected file as "pending closure" in the  I-track system (**Ex. 32),** a simple filing mistake, which had no impact. Traina testified that "to be fair, …like any system, there was problems with I-track." **Ex J Traina N.T. 74; Ex. 1 ¶ 30**.

◻ 3/13/06, Wolfe agreed with Cashman's rejection of a file for surveillance (File 1co26921), because it lacked "red flag" indicators per CNA's compliance policy, which did not allow a claim, based on request of a third party. Wolfe stated, "I just called her manager to explain why we rejected it.  Stand by for some flak, but just direct it my way." **Ex. 33; Ex 1 ¶ 31**

◻ 3/16/06: Cashman advised Wolfe that he did not assign a previous vendor to an investigation on File No. 1E020890 because the vendor was not on the (SIU) approved vendor list.  **Exhibit 34**.  Cashman was the one who elevated this to Wolfe <u>who originally agreed with his assigning to the approved vendor</u>.  Wolfe then talked to Claims Plus Mgr. Murphy and e-mailed Mr. Cashman indicating an exception that he was not aware of. While he admitted this to Wolfe, Mr. Cashman took care of it, but needed Wolfe's approval to assign to an exception vendor;Wolfe instructed him to document that in the file, even though the vendor was not on SIU's approved list. (**Ex. 34 #204-208)**[6] **Ex 1 ¶ 32.**

◻ 4/21/06: Wolfe agreed with Cashman's assessment that there were no "red flags" in a claim but instructed him to assign surveillance anyway. (Claim 1k943259).**Exhibit 37 Ex 1 ¶ 36**.

◻ 5/8/06:Cashman explained that he described adjuster as "torqued" because he was upset that a vendor did not start the surveillance as requested, although Cashman instructed vendor to begin surveillance at 5:00 am. **Ex. 42** It was not unusual for adjusters to be upset according to Traina, "adjusters tended to be unhappy with almost everybody at somepoint in time…"  **Exhibit J Traina N.T. 70**. Cashman communicated well with the adjusters, the claims representatives and his customers on the status of investigations. Id 70-71; **Ex. 1 ¶ 41**.

◻ 6/2/05: Wolfe notified Cashman that he attained 95.83% compliance rating on April 2006 file reviews. Wolfe notified Bonk of the April results noting "significant improvement." **Ex. 47**

---

[6] Page 205 has been totally redacted by defendants.

Wolfe stated there were some files that needed follow up, he but did not mention this as a performance deficiency and other FCMs had similar issues. **Ex. 30; Ex. 1 ¶ 46**.

□ 7/11/06: Cashman told Wolfe he was getting the 5th chemo treatment and received some assignments when he was off, which is not supposed to happen. He was still tired from the chemo and experiencing its effects, and this could affect updates and reports.**Ex. 53; Ex. 1 ¶ 53**

□ 7/11/06: Cashman received an email where Wolfe found a claim in the I-track system that was still assigned to Art Cain, a former investigator, stating that it looks bad when the name of an old investigator is on a metric report.  **(Ex. 52 #233)**   This was something that Mr. Cashman did not cause and involved a simple change of the name of the investigator. Traina testified that "to be fair, …like any system, there was problems with I-track." **Ex J Traina N.T. 74; Ex 1 ¶ 52.**

□ 7/17/06: Mr. Cashman brought to Wolfe's attention a request for additional investigation on a rejected claim lacking fraud indicators according to the SIU compliance standards which requires rejecting claim based on the insured's request to get a lower settlement demand. (**Ex. 54**).  Wolfe then asked Cashman to assign the case for fraud investigation and he complied. Cashman did not see this as an issue with his performance as he was the one who brought it up to Wolfe, and Wolfe did not mention this as a performance issue. **Ex 1 ¶ 54**

□ 8/9/06: Traina (who was not his supervisor at the time) sent Mr. Cashman an email about a file supposed to be marked urgent for surveillance. (Claim E3150898). Cashman  explained the reason for not assigning it as an urgent request was based on the message that was not properly marked w/ reason for urgency by adjustor. Cashman explains workload extremely high due to reassigned McClarren files. **Ex. 55; Ex 1 ¶ 55**

□ 8/21/06: Mr. Cashman asked Wolfe a question and copied the team because these were very common questions for all the FCMs. Wolfe answered, and copied the entire team that when investigation is unreasonably delayed due to factors beyond control, the FCM can place the file in pending closure providing there is clear documentation as to reason and diary date set for follow-up. (**Exhibit 60A**)  Later, Wolfe sent this email to HR stating Cashman was the only one that was unclear on this, which is not true. **Exhibit 1 ¶ 62**

### e.  The Change In Plaintiff's Rating By Wolfe Is Evidence Of Pretext

Defendant's argument that Wolfe's change of plaintiff's rating is not pretextual lacks legal support.  In Brewer v. Quaker State Oil, 72 F.3d at 332, the court held that plaintiff produced objective evidence consisting of his average numerical rating and sales bonus as evidence of pretext. Id at 331. Here, as in Brewer, plaintiff submits the evidence of  his good performance according to the Defendants' SIU Productivity Records Exs. 35C, the changed review and the fact that he got a bonus after the review.  Traina prepared Mr. Cashman's 2005 performance evaluation covering

the eight months of 2005 he supervised him, rating him "2" meets or exceeds requirements. **Exhibit 27**.  Wolfe began to supervise Plaintiff sometime in September 2005 and Plaintiff was out due to his disability for much of November and December 2005. **Ex. 24**. In February 2006 Wolfe sent Bonk a different version of Mr. Cashman's 2005 evaluation marking him down to a "3" or meets most requirements rating with Bonk's approval. **Exhibit 28, 29.**  Traina testified he had no involvement in the changing of Mr. Cashman's rating to a "3."  **Exhibit J Traina N.T. 89-90**. Traina did not know of any other investigator for whom Mr. Wolfe changed ratings for that he previously supervised at that time.  **Id. N.T. 95.** Wolfe testified that he did not change any other FCM reviews. **Exhibit K Wolfe N.T. 37-38**.  Defendant did not produce any document showing two ratings for the same year for any other FCM. **Exhibit K** Wolfe **N.T. 39**.

**f. PIPing To Terminate Older Employees  Is Evidence Of Pretext**

　　Plaintiff submits evidence that the defendants' practice of PIPing older employees in the protected age group in an effort to force them out, force them to retire or resign is evidence of pretext. Sprint v. Mendelsohn,- U.S.-, 126 S.Ct. 1140 (2008) (no per se rule excluding evidence of other employees in the protected group who were discriminated against because of age); Ansell v. Green Acres Construction Company, 347 F.3d 515, 522 (3d Cir. 2003)(evidence of employer's firing of other older employees is relevant to plaintiff's argument that his termination was motivated by defendant's overarching plan to eliminate older workers)  Bruno v. WB Saunders 882 F.2d 760 (3d Cir. 1988) at 767, citing McDonnell Douglas Corp v. Green, 411 US 792 at 804-805 (1973) ("Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities; and petitioner's general policy and practice with respect to minority employment.").  Defendants have PIPed and

terminated other older employees (Cashman, Traina, Carroll, Reif, Hammel, Godal, Myers, Miles, Rittenbaugh, and Unterberger) after years of successful performance. **Ex 1, 96, 97, 99, 108, 109, 110, 112, 115**. Plaintiff submits that removal of older employees adheres to Lilienthal's plan that "**we need kids in here**" and favoring young hires. **Ex 105**. By placing the older employees on PIPs, CNA saved money because its severance policy exempts people discharged for performance reasons. **Ex. K Wolfe N.T. 235-237.** This is a financial incentive for manufacturing performance issues when replacing older workers.

**g.  Subsequent Hires Are Substantially Younger**

Evidence of subsequent young hiring by the defendant is also relevant to pretext. Ansell v. Green Acres Construction Company, 347 F.3d 524. Both Joseph Godal (Ex. 112) and Stuart Hamel (Ex. 115) testify that the Reading  Express Center hired large groups of new hires in their 20's worked, beginning in late 2004. Eventually, defendants hired younger employees in 2006 and 2008-2009: Doug Breit (age 39, hired 9/06); Shane Reidman (DOB 1976, age 33) hired 1/08;  William Greene (DOB 1961, hired 1/09), Christian Ubillus (DOB 1972, hired 5/08; and Tracy Crates (DOB 1971, hired 3/09). **Defendants'  Exhibits D3 CNAJCDP11026,  11028, 11117, 11201, 11252**. Subsequent acts may still be probative of intent. Id. at 524.

**h.  Plaintiff's Prior Satisfactory Performance As a Fraud Investigator Is Evidence of Pretextual Claim of Sudden "Poor Performance"**

In Siegel v. Alpha Wire Corp, 894 F.2d 50 at 55-56 (3d Cir. 1990), an age discrimination case, the Third Circuit held that the inconsistencies in performance evaluations prior and subsequent to employee termination may support evidence of pretext. Id. at 55.  Here, as in Siegel, plaintiff is relying not only on his past record from 1992-2006 (**Ex.4-1315, 15A 27, 28**) but also on the 2005 review (**Ex. 28**), merit increases and bonus history that was given him just

after the 2005 review and the SIU Productivity Spreadsheets[7] all of which show inconsistency in defendant's position that he was allegedly a poor performer. **Ex1 ¶ 4,7,8, 11, 35C**. The bonus amount is consistent with the one he previously received in 2004. **Ex. 16**.

### i. Defendants Argument That Weiner Was Not Replaced Is Misplaced

Defendants argue that Mr. Cashman was not eligible to apply for a different position due to the PIP. But Wolfe never told Plaintiff any such thing. Ex. 1 ¶ 91. Wolfe told Cashman "**that position is not open for you either, there is no job for you at CNA.**" **Exhibit 1¶ 91**, **Exhibit 111**. Moreover, Wolfe told Curran that if Cashman asked about other jobs, he "would simply tell him that there is no other role currently available in our organization." **Exhibit 70**. Wolfe's response to Curran did not say Cashman was not eligible for any job because he knew the PIP was bogus. Id. Eventually, Shane Reidman (DOB 1976) was hired in January 2008 for the MIT position. It is plausible that because Cashman filed with the EEOC in April 2007, Defendants received his charge in May 2007 and may have decided to wait a while before filling the job. **Ex. 95, 95A**.

### j. CNA's Turnover Policy Targets Retirement Due to Age and Seniority

In Hazen Paper v. Biggins, -U.S- 113 S.Ct. 1701 (1993), the Supreme Court noted that an employer who targets employees with a particular pension status on the assumption that these employees are likely to be older may engage in age discrimination where pension status is a proxy for age. Id. at 1707. In the Complaint ¶ 78 Mr. Cashman alleges that he was eligible for retirement due to the combination of his age, 59 and years of service (14), which met the Rule of 65 (age and service equals 65). Mr. Cashman submits that CNA's turnover policy encourages early retirement freely using PIPs to do so. **Ex. 114.** Traina (DOB 1950, then age 56) disagreed

---

[7] See Section C 3 supra, incorporated by reference, setting forth Mr. Cashman's productivity according to **Ex. 35C**.

with his PIP in August 2006 and decided to retire because he disagreed with the PIP. **Ex J Traina N.T. 31**. Wolfe's name is on the initial PIP produced by CNA for Traina, but with Cashman's name on it (compare CNAJDCPA00001 with CNAJCDP11807 at **Ex.96**). Bonk and Wolfe were using other PIPs as a form for Cashman's PIP.

Traina testified, "they [Bonk and Wolfe] put me on a performance review based on—on **something that was  unattainable**. So, I'd say I disagreed with, you know, several aspects of it." **Ex J Traina N.T. 35-36**.  When asked if CNA gave him a PIP in order to make him retire, Traina responded: "**I believe it—it's possible**. Around September of every year is when the whole organization starts looking at you know, their head count, profitability, etc. And personal opinion is, I think it was **probably an easy way to get rid of a position** or not refill a position." **Id. 31-32**.  Traina's position was filled by Marvin Barber, who is obviously younger (early forties).  **Id. 32-33**.

The company's articulated policy of **"10 % annual voluntary turnover"** appears in Wolfe's 2006 performance evaluation **(Ex. 107)** CNAJCDP 2471-2480(c) under "Talent Management" p. 7, (CNA 2477 at bottom.) Expectations (p. 8, CNA 2478 #3) states *"Control voluntary turnover through development and re-recruitment efforts . . .expectation at or below 10% voluntary turnover"* and lauded Wolfe for achieving terminations, under Comments:

> **Two employees terminated voluntarily in 2006 and Tim hired an additional Fraud Case Manager . . .One employee was placed on a PIP for poor   performance but decided to retire shortly thereafter . . . Ex. 107**

Wolfe's overall performance rating for 2006 was a **"1 - Exceeds Requirements"** and for **"Talent Management"** was also "1 - Exceed Requirements."  This was 80% of his rating, according to the document.  Wolfe got promoted in part for getting Mr. Cashman to retire early. At p. 9 (CNA 2480) Corporate Competencies, comments state

"Tim stepped up to performance issues with one member of the FCM team who was placed on a PIP and subsequently resigned . . ."

CNA has attempted to mischaracterize Mr. Cashman's email of September 20, 2006 (**Ex. 74)** as a "resignation" which it clearly was not. Wolfe was promoted to Bonk's job in November 2006, immediately after forcing Cashman out.

The ongoing turnover program appears in the email from Bonk to Carroll in 2004. Bonk placed Carroll on a PIP after Carroll had declined to place Cashman on a PIP. **Ex. C Carroll N.T. 33-35**. In this email (**Ex. 114)** Bonk states  ". . .***The tenure of SIU Investigators in the NE is also the longest in the country . . .As we go forward I would anticipate that we will see this trend continue until NE staff turnover (through*** <u>***RIF***</u>***,*** <u>***retirements***</u>***, etc.) results in a reduction in the overall tenure of staff."*** (emphasis added)

Bonk wanted to put Cashman on a PIP in 2004 but was unable to force him out until 2006. The company's long term goal for SIU investigators in the Northeast U. S., including Cashman, was turnover, usually called "voluntary" whether it is or not.  CNA did not allow Cashman to rescind his early retirement notice to further the goal of "reducing tenure" of  SIU staff.  Breit is 20 years younger. Wolfe admitted the 10% turnover goal in his deposition:

> **Q. Now, as part of your performance review as SIU manager, did you have any targets or responsibilities relating to employee turnover?**
> **A. Yes.**
>
> **Q. And what were those responsibilities?**
> **A. Expectations change over the years, so I know there was an expectation in terms of percentage turnover.  It may have been 10% but I can't recall for certain.**
>
> **Q. How are you supposed to achieve the percentage turnover?**
>
> [Mr. Antonelli: Object to the form of the question. Go ahead.]
>
> **(Ex. K, Wolfe N. T. 160-161**)

Moreover, Wolfe confirmed the 10% goal, in his 2005 performance evaluation (**Ex. 106 CNAJCDP 2465-2466** ) where it states under  Talent Management,

> **Q. . . .On page 2466 of this evaluation . . .It states . . ."During the last year Tim experienced three voluntary turnovers, it should be noted that these turnovers included a retirement, an employee in a performance improvement plan, and one who resigned shortly before the staff reduction announcement." Is that your recollection of your experience during 2005?**
> **A. Yes.**
>
> **Q. And you received a 2, meets all -- is that a 2? . . .and I see that on p. 2465 under Talent Management that it states control -- one of the goals here is control voluntary turnover through recruitment efforts, expectation at or below 10 percent voluntary turnover.  Do you remember that?**
> **A. Yes.   Ex. K. Wolfe N.T. 166-167**

In his Affidavit (Deft Ex. G, #77) Wolfe carefully states "CNA does not have a goal of _eliminating 10% of its_ _workforce_ through voluntary retirement" -- because those jobs are not eliminated. The yearly goal of getting 10% of its workforce to retire or quit enables 10% of CNA's workforce can be replaced by younger "kids" every year, to meet Lilienthal's long term strategy starting in 2002.

### k.   CNA Does Not Have To Discriminate Against All Members of the Protected Group

CNA argues that it did not discriminate against McClarren who was close in age to plaintiff. An employer does not have to discriminate against all members of a class to illegally discriminate against a given member of that class Goosby v Johnson &  Johnson 228 F.3d 313, 320 (3d Cir. 2000).

Plaintiff submits that both he and his coworker Walter McClarren were targeted as potential "voluntary quits" by Wolfe and Bonk because they are both about the same age, had the same job, similar careers in law enforcement before becoming experienced insurance investigators, both survived CNA's 2005 reduction in force of SIU, both had the same issues with procedural changes in their SIU jobs under the new business model. Just because they didn't fire

McClarren and helped him does not mean there is no discrimination. Goosby v Johnson & Johnson  228 F.3d at 320, Reeves v. Sanderson Plumbing, 530 U.S at 15.

A court is not required to analyze each incident separately to determine whether discrimination has occurred, "A play cannot be understood on the basis of some of its scenes but only upon the entire performance, …a discrimination analysis must concentrate on the individual incidents but on the overall scenario." Andrews v. City of Philadelphia, 895 F.2d 469, 484 (3d Cir. 1990).  Particularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities. Discrimination cases, including age discrimination, should not necessarily examine each alleged incident in a vacuum. Id., Vance v. Southern Bell Tel. and Tel.  Co., 863 F.2d 1503, 1510 (11th Cir. 1989).

Based on the above, a reasonable jury could conclude that plaintiff established an inference of age discrimination and sufficient evidence that defendants' articulated reasons are pretextual. Smith v. City of Wilkensburg, 147 F.3d 272, 280 (3d Cir. 1998) (plaintiff's prima facie case coupled with the rejection of the reasons offered by the employer for the employment decision allows a reasonable jury to conclude that the employer intentionally discriminated).

## B.  A Reasonable Jury May Infer That Plaintiff Has Established ADEA Retaliation

### 1.  Plaintiff Has Established An Inference of Retaliation

In order to establish a prima facie case of retaliation, under the traditional ADEA framework, plaintiffs must demonstrate: (1) that he opposed unlawful employment practices or engaged in a protected activity; (2) that the employer took an adverse action against him; and (3) that a causal link exists between the protected activity or opposition and the employer's adverse action. Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564 (2d Cir. 1989) Weiss v. Parker Hannifan Corp., 57 FEP

Cases 216, 225 (D.N.J. 1990); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), cert denied, -U.S. -, 110 S. Ct. 725 (1990), Fasold v. Justice, 409 F.3d 178 (3d Cir 2005) (ADEA retaliation).

Plaintiff submits that he can establish a prima facie case of retaliation:  Mr. Cashman complained internally to HR and Wolfe on October 23, 2006  after which CNA rejected his decision to rescind his retirement without investigating his complaint. **Ex. 78**.  Burlington Northern and Santa Fe Railway Company v. White, 126 S.Ct. 2405, 2415 (2006). (Plaintiff must show a reasonable employee would have found the challenged action materially adverse which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination).  See also Sheridan v. DuPont, 100 F.3d 1061, 1071-72 (3d Cir.1996).

There is clearly a causal, temporal relationship between the protected activity from October 23 and the material adverse action of November 3, 2006 resulting in plaintiff's termination. **Ex 90, 92** Robinson v. Septa, 982 F.2d 892 (3d Cir. 1993) (defendant subjected plaintiff to a "constant barrage of written and verbal warnings . . ., inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge" set a pattern of behavior that defendant followed in retaliating against plaintiff's later efforts at opposing the Title VII violations he perceived).

Wolfe testified that he could have accepted the rescission but opted not to:

**Q. Did you have authority as of November 1st, 2d, 3d, of 2006, to allow Mr. Cashman to rescind his retirement decision and continue working?**
**A.  Possibly. I didn't explore that option.**
                                         **Ex. K Wolfe N.T. 187**

At that point, as of October 23, 2006 Wolfe, HR and CNAF executives were all aware that Plaintiff complained of age discrimination. **Ex.78-80**. On October 24, 2006 HR Mansfield forwarded Cashman's retirement rescission to VP Liapes asking "if we are obligated to accept

his rescinding of his retirement notice. **He is clearly positioning with this email [Ex78]**…"
**Exhibit 80**.

Defendants rely on <u>Barber v CSX</u>, 68 F.3d 694, 701 for its claim that it had taken steps to reallocate Mr. Cashman's work.   In <u>Barber</u>,  the court held that plaintiff did not establish retaliation because he did not engage in protected activity by opposing unlawful employment practices. <u>Id</u>. at 701-2.  Barber wrote a letter to HR complaining of unfair treatment in general and dissatisfaction that someone else was awarded. Barber's letter was vague and did not mention that such treatment was due to age discrimination. Id. at 701. The court reasoned that while a formal letter of complaint to an employer or EEOC is not required under the ADEA, "informal protests of discriminatory employment practices, including making complaints to management…" do give rise to a retaliation claim under the ADEA.  <u>Id</u> at 702.  This case is not inconsistent with Barber.  Here, Mr. Cashman made a written internal complaint to his management, HR and corporate executives.  Defendant cannot argue that Mr. Cashman's complaint was vague.  It was very specific, " My original decision to retire was made during a period of extreme stress caused by an **unwarranted work performance review**.  I was recovering from a stress related illness and facing tests [for recurrence of] Cancer. Management was aware that I was treating for this condition. During this period, I was presented with a Performance Improvement Plan, which I believe may have been **prejudicial in relation to my age and ongoing health conditions**." **Ex. 78**.  Moreover, on October 30, 2006 -- having received no response to his October 23 email – Mr. Cashman complained not only of discrimination based on his age and his "health situation" but of **retaliation**, stating  **"There is an attempt to force me to retire involuntarily or confuse me in relation to my rights and job position."** This came only 3 days before Nutley ordered him to leave the premises after turning

in his laptop. **Ex I Nutley N.T. 25, Ex. 91**.  CNAF clearly knew of Mr. Cashman's  age

complaint. Nevertheless, Mansfield instructed Wolfe to "**go into the system and complete the**

**termination paperwork**." **Exhibit 90.**  Nutley mentioned the complaint in her notes of

November 3 and Liapes mentioned it in her notes of November 6, 2006.  **Ex. 91, 93**.

   CNA's position that it would not let Mr. Cashman rescind the early retirement email

because it already redistributed his work is untenable.  There is nothing "legitimate" about it.

CNAF had knowledge of Cashman's complaint but the only response came *after he was fired,* on

Monday November 6, 2006, when Liapes called him and said she would "investigate." **Ex. F,**

**Liapes N.T. 30)** Liapes claims she did "investigate" Cashman's claim of discrimination but there

is no report because "I don't make reports." (**Ex. F Liapes N.T. 32)**

   Mr. Cashman submits Wolfe's testimony that he did not explore the option of allowing

Cashman to remain employed, "**Did you have authority as of November 1st, 2d, 3d, of 2006, to**

**allow Mr. Cashman to rescind his retirement decision and continue working? Possibly. I**

**didn't explore that option." Ex. K Wolfe N.T. 187**   Moreover, all CNA's executives agree

that there is no policy that forbids an employee from rescinding an email correspondence stating

an intention to retire when no formal retirement papers had been signed. **Exhibit E Nutley N.T.**

**15; Ex. G. Mansfield N.T. 157, Ex. 80** (are we obligated to accept his rescinding…he is clearly

positioning)**, Ex. 82.**

   Plaintiff submits the evidence that when he inquired about the job in Major Investigations

Team left vacant by Stephen Weiner on October 27, 2006 based on his experience, Wolfe

responded coldly, "that position is not open for you either, there is no job for you at CNA." **Ex.**

**1 ¶ 91.** Moreover, Wolfe did not tell Cashman that he was prohibited from this job because of

the PIP policy.  **Ex. 1 ¶ 91**.  A reasonable jury could infer that Wolfe did not want Cashman to have any job, after his complaint of age and retaliation.

Mr. Cashman further submits the evidence of pretext relating to his previously unblemished long term employment and satisfactory performance from 1992, the change in rating from "2" to "3", the bonus he received in March 2006, and the objective production as documented in the SIU productivity charts, **Exhibit 35C**.  See Robinson v. SEPTA, 982 F.2d 892; Siegel v. Alpha Wire, 894 F.2d 50.

## C.  CNA Has No Legitimate Defense To Plaintiff's FMLA Claim

Defendants cannot articulate any legitimate reason for their denial of FMLA protection for Cashman's days off for cancer treatments in 2005 and 2006, so they claim he was "not prejudiced."  This is a breathtaking falsehood, a leap of incoherent nonsense.  In order to buy into that preposterous scenario one would have to believe:

**(a)** that Cashman's performance was really so bad that he would have been placed on a PIP and fired anyway;

**(b)** that CNA generously gave Plaintiff all the help he needed and all the time off he asked for "without consequences" and treated him better than he deserved in "allowing" him to "voluntarily" retire early, at age 59, facing cancer without medical benefits.

**(c)** that Mr. Cashman suffered no prejudice by the unlawful termination.

We need a reality check.  Let's take one thing at a time.

Plaintiff's Motion for Partial Summary Judgment and exhibits thereto are incorporated herein by reference in the interest of brevity.

**1.  Cashman's Adverse Action Is Related To FMLA Leave**

Cashman's recurrence of cancer was his "performance deficiency."  CNA's fake complaints about Cashman's performance began within weeks of his notice to Wolfe that his cancer had returned in September 2005 (**Ex. 1, # 14, 15, 16, 17, 18, 20, 21, 25, 26, 27, 28, 33, 35, 36, 39**).  Wolfe controlled Plaintiff's PTO, his work assignments, and his ultimate fate at CNA. Wolfe knew how to get promoted.  Retire Cashman.

Timing of events, Wolfe's calculated actions against Cashman in response to those events, and then Wolfe's immediate promotion to upper management after accomplishing the "voluntary turnover" of John Cashman in November 2006, shows CNA's real intentions.  Wolfe did allow Cashman PTO days.  He knew exactly when Cashman had chemo, when he had biopsies, when he had a surgery scheduled, when he would be sick, when he was most vulnerable.  Wolfe took advantage of this knowledge, dumping multiple new assignments on Cashman when he was "off work" and criticizing him when he returned.  When Plaintiff was out on 2 weeks STD/FMLA leave in December 2005 he got 13 new assignments Wolfe knew he could not address, and this pattern kept up. **Ex. 1, # 20, 21, 35, 39, 43, 52, 53, 56, 101.**  When he returned to work in January 2006 those and other work was waiting, and he had to catch up without training or assistance from Wolfe **Ex. 1 #27.** Adding insult to injury, Wolfe counted PTO and STD/FMLA days in claiming Cashman had a "102-day cycle time" when he marked down Cashman's 2005 evaluation from the "2" Traina had rated him to a "3"  which was still satisfactory.  Now CNA claims it wasn't, but CNA doesn't give bonuses for unsatisfactory work, and Cashman got a $4,368 performance bonus for his 2005 work. **Ex. 16**.

**2.  August 2006: McClarren Returns to Work, the Cashman PIP and the Breit Hire**

McClarren returned to CNA from 12 weeks' FMLA medical leave on August 16, 2006.

**(Ex. 43)** Two days later, on August 18, 2006, Bonk directed Wolfe to put Cashman on a PIP.

Wolfe claims timing of these events was unrelated, **(Ex. K, Wolfe N. T. 117)**

But timing of Wolfe's decision to hire Doug Breit was apparently very closely related to

the PIP directive against Cashman:

> **Q. . . .When did you become aware that Doug [Breit]:was going to be rehired for the Maitland office?**
> **A. When did I become aware that he was going to -- well, I made the decision to hire him.**
>
> **Q. When was that decision?**
> **A. I don't recall when I actually made the decision. I do believe that it was <u>August</u> sometime when I finally got approval to proceed with the hiring and then open a job requisition and start the formal process, so . . .the position would have been advertised, and I don't recall the exact date that, you know, I made the formal decision to hire Doug [Breit].**
>
> **Q. When did you get permission to make a new hire? <u>Was it before or after August 18, 2006?</u>**
> **A. . . . .<u>I can't tell you the exact date.  It's possible that's the date</u>. I recall that it was August.**
>
> **Q. Do you have any recollection whether it was before or after Mr. Bonk wrote the memo of August 18th telling you to put Mr. Cashman on a PIP?**
> **A. I believe it was after.**
>
> **Q. How much after?**
> **A. I don't recall.                 (Ex. K, Wolfe N.T</u>. 175-176 emphasis added)**

It is reasonable to conclude from this testimony that Wolfe got permission to hire Breit on or

shortly after Bonk's directive to PIP Cashman in August 2006, just 2 days following McClarren's

return to work from 12 weeks of FMLA sick leave, during which Cashman had helped handle

McClarren's workload.  Breit also testified that Traina alerted him that a position would open in

the SIU sometime in August or September 2006. **Ex. B Breit N.T. 14**

The false PIP against Plaintiff Sept. 19, 2006 was based on issues created in June 2006, when Wolfe knew Plaintiff received weekly chemotherapy. **Ex. 1, ¶ 51.** Wolfe timed Plaintiff's work assignments and unfair criticisms for the times Cashman would be sick, penalizing him for taking PTO days.  The PIP was also intended to hit Plaintiff without warning when he faced surgery, for maximum impact.  Administration of an "action plan" or PIP was known to cause severe stress on an unsuspecting employee. Former HR Rep. Leslie Curran testified Joanne Rittenbaugh was taken from her office by ambulance after Curran had administered a PIP (**Ex E Curran N.T. 70-71**)  Rittenbaugh promptly resigned, after she left the hospital. Id. Cashman suffered acute shock and stress, and wrote Wolfe an early retirement email.  **Ex. 1 ¶ 76**.Wolfe promptly got promoted for excellent "voluntary turnover," over the 10% target. (**Ex. 107**)


**3. Cashman Can Establish Prejudice Because The PIP Is False**

The absence of  Wolfe's carefully prepared SIU Productivity Spreadsheets **(Ex. 35C)** from Defendants motion is the best evidence of the falsity of the claim Cashman was "not prejudiced" by CNA's withholding of FMLA protection.  Cashman's accomplishments are in black and white, despite Wolfe's deletion of spreadsheets he says he used for monthly emails on Cashman's percentage of "compliance" calculated by a method he can't  explain.


Cashman's monthly and quarterly charts of SIU Productivity Statistics for 2006 summarize the 22 spreadsheets CNA withheld from its motion. (**Ex. 35 A, B, C**)  The charts enable comparison of Cashman's performance to McClarren and other coworkers:

**SIU Productivity**
**First Quarter 2006**

| Name | New | Closed | Cls Ratio | Savings | % Clsd Svg | Cycle Time |
|------|-----|--------|-----------|---------|-----------|------------|
| Cashman | 198 | 187 | 94% | 0 | 0 | 39 days |
| McClarren | 152 | 118 | 78% | 0 | 0 | 29 days |
| Picard | 179 | 155 | 87% | $137,942 | 45% | 32 days |

**Second Quarter 2006**

| Name | New | Closed | Cls Ratio | Savings | % Clsd Svg | Cycle Time |
|------|-----|--------|-----------|---------|-----------|------------|
| Cashman | 433 | 482 | 111% | $680,387 | 52% | 31 days |
| McClarren | 187 | 309 | 165% | $209,362 | 34% | 23 days |
| Picard | 416 | 530 | 127% | $867,406 | 36% | 32 days |

**Third Quarter 2006**

| Name | New | Closed | Cls Ratio | Savings | % Clsd Svg | Cycle Time |
|------|-----|--------|-----------|---------|-----------|------------|
| Cashman | 572 | 618 | 108% | $1,021,176 | 45% | 30 days |
| McClarren | 251 | 340 | 135% | 398,737 | 36% | 22 days |
| Picard | 560 | 714 | 128% | $1,145,733 | 38% | 32 days |

(Source: Exhibit **35C** hereto)

(Fourth Q not included as PIP, early retirement email and rehire of Doug Breit, age 39, had occurred by Sept. 30; Fourth Q statistics include Breit's work on Cashman's files)

These statistics demonstrate the falsity of the PIP "unacceptable" performance rating of "4" dropped on Cashman like a phoned-in bomb on Tuesday September 19, 2006 in Leslie Curran's office, as Wolfe spoke from San Francisco and HR Manager Mansfield listened in Chicago.  The fact that Cashman did not have to be taken by ambulance from the CNA building in Reading PA, as was Ms. Rittenbaugh, is a credit to Cashman's strength, professionalism and self control while facing cancer surgery. He left Curran's office devastated and in shock. **(Ex. 1, ¶79)** and that night he spoke to his former supervisor Richard Carroll, who told Cashman he would likely be fired in 30 days, as Carroll had been in 2004, after he had been put on a PIP following his refusal to put Cashman on a false PIP**. (Ex. 1 ¶78; Ex. 98 ¶13, 59)**  Getting fired was unthinkable. It was a lifetime disaster, the ultimate disgrace, to him. Believing in the certainty of termination from his job, Cashman felt there was no alternative but to take early retirement, and next morning he sent his retirement notice to Wolfe via email. **(Ex. 74)**  He was

59. Next day, Sept. 21, 2006  he emailed Wolfe asking for PTO for outpatient cancer surgery

Sept. 26.**(Ex. 75)**  Once again, Wolfe's timing had been impeccable.

Also on Sept. 21, 2006, Wolfe gave Plaintiff more assignments. Cashman was puzzled, as

the PIP claimed his work was unacceptable, and this seemed like everything was fine.  When he

questioned Wolfe about the additional work, Plaintiff received an email stating, "**we have time**

**to bring Doug [Breit] up to speed**…" **Ex. 76** (#91) Wolfe also testified he gave him more work

because he trusted Cashman to handle files appropriately.  **Ex. K Wolfe N.T. 181**.

On Sept. 22, 2006, Cashman was ill from chemotherapy and asked for PTO.  Wolfe left

him a voicemail stating he believed Cashman did not want to handle cases.  Plaintiff explained

his concern was that dropping complex cases on a new investigator in mid-stream could cause

problems and negatively impact SIU.  Wolfe responded by email, stating, "That is okay John.

We have a good six weeks until you retire, so there should be plenty of time to handle the

majority of your assignments.  When we get nearer to November 3, I will take you out of the

queue and allow you time to transfer anything that is still pending." **Ex. 77** (#373-375).  Wolfe

was satisfied with Plaintiff's performance.  There was no more mention of the PIP.  Plaintiff felt

he had been taken off the PIP because there seemed to be no problem.  Once Cashman emailed

Wolfe that he would retire, suddenly there was no criticism.  Wolfe's entire attitude had changed.

**Ex. 1 ¶ 83, 84,  85.**

After the surgical procedure on Sept. 26, Cashman rested, returned to work and his health

stabilized.  He was finally able to think more clearly.  Wolfe had continued to send him new

assignments, even complex files that would take longer to investigate than he had before his

early retirement date. He kept getting more and more new files -- and no word from Wolfe about

the quality of his work. **Ex 1, ¶ 83.**

Cashman rethought his drastic rushed decision to retire early. He needed medical benefits and needed to keep working.  He had not signed any retirement papers.  The corporate office advised that he could rescind his decision to retire any time before signing the actual retirement papers.  **Ex. 1, ¶**88.  No one had asked him to sign anything, and he thought the reason was that he could change his mind. There was no policy stating an employee could not change his mind about his retirement date. **Ex. 1, ¶87**

**4. Cashman Is Clearly Prejudiced By The Loss of Employment and Medical Benefits**

On Oct. 23, 2006 Plaintiff stopped all retirement procedures because he needed to work and he needed his medical benefits. **Ex. 1 ¶  88.** CNA corporate office advised him he could rescind the decision to retire.  **Ex. 1¶  87**.  He sent an email to Wolfe and Betsy Mansfield (HR) **(Ex 78 # 110)** stating in part:

> ". . .My original decision to retire was made during a period of extreme stress caused by an unwarranted work performance review.  I was recovering from a stress related illness and facing tests [ for recurrence of] Cancer. . .  My monthly reviews showed improvement and did not indicate any serious problems. . . . .
> ". . . . Between August 2005 and July 2006 I had two reoccurrences of cancer which required surgery and subsequently two separate . . . courses of chemotherapy . . . I worked during these treatments and took a minimal amount of sick time.  I did not elect to go on short term disability, since we had another employee [McClarren] on STD and I felt this would cause a hardship on other employees. . . .I performed my duties to the best of my ability and was not advised. . . .that my performance was seriously deficient or that I was in jeopardy of losing my position.  I was, in fact, applauded by my manager for improvement in a review during this time. . . .I further feel it would create a hardship on both myself and my family to leave my employment during this time. . ."(emphasis added)

On October 24, 2006 HR forwarded Cashman's retirement rescission to VP Liapes asking "if we are obligated to accept his rescinding of his retirement notice. He is clearly positioning with this email…" **Ex. 80** (CNAJCDP00858-9)

On October 27, 2006, a conference call took place attended by Cashman in Reading, Wolfe in San Francisco, and Betsy Mansfield, HR Chicago. Wolfe told Cashman he could not

continue to work because his job was already filled. Breit was the new hire Wolfe had mentioned

before. Cashman then said he knew there was a job open as Investigator, Major Investigative

Team (MIT), because Stephen Weiner had resigned.  Cashman  expressed interest in the job.

Wolfe stated coldly, "that position is not open for you either, there is no job for you at CNA."

(**Ex. 1, ¶91**)  Wolfe mentioned no "policy" as is now claimed, prohibiting someone on a PIP

from transferring to a different job.  Wolfe had just been promoted to Bonk's job, in an "acting"

position, (**Ex. K, N.T. Wolfe,** 186-187) and knew he had to force Cashman out if the promotion

was to become permanent.

Weiner is a valued colleague of Cashman, and about the same age. Both were born in

1947, had been respected police officers and had survived numerous layoffs at CNA.  Cashman

was unaware Weiner had decided to take early retirement in part because of the way CNA was

treating his colleague Cashman. (**Ex. 111, Affidavit S. Weiner**)

Plaintiff requested and received "something in writing" stating CNA was refusing to let

him rescind his early retirement date. **Ex. 82, 87, 88.** Curran signed a receipt for Cashman's

laptop and equipment stating he was not terminating voluntarily. **Ex.  91**  Plaintiff was clearly

terminated and has suffered damages as a result.  See Exhibit 116 (Plaintiff's Expert Report on

Damages).

**5. CNA Did Not Favor Employees Who Needed Time Off For Illness**

Plaintiff relies on former SIU Manager Carroll's statement that Defendants did not look

favorably upon individuals who took time off to attend to their illness. **Ex 98**.  This was part of

the corporate culture.  Ryder v. Westinghouse, 128 F.3d 128.

As CNA acknowledges in its brief on the FMLA claims in this case, summary judgment

should be denied where plaintiff demonstrates such weaknesses, implausibilities, inconsistencies,

incoherencies or contradictions in the employer's proferred legitimate reasons for its action that a reasonable fact finder could rationally find them "unworthy of credence" and hence infer that the company did not act for non-discriminatory reasons. <u>Fuentes v. Perskie,</u> 32 F. 3d 759 (3d Cir. 1994).

The fact pattern of this record, the way Wolfe's actions against Cashman occurred repeatedly during his PTO absences for cancer treatments, assigning him cases while he was supposedly off work, nitpicking at his work, lowering his rating by including his sick time in alleged delays in working his files, loading him up with extra work from Mr. McClarren's caseload then manufacturing a false PIP against him two days after McClarren returned from leave and hiring Doug Breit at the same time, are not mere coincidence.  They are the kind of "implausibilities, inconsistencies, incoherencies and contradictions" for which summary judgment should be denied to CNA.  <u>Id</u>.

**D. A reasonable Jury May Infer Plaintiff Has Established ADA Discrimination, Intimidation And Retaliation.**

**1.  CNA Retaliated Against Cashman When he Requested Accommodation**

On July 11, 2006 Wolfe asked Plaintiff for a summary of vendors' performance "by the end of the day" and Cashman sent Wolfe an email reply:

> "Tim I am headed for the Dr's for treatment #5 (one to go after that) I will put something together for you later today when I return.    PS  Vacation was enjoyable but unfortunately, . . . .I received some assignments and reviews while on vacation . . .Is that supposed to happen?  It really makes the situation worse . . ."
> (**Ex. 53**, also **Ex. 1 ¶53**)

Cashman was requesting Wolfe not to send him "rush" work needed that day and not to send him assignments and reviews during vacation.  This was reasonable during chemotherapy; it was

really a request to stop harassment.  Wolfe ignored it and kept it up.  CNA refused this "accommodation."

On August 17, 2006 Cashman felt ill and made a doctor's appointment.  He asked Wolfe "Please do not assign any late rushes if possible."  (**Ex. 57**)  Next day, on August 18, 2006 Wolfe emailed Bonk, "**John just does not seem to be engaged . . .he lacks attention to detail . . .he is just going through the motions." (Ex. 59)**  Bonk decided right then to "**move to a PIP.**"

On August 30, 2006 Cashman emailed Wolfe, "Tim, Please change my PTO day from 9/1/06 to 9/8/06.  I am having a medical procedure and Dr. changed the date.  Appreciate it. Thanks" **(Ex. 61)** On September 6, 2006 Plaintiff told Wolfe he was having biopsies and pre-op tests and may be unable to join a conference call next day. **(Ex. 62)**  On Sept. 7 Plaintiff emailed Murdock Williams about the biopsy Sept. 8, asking him not to send any URGENT referrals **(Ex. 63).** He copied Wolfe, who told Plaintiff not to contact Williams, told him "you need to go through me first" and took him out of the work queue altogether.  Cashman was worried by this rebuke.  He apologized to Wolfe, stating, "Sorry Tim, I did not. . .want to be taken out, just did not want to have any issues with Urgent referrals . . .thought I copied you on that email." **(Ex. 63)**  Wolfe wanted to control Cashman's harassment himself, attending personally to every detail. The chain of events escalated with the false PIP September 19 and the outright discharge November 3, coinciding with Wolfe's promotion to Bonk's job.

The precise temporal sequence between a request from Cashman and a swift rebuke or criticism from Wolfe shows a striking causal relationship.  This is retaliation, not unlike that seen in  Shellenberger v. Summit Bancorp, 318 F. 3d 183 (3rd Cir. 2003)  Shellenberger suffered from allergies to coworkers' perfume, felt tip markers, white-out and deodorants.  She was not disciplined when she had to leave work early or change her desk location.  But then she was

fired.  The only reason given was "we just can't work out our relationship with you." When

asked if she was being let go due to her disability, her boss responded, ". . .according to the

bank's attorneys, you do not have a disability." 318 F. 3d at 185.  At trial the Court granted

Summit's Rule 50 motion for judgment as a matter of law as to Shellenberger's disability claim.

Shellenberger appealed only the dismissal of her Retaliation claim.

The Third Circuit reversed, stating Shellenberger's failure to establish that she was

disabled does not prevent her from recovering if she can establish that her employer terminated

her because she engaged in activity protected under the ADA, citing Krouse v. American

Sterilizer Co., 126 F. 3d 494, 500 (3d Cir. 1997). A Plaintiff may use either direct or

circumstantial evidence to prove retaliatory animus under the ADA. Shaner v. Synthes, 204 F. 3d

494, 501 (3d Cir. 2000).

**2. Plaintiff has Established an Inference of ADA Discrimination.**

Defendants first argue Cashman is not a "qualified individual with a disability" under the

ADA, then assume he has a disability and claim CNA "supported him during his illness" because

"no one commented negatively to him" about his health.  They also claim Cashman "admits" no

health comments were made to "anyone else", but no one knows that. This is nonsense.  The

issue of whether Cashman is a qualified individual with a disability is an issue of material fact

precluding summary judgment.

With the "regarded as" provisions of the ADA Congress chose to extend the protections

of the Act to persons who have no disability but are perceived by others as having a disability.

The primary motivation for the inclusion of misperceptions of disabilities in the statutory

definition was that "society's accumulated myths and fears about disability and diseases are as

handicapping as are the physical limitations that flow from actual impairment."  See 29 C.F.R.

pt. 1630, app. § 1630.2(l) (EEOC's "Interpretive Guidance" to the ADA citing <u>School Board of Nassau County v. Arline,</u> 480 U. S. 273, 284, 107 S. Ct. 1123 (1987).

Plaintiff was *regarded as a person with a disability* from the first notice of his cancer to Wolfe on September 1, 2005, **(Ex. 1 # 14, also Ex. 17)** until he was ordered off the premises by VP Nutley on November 3, 2006.**(Ex. N, Nutley, N.T.** 25:14-15).   Cashman was discharged for the same reason as the registered nurse plaintiff in <u>Deane v. Pocono Medical Center,</u> 132 F. 3d 138 (3d Cir. 1998) was discharged.  In <u>Deane</u>, the Third Circuit Court of Appeals reversed the district court's grant of summary judgment to PMC, holding it was inappropriate because there were factual disputes over how impaired PMC regarded Deane as compared with her actual level of impairment, and whether PMC's perception of Deane constituted a significant restriction in her ability to perform a range of jobs as compared to the average person with her training and abilities.

Stacy Dean sustained a cartilage tear in her wrist while lifting a patient and was out of work nearly a year.  When she returned, her doctor restricted any lifting to 20 pounds. Her job as a medical/surgical nurse required some patient lifting and PMC said she could not do that job. She asked to transfer to pediatric or oncology nursing but was told there was no job for her at PMC.  In this case Cashman, faced with a false PIP, and without medical restrictions, asked to transfer to the MIT, for which he was well qualified **(Ex. 112)** but was told there was no job for him at CNA. **Ex. 1 ¶ 91**.  Deane argued that PMC regarded her as more disabled than she actually was, and that she was still capable of caring for patients. PMC believed she was unable to provide patient care because of the lifting restriction. Wolfe's email to HR the day before he administered the PIP to Cashman stated he did not expect Cashman to meet the PIP, and that ***"He may bring up his illness as an excuse. . ."*** for the alleged performance issues.  Asked why

he said that, Wolfe answered, "***Because he had taken some time off and gone through procedures, and that was my feeling at the time.***" (**EX. K, Wolfe** p. 230). CNA believed Cashman was incapable of performing his job, despite his lack of restrictions, because he was treating for cancer. This is a misperception and a fact dispute precluding summary judgment under ADA.

In <u>Deane, *supra,*</u> PMC argued there was no causal relationship between the alleged misperception and Deane's discharge, just as CNA argues the same lack of causality between Cashman's need to take chemotherapy and his discharge.

A person is regarded as having a disability if he (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has no such impairment but is treated by a covered entity as having a substantially limiting impairment. 29 C.F.R.§ 1630.2(1). <u>Eshelman v. Agere Systems Inc.,</u> 397 F. Supp. 2d 557 (E.D. Pa. 2005) *affirmed* 2009 U. S. App. LEXIS 1947 (3d Cir. 2009).

Joan Eshelman had worked for Agere (in Reading, PA) for 20 years.  She had undergone chemotherapy for cancer.  After she returned to work she had some short-term memory problems, colloquially known as "chemo brain," which her employer knew about.  When the company restructured, she was in line for transfer to a facility that would require a longer commute. She expressed concern about the commute in light of her memory problems, and was laid off.  A jury found the employer regarded her as disabled under the ADA and awarded $200,000 in damages.  The Court also granted an additional award to offset the negative tax consequences of receiving the back pay the jury awarded as a lump sum.  Agere contended there

was insufficient evidence and sought to overturn the verdict.  The District Court found the record established sufficient evidence to prove the employer believed -- either sincerely or mistakenly -- that Eshelman's memory impairment substantially limited the major life activities of thinking and working, and denied the motion.  The Third Circuit Court of Appeals affirmed.

At trial, Eshelman did not contend she was actually disabled within the meaning of the ADA at the time she was discharged; she argued her termination was based on Agere's belief that she was disabled, or alternatively on her record of impairment.  Agere argued there was insufficient evidence to sustain either "regarded as" disability or "record of" disability under the ADA.

Wolfe and Bonk apparently thought Cashman suffered from Eshelman's "chemo brain" because he suffered fatigue, difficulty in concentration, nausea, and sometimes lethargy.  Ex. 1 ¶ 51.  The fact that Cashman was working, not out on leave, maximized Wolfe's opportunities to harass and frustrate him.  (**Ex 1 ¶102**).

The relevant inquiry in Eshelman, *supra,* as in this case, is whether the employer perceived Plaintiff as disabled within the meaning of the ADA, not whether Plaintiff was actually disabled at the time defendant employer decided to terminate him. Capobianco v. City of New York, 422 F. 2d 47, 57 (2d Cir. 2005) ("A 'regarded as' claim turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability") cited by the Eshelman Court on appeal.

## a.  Mr. Cashman Was Regarded As Having a Disability

In this record Timothy Wolfe freely acknowledged he regarded John Cashman as a person with a disability within the ADA when he explained he requisitioned a new hire for the FCM unit because he was afraid Cashman's "serious health problems" could put him **"out of**

**commission"** i.e. out on medical leave. (**Ex. K, Wolfe N.T. 95-97**, also **Ex. 41,** Wolf email 5/5/06 to Martin re: FCM staffing, stating Cashman had missed a meeting in September 2005 due to illness and was facing his second course of chemotherapy in 7 months.)  When Cashman learned McClarren was out on sick leave for major surgery and decided not to take a leave and instead use PTO days for his treatments and outpatient surgeries, Wolfe assigned Cashman many of McClarren's files in addition to his own, then wrote Bonk on Aug. 18, 2006, **"*Jim, FYI, John does not seem to be engaged . . .he lacks attention to detail, I'm afraid that he is just going through the motions"* (Ex. K,** Wolfe 120-121, also **Ex. 58, 59)** and Bonk responded with a PIP directive, stating "**We've been way too patient with this matter. . ."**  Clearly, both Wolfe and Bonk perceived Cashman as being unable to "engage" in his job, and lacking "attention to detail."  There is no record of such concerns prior to Cashman's notice to Wolfe in September 2005 of his need for chemotherapy. (**Ex. 18** Wolfe email to Bonk and response 9/2/05 suggesting contingency plan.)

   A perceived disability must, in a 'regarded as' claim, substantially limit a "major life activity." Tice v. Ctr. Area Transportation Auth., 247 F. 3d 506, 514 (3d Cir. 2001) citing Suttom v. United Air Lines Inc., 527 U. S. 471, 489 (1999).  The ADA does not define "major life activity" but EEOC regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R.§ 1630.2(i); Emory v. AstraZeneca Pharms. LP, 401 F. 3d 174, 180 n. 4 (3d Cir. 2005) deferring to definitions of terms used in the ADA as articulated in the EEOC regulations.)  Eshelman asserted the jury could reasonably have concluded that although she excelled at her job and was a valued employee, Agere nonetheless erroneously viewed her memory impairment caused by chemotherapy as substantially limiting two major life activities:

namely her ability to think and her ability to work.  It is undisputed that working and thinking

qualify as major life activities. See Taylor v. Phoenixville School Dist., 184 F. 3d 296, 307 (3d

Cir. 1999) (construing thinking as a "major life activity.")

Agere argued Eshelman's 'regarded as' claim was implausible given the praise and

accolades it lavished on her both before and after her treatment for cancer. That was not

persuasive for the Third Circuit.  In this case, that argument is not made; instead there is clear

determination that Cashman's performance had become "deficient" after chemotherapy.

Deficiencies were invented.  Cashman's 2005 evaluation was marked down by Wolfe early in

2006, though it was still satisfactory enough for a $4,369 performance bonus.  Management's

perception of Cashman's cancer prognosis was swift and uncompromising negativity.  Wolfe

feared Cashman would be out of commission. (**Ex. K**, p. 97) By August 2006 Bonk and Wolfe

both thought his work "unacceptable" despite the metrics to the contrary in Wolfe's SIU

Productivity Report Spreadsheets report. (**Ex. 35A, 35B, 35C**)  Agere believed Eshelman's

cancer-related memory problems rendered her unable to perform any job after the Reading

facility was closed.  Similarly, Wolfe told Cashman there was "no job for him" at CNA despite

his qualifications for Steve Weiner's investigative position on MIT. (**Ex. 70, 71**)  In denying

defendant's motion for judgment as a matter of law the Eshelman Court noted

> The jury could have concluded Agere's perception of Eshelman's overall memory
> problems, not simply her difficulty learning driving directions to a new work site,
> effectively rendered Eshelman unable to perform any job at Agere.  Eshelman's memory
> impairment was one of three factors that effectively precluded her from every job
> remaining under Agere's restructured operation outside of Reading.  The jury's function
> was to determine whether Agere's non-discriminatory justification for Eshelman's lay-off
> was the actual reason; it determined it was not.

**b. Cashman's ADA Claim Is Also Based on Record of Disability.**

Congress included "record of" disability claims in the ADA to ensure that employees could not be subjected to discrimination because of a recorded history of disability. School Board of Nassau County, Fla. v. Arline, 480 U. S. 273, 284-85 (1987); Adams v. Rice, 531 F. 3d 936, 945-46 (D. C. Cir. 2008) ("The 'record of' definition was tailor-made for plaintiffs who . . .claim they once suffered from a physical or mental impairment that substantially limited a major life activity, recovered from the impairment, but nonetheless faced employment discrimination because of it.")  See also 29 C.F.R. pt. 1630 app.. § 1630.2(k) explaining that the "record of" definition "protects former cancer patients from discrimination based on their prior medical history.")  Cashman's record of cancer in 2004 and his three-month medical leave was well known to CNA and to Wolfe even though Wolfe was not his supervisor until a year and a half later, in September 2005. **(Ex. 3) (CNAJCDP00548), Ex. 14. Ex. 25B)** Mr. Cashman had a record of disability at the time he was fired.

Like Eshelman, Cashman  claims CNA terminated him (**Ex. 3**) because of his documented history of cancer in 2004 and its recurrence in 2005 and 2006 requiring courses of chemotherapy, which played a role in CNA's decision not to offer him an open position in the MIT. **(Ex. 111)**.  Cashman's cancer history was recited by Wolfe in his May 2006 requisition for a new hire **(Ex. 41)** along with his recurring treatment and he fear he would be "out of commission." **(Ex. K Wolfe N.T. 97)**  This accords with the purpose of record of disability claims under the ADA, which is precisely to ensure that workers are not discriminated against on account of documented history of substantial impairments. See Emory, *supra* 401 F. 3d at 182.6; Olson v. General Electric Aerospace, 101 F. 3d 947, 953 (3d Cir. 1996).

**c. Cashman Does Not Claim Constructive Discharge; He was Fired**

CNA's brief p. 29 says "Cashman cannot support his claim he was constructively

discharged" when there is no such claim, except by CNA.  This is weird. The case law cited

deals with constructive discharge and should be disregarded; it is not in the Complaint. (Deft. Ex.

C) CNA wants to call Cashman's early retirement notice **(Ex. 74)** a "resignation" but it doesn't

say "resign."  CNA knows Cashman applied for Unemployment Compensation and received

$10,518 benefits in 2007 (**Ex. 117**).  If it was a "voluntary quit" Cashman would not be eligible

for UC benefits, and CNA would presumably have opposed his claim.  It did not.

Cashman was fired November 3, 2006.  The day before, he was told to turn in his laptop

and equipment. HR rep Leslie Curran signed a receipt stating this was involuntary. **(Ex. 92)**

Cashman was told to leave the premises by CNAF Vice President Deborah Nutley, in a

conference call that day (**Ex. I, Nutley N.T. 23-26**).  Nutley testified, "He said, **"Are you**

**ordering me to leave?  I said yes."  (Ex. J, Nutley** p. 25 lines 14-15)  When the vice president

of CNAF, the parent corporation of CCC, tells you to turn in your laptop and leave the premises,

you've been fired.   There was no doubt in Plaintiff's mind, nor in Wolfe's mind, when he told

Cashman "there is no job for you here." That's not "constructive discharge" by any stretch of the

imagination.

**3. ADA Retaliation is Established In This Record**

To establish a *prima facie* case of retaliation under the traditional Title VII framework,

which applies to the ADA, Plaintiff must demonstrate: (1) Cashman opposed unlawful

employment practices or engaged in a protected activity; (2) CNA took an adverse action against

him; and (3) a causal link exists between the protected activity or opposition and CNA's adverse

action. Burlington Northern & Santa Fe Railway Co. v. White, 548 U. S. 53 (2006);  Jalil v.

Avdel Corp., 873 F. 2d 701, 708 (3d Cir. 1989) *cert. denied* 110 S. Ct. 725 (1990).  Cashman's protected activity occurred on October 23, 2006 when he rescinded his early retirement email and complained of being placed on a PIP because of his age and health status.  It did take him a month (not 5 weeks) to do this, but as CNA knows, he faced cancer surgery in the interim, was somewhat fatigued and worn down . (**Ex. 1, Cashman, #66, 67, 68, 69)**  CNA feels he took too long to recover sufficiently and realize he needed to keep his medical benefits! Again, on October 30, 2006 -- having received no response to his October 23 email -- he complained not only of discrimination *inter alia*  his "health situation" and of retaliation, stating  **"There is an attempt to force me to retire involuntarily or confuse me in relation to my rights and job position."**  This came 3 days before Nutley ordered him to leave the premises after turning in his laptop.

**a. CNA's Alleged Reason for the Retaliation is Pretextual**

CNA's excuse was that Cashman's work had already been distributed to Breit and others -- but Breit was hired September 11, 2006, (**Ex. 65)** 8 days before Cashman's false PIP and 9 days before he "decided" to take early retirement rather than be fired outright. Which happened anyway.  CNA had been preparing to fire Cashman for months, since August 2006, and its position that it would not let him rescind the early retirement email because it already redistributed his work is untenable.  There is nothing "legitimate" about it. CNAF was immediately aware of Cashman's complaint but the only response came *after he was fired,* on Monday November 6, 2006, when Liapes called him at home and said she would "investigate." **Ex. F, Liapes p. 30)** Liapes says she did "investigate" Cashman's claim of discrimination but there is no report because "I don't make reports." (**Ex. F p. 32)**

**b. There Is A Causal Connection Between The Protected Activity And The Adverse Action.**

There is clearly a causal, temporal connection between Cashman's recission of his "voluntary" early retirement on October 23, his complaint of discrimination on October 30, 2006 and his discharge by VP Nutley on November 3, 2006. CNAF executives were concerned enough about the obvious causal and temporal relationship here that another vice president (Liapes) contacted Mr. Cashman on November 6, after his discharge, about his complaint.  The nonexistent investigation does not absolve CNAF of its liability.  As in <u>Burlington Northern & Santa Fe Railway Co. v. White,</u> 548 U. S. 53, 126 S. Ct. 2405 (2006) the Supreme Court cautioned that Title VII protects individuals not from all retaliation but only from retaliation "that produces an injury or harm."  For an injury or harm to be actionable, it must rise to a "level of seriousness." Id. at 2414-15. There is no question that loss of employment or forced early retirement meets the "materially adverse" standard.

**c. Plaintiff Suffered a Material Adverse Action**

In the present case, Plaintiff's being placed on a PIP (**Ex. 72)** which states the possibility of his discharge in 30 days, is materially adverse, especially when done in a manner designed to extract a "voluntary" early retirement from a man facing cancer surgery.  This is egregious. When Cashman recovered from his surgery he rescinded his ill-considered early retirement notice but CNA would have none of it, despite the fact that no company rule prohibited this. Mandatory "early retirement" on unemployment benefits and facing cancer without health insurance is retaliatory.  "Poor performance" if it existed, (which it did not, according to SIU Productivity Exhibits **35A, B and C)** is hardly a legitimate business reason for this punishment. Placing an employee on a performance plan under threat of discharge is a materially adverse action against a healthy worker. <u>Burlington Northern & Santa Fe Railway v. White,</u> *supra;*

Michael v. Caterpillar Financial Services Corp., 496 F. 3d 584, 596 (6th Cir. 2007), *cert. denied*

128 S. Ct. 1657 (2008) cited by Judge Dalzell in Killen v. Northwestern Human Services Inc.,

2007 U. S. Dist. LEXIS 66602 (E. D. Pa. Sept. 7, 2007), 101 Fair Empl. Prac. Cas. (BNA) 1177.

Burlington Northern's broad definition of what is materially adverse in the retaliation context

"permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as

such in the retaliation context." Michael, at 596; Burlington Northern Id. at 2415.

In this case CNAF claims Cashman "resigned," that he claims "constructive discharge"

and that he was guilty of "poor performance" (despite its own statistics to the contrary **Ex 35C**)

while suffering a recurrence of cancer, chemotherapy and surgery without the "luxury" of

medical leave protected by FMLA.  The company should be ashamed to come into Court with

this bogus argument.  Cashman did nothing wrong.  He did a good job under adverse

circumstances (**Exhibit 35C**) and was forced into early retirement at age 59 while battling

cancer, on a direct order from a vice president to leave the premises.  Such harsh treatment is

disgraceful.

CNA has produced no evidence that its failure to provide fair performance evaluation and

intermittent FMLA leave to Mr. Cashman was legitimate or unintentional.  There is no policy

prohibiting an employee from rescinding an email notice of early retirement. Wolfe confirmed

this under oath (**Ex. K, Wolfe** p. 189). The company's adverse treatment of John Cashman is

disgraceful and illegal.

**E.  CNAF is an Essential Party Defendant in This Case and Must Not be Dismissed**

Defendants create an issue of material fact in claiming CNAF is a "holding company" which has "officers and directors but no employees" relying on an affidavit by a Mr. Lehman stating he is an Assistant Secretary of CNAF. [8]

Either Mr. Lehman is misrepresenting himself to the Court, or CNAF is misrepresenting itself to the SEC, because CNAF's Form10-K reports, filed with SEC and included in the company's Annual Financial Report to Shareholders, contains its **I.R.S. Employer** Identification No., 36-6169860 and states at p. 4 that the company has 9,800 employees in 2006. See also Form 10K for 2008 which states CNAF has 9000 employees.  **(Ex.101[9] hereto)**  This "no employees" claim is a gimmick.  The reduction of 800 employees in two years documents the effectiveness of Lilienthal's ongoing employee turnover policy instituted in 2002 and continuing to the present.

The Honorable Juan R. Sanchez, District Judge, refers to "CNA Financial Corp. CEO Stephen W. Lilienthal" in the first sentence of his Memorandum, treating Lilienthal as an employee, in Defendants' Ex. "I". Judge Sanchez clearly believed Mr. Lilienthal was employed by CNAF in issuing the 13-page Memorandum and Order denying Plaintiff's Motion to Compel Mr. Lilienthal's deposition in Reif et. al. v. CNA, et. al., E. D. Pa. No. 06-cv-4761 on February 21, 2008.  Indeed, Judge Sanchez states (Defts' Ex. I at p.13) that "lower level employees" of CNAF had knowledge of Plaintiff's termination and a 30(b)(6) corporate designee should be deposed. CNAF apparently had employees then.

---

[8] The question is whether Mr. Lehman works for CNAF.  He states he does, in the capacity of "an Assistant Secretary" but does not state by whom or what entity he is employed, or whether he is a volunteer.  In denying that CNAF has any employees he implicitly denies employment by CNAF, but he is apparently representing its interests as an officer of the company.
[9] Exhibit 101 includes both 2006 and 2008 Form 10K and Annual Report Excerpts

Per Judge Sanchez' Order of February 21, 2008 Plaintiffs scheduled a deposition under F.R.CP. 30 (b)(6). Sr.Vice President Robert Keith was the designated witness deposed March 6, 2008; excerpt is CNAF's Exhibit "H".  Mr. Keith testified (**Ex. 113** p. 6-9) he was employed by CNA for almost 30 years, CNAF does business under the name CNA, CNAF home office is in Chicago, CNAF has an office in Reading PA, he reports to Thomas Pontarelli, Executive Vice President of Human Resources and corporate services, and Mr. Pontarelli reports to CEO Lilienthal. (**Ex. 113 p. 13-14)** Keith said CNAF employs about 30 HR generalists in its local offices around the country, and they review employee terminations to ensure consistency and compliance with state and federal laws. (**Ex. 113 p. 16-24**) This is not a company without employees.

"CNA" is a service mark for CNAF. In defendants' Statement of Facts there are numerous references to "CNA"[10] as CNAF. The introduction refers to CNA Financial Corporation (CNAF) as a named defendant and says "CNA" refers to CCC (Continental Casualty Co.) or "Defendants" plural, including CNAF.  Keith said CNAF is  CNA.

In Reif et. al. v. CNA  *supra*, defendants claimed CNA was an improperly named defendant, it was merely "a service mark" and as such should be dismissed.  In that case, filed October 24 2006, CNAF was not a party defendant until December 5, 2007 in the Second Amended Complaint (Reif docket #52).  Mr. Antonelli personally accepted service December 12, 2007 **(Ex. 103)** and CNAF never objected to being a defendant.  CNAF admitted it is the Sponsor of the CNA Retirement Plan,**(Ex.102** Disclosure filed October 2007), the same Retirement Plan under which Plaintiff John Cashman was forcibly retired early, at age 59.

Page 4 of CNAF's Annual Report of 2008 states:

---

[10] See, e.g. paragraphs 37, 38, 48, 27, 70, 79, 85, 97, 101, 103 and Section K, "CNA Did Not Give Walter McClarren Preferential Treatment . . ."

**Employee Relations**

**As of December 31, 2008, we had approximately 9,000 employees and have experienced satisfactory labor relations.  We have never had work stoppages due to labor disputes.**
**We have comprehensive benefit plans for substantially all of our employees, including retirement plans, savings plans, disability programs, group life programs and group healthcare programs. . .**

                                           **(Exhibit 101 2008 Annual Report)**

If CNAF "has no employees" it is misleading I.R.S. and SEC when it files 10-K and 10-Q

reports. See 2006 and 2008 Annual Report Excerpts **Ex. 101**. Also, at the end of the CNA 2008

Annual Report CEO Motamed and CFO  D. Craig Mense each personally certified on February

23, 2009 under the Sarbanes-Oxley Act that disclosure has been made of:

      **5 . . .(b) Any fraud, whether or not material, that involves management <u>or other</u> <u>employees</u> who have a significant role in the registrant's internal control over financial reporting.**

                           (Exhibit **101** emphasis added)

CNAF cannot legitimately contend to this Honorable Court that it has no employees

**when it issues formal written public Annual Financial Reports stating it has 9,000**

**employees** and its CEO and CFO certify to disclosure of any fraud involving "management or

other employees" under Sarbanes-Oxley.

## IV.  CONCLUSION

For all the above stated reason, and because there are genuine disputed material facts in the record, Plaintiff respectfully submits that this Honorable Court deny defendants' motion for summary judgment.

11/6/09                                     Respectfully submitted,

/s/

_____
Carmen R. Matos, Esquire, PA I.D. No. 32795
Anita Alberts, Esq. PA ID 28086
40 East Court Street, 3d Floor
Doylestown, PA 18901
215-345-8550
215-345-8551
crmatoslaw@aol.com
afalawyer@comcast.net
Attorneys for Plaintiff
Mr. John Cashman

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the following legal papers were served upon:

Richard J. Antonelli Esq.                       Anita F. Alberts, Esq.
Rebecca Dick-Hurwitz, Esq.                      40 East Court St, 3d Floor
Babst, Calland, Clements & Zomnir PC            Doylestown, PA  18901
Two Gateway Center, Eighth Floor
Pittsburgh PA 15222


in the following manner:

| | |
|---|---|
| <u>Legal Papers</u>: | Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment, Certificate of Service |
| <u>Manner</u>: | ECF 11/6/09 Exhibits Volumes I, II, III by fedex mailed 11/6/06 |

                                                /s/
Date:   November 6, 2009            By:_____
                                            Carmen R. Matos, Esquire
                                            crmatoslaw@aol.com
                                            Attorney for Plaintiff
                                            Mr. John Cashman