**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN CASHMAN,** | : |
| Plaintiff, | : |
| | : Civil Action No. 08-5102 |
| v. | : |
| **CNA FINANCIAL CORP**. | : Hon. Thomas M. Golden |
| and | : |
| **CONTINENTAL CASUALTY CO**., | : Jury Trial Demand |
| Defendants. | |

## PLAINTIFF'S PRETRIAL MEMORANDUM

### I.  PLAINTIFF'S STATEMENT OF FACTS

Mr. Cashman filed his complaint on October 24, 2008, alleging that Defendants

forced him to retire on November 3, 2006, based on his age, 59; disability (bladder

cancer), FMLA and interference with FMLA rights; and based on retaliation for

complaining of unlawful age and disability discrimination. Mr. Cashman's federal claims

arise under the Age Discrimination in Employment Act 29 U.S.C. § 621 et seq., as

amended (hereinafter "ADEA"); the Americans with Disabilities Act of 1990, 42 USC

§12201 et seq. (hereinafter "ADA") and the Family Medical and Leave Act  (hereinafter

"FMLA").  Mr. Cashman asserts his state claim under the Pennsylvania Human Relations

Act, 43 P.S. § 951 *et seq.* (hereinafter "PHRA"),

Mr. Cashman was born February 7, 1947, attended Temple University, worked

for the Philadelphia Police Department from 1969 to 1992, and retired from the Police

Department as Detective. His last assignment was in the Federal Insurance Task Force

investigating insurance fraud.

In October 1992, defendants hired Mr. Cashman as a Fraud Claims Investigator in

the Special Investigations Unit (SIU) at the Reading office. Mr. Cashman, a loyal

employee, always earned performance ratings of meets, or exceeds expectations and continuously received merit increases and bonuses, due to his diligent performance.

Mr. Cashman earned a promotion to Team Leader in 1997. Mr. Cashman reported to Richard Carroll, then SIU Manager, from around 1995 to 2004, about ten years. Mr. Carroll was pleased with Mr. Cashman's performance, and Mr. Cashman received regular merit increases and incentive bonuses. In 2003 CNA awarded him incentive bonus of $4,478; in 2004 the bonus was $4168; in 2005 it was $4368 and $4300 in 2006.

In 2002, Stephen Lilienthal became the new President and Chief Executive Officer of CNAF and Chairman and CEO of CNA insurance companies. Lilienthal spoke at the Chicago quarterly leadership meeting in August 2002 wherein he issued a "challenge" to CNA managers from across the country. Following this meeting intranet messages went out all over the US including Reading PA, the facility where Plaintiff worked, stressing Lilienthal's directive, **"We need to get *kids* in here."**

From 1992 through 2002, Mr. Cashman was rated "2" exceeds expectations. In 2003 he received a "3" or meets expectations rating. In 2003, James Bonk, Director of SIU, suggested to Mr. Carroll that he place Mr. Cashman on a performance improvement plan (PIP) for alleged excess mileage use. Mr. Carroll reviewed the reasons given and believed that the PIP was not justified. Mr. Carroll did not plan to place Mr. Cashman on a PIP based on performance. Nor did Mr. Carroll ever warn or discipline Mr. Cashman. To the contrary, Mr. Carroll believed plaintiff was an excellent fraud investigator. Carroll was placed on a PIP by Bonk in part for refusing to PIP Mr. Cashman, and he was terminated in early 2004.

In around April 2004, Mr. Cashman was diagnosed with cancer and required some time off for surgery and chemotherapy treatment.  He returned to work, was able to work without accommodation, and continued to meet the expectations of his employer. Defendants' managers did not look favorably upon employees who had to take time off due to illness or disability. Mr. Cashman had a record of his disability at CNA.

In 2004, Mr. Cashman then reported to Gary Traina, SIU Manger. Mr. Traina never warned or disciplined Mr. Cashman at any time. Mr. Cashman also reported to Joseph Cunningham, SIU Manager for a short time period. Mr. Cunningham never disciplined or warned Mr. Cashman at any time.

On March 15, 2005, Defendant rated Mr. Cashman's performance for 2004 as "3" or meets expectations.  Manager Gary Traina completed the review, stating, in part, "John is able to work with little or no direct supervision.  He has been with SIU since 10/1992 and remains a vital part of the organization."  The performance review states in the area of productivity improvement, "John was out for an extended amount of time during the year due to medical reasons…"    Mr. Cashman was diagnosed with cancer and received chemotherapy and other medical treatment during 2004.   As a result of the satisfactory review, Mr. Cashman received a bonus of $4368.   Mr. Cashman did not believe that his job was in jeopardy after this review and bonus incentive.

In September 2005, the defendants instituted a new SIU process for investigating fraud claims where a Fraud Case Manager (FCM) would contract with certain designated vendors to conduct fraud investigations. The transition to this new model was met with resistance by a large majority of the claims office and some problems ensued.  These problems required intervention from management and meetings to straighten out

problems and non-compliance by claims. Many claims personnel were not aware of changes and constant coaching was required to assure they knew the process.  Wolfe and Bonk were aware of these issues.

In September 2005, Mr. Cashman began to report to Timothy Wolfe, SIU Manager. On September 1, 2005, Mr. Cashman advised Wolfe that he needed to have surgery on September 19, 2005, due to recurrence of cancer.  Wolfe informed James Bonk, Director of SIU, of Mr. Cashman's cancer recurrence.

On September 20, 2005, Mr. Cashman sent Mr. Wolfe an e-mail advising him that he had a surgical procedure, that his physician wanted him to start a course of chemotherapy, and that his treating physician recommended no travel due to the side effect of the chemotherapy.  Mr. Cashman was not able to travel to the SIU kick off meeting in Chicago the following week where the new model was explained.  Although he did not attend the meeting, Wolfe asked him to handle assignments that came in during the time of the meeting, which Mr. Cashman completed.  Mr. Cashman continued to advise Wolfe of his treatment including outpatient procedures and the effects of medication.  Mr.Cashman informed Wolfe that he would undergo another one-day outpatient procedure at the hospital. Mr. Cashman experienced side effects from chemo treatment and was not able to make a presentation on October 4, 2005. After advising his employer of his recurring disability, defendants scrutinized Mr. Cashman's performance more closely than in the past 13 years of employment. The criticism was unfounded. Most of the criticism resolved around disputes of whether sufficient red flags warranted a fraud investigation or whether certain vendors could be used that were not on the CNA designated list of vendors.  Management became more flexible as to the meaning of what

constitutes a red flag and directed fraud investigations, which did not meet the SIU red

flags compliance policy.  When ordered to do such an investigation, Mr. Cashman

complied.

In November 2005, Mr. Cashman had to take time off for a hospital stay. Mr.

Cashman applied for short-term disability benefits. Mr. Cashman was on short-term

disability and personal time off from November 21, 2005 until January 3, 2006 when he

returned to work with no restrictions. Mr. Cashman had another record of the recurring

disability.

In January 2006, Gary Traina rated Mr. Cashman as "2" exceeds expectations.

The review was changed by Wolfe who rated Mr. Cashman's work performance for 2005

as "2" or meets requirements. Wolfe did not change any other reviews.  The review

stated, "John adjusted well to changes of past year and implementation of the new model

and has been a valued member of the Fraud Case management team."  The compliance

numbers inputed by Wolfe in the review were not accurate.  Wolfe admitted that he

destroyed the records on which Mr. Cashman and his colleagues' compliance numbers

were based. Mr. Cashman received a bonus on March 13, 2006 in the amount of $4300.

Wolfe had supervised Cashman only for several weeks, due to Cashman's illness in late

2005.

In May 2006, Mr. Cashman told Wolfe he would have to undergo another

course of six chemotherapy treatments beginning June 5, 2006 once per week on Monday

afternoons and that he may need surgery later in 2006.  Wolfe advised Mr. Cashman not

to worry, that he understood and would take this into consideration with respect to his

performance. Wolfe further stated, "I am sorry to hear that you need more treatments and

I hope the outcome will be positive. Let me know if you need any special

accommodations while you are attending these sessions."  Wolfe did not advise Mr.

Cashman that his performance was "poor" or that he should consider taking intermittent

Family Medical Leave. Mr. Cashman did not take time off for the chemotherapy

treatment, but worked remotely and asked that he not be given rush assignments since he

might be tired from the effects of the chemo.

      In May 2006 Wolfe requested additional staff due to the illness of  Mr. Cashman

and his colleague, Walter McClarren who took a 12-week medical leave for major

surgery.  Cashman discussed McClarren's illness and his own health difficulties with Mr.

Wolfe, who responded,**"it gets hard when you get older."** The comment struck

Cashman as an indication of CNAF's and Wolfes's bias for younger people and against

employees with disabilities. Mr. Cashman later reported this comment to SVP Nutley

who viewed this comment as "problematic."

      During the month of June and July 2006, while receiving chemo, Wolfe

scrutinized Mr. Cashman's work in an unwarranted manner.  Mr. Cashman's productivity

according to the SIU Productivity record was better than other Fraud Case Managers.

On August 22, 2006, Mr. Wolfe, then SIU Manager stated that Mr. Cashman was doing a

very good job based on Mr. Cashman's closure ratio of 111%, savings year to date of

$680,387.

      Mr. Wolfe complemented Mr. Cashman on numerous occasions for rejecting

claims that did not fit the criteria for fraud, which would have wasted company assets on

investigation.  Wolfe specifically advised Mr. Cashman that he appreciated the fact that

[Mr. Cashman] was not rubber stamping the requests for fraud investigations and was

rejecting claims that did not fit the fraud criteria.   Yet, it was not unusual for a claims adjustor to disagree with the FCM as to whether a fraud investigation should be conducted.  In such case, management often ordered the FCM to assign the claim for investigation.  This did not indicate that the FCM was a poor performer in such a situation.

On September 18, 2006, Mr. Wolfe announced the hire of Doug Breit as a new Fraud Case Manager. Mr. Breit was 39 years old, substantially younger than Mr. Cashman, and did not have a disability.Breit had been laid off in October 2005 from the SIU and was rated lower than Mr. Cashman at that time.  Wolfe offered Breit training in Minneapolis while Mr. Cashman was not offered any training. Mr. Cashman was clearly more qualified compared to the younger Doug Breit.  Breit assumed Mr. Cashman's work after Mr. Cashman was forced to retire.

On September 19, 2006, suddenly and without warning, Mr. Wolfe placed Mr. Cashman on a Performance Improvement Plan (PIP) for false reasons. Wolfe, who was located in San Francisco, read the PIP to Mr. Cashman by phone.  Wolfe did not advise Mr. Cashman that corporate Human Relations Official Betsy Mansfield was also on the line.  Other substantially younger employees (Fraud Case Managers) were not performing at the level that Mr. Cashman was according to the SIU Productivity Reports, but they did not receive a PIP.

 On September 20, 2006, Mr. Cashman announced his intention to retire under duress based on his medical condition and the stress caused by management's decision to place him on a PIP.  Mr. Cashman understood that a PIP was like a goodbye kiss, having been aware of other employees PIPed and terminated.  Mr. Cashman spoke to HR

Representative Leslie Curran about his medical condition. Her only advice was that he could go on Short Term Disability.  She did not mention intermittent Family Medical Leave Act (FMLA) leave.  At that time Mr. Cashman did not sign any retirement papers.

On September 21, 2006, Mr. Cashman began receiving new file assignments, including a complicated claim.  He hesitated to begin the investigation because it appeared this could run well past his expected retirement date. Mr. Cashman emailed Wolfe to express this concern. Mr. Wolfe instructed Mr. Cashman via return email, "John, please handle all cases as normal until further notice."  There was no mention of the PIP.

Also on September 21, 2006, Mr. Cashman e-mailed Mr. Wolfe that he was receiving more assignments, while attempting to clean up his pending files.  Mr. Cashman advised Mr. Wolfe that he would handle the files as usual but awaited further direction.  Mr. Wolfe responded by email, stating "John, please continue handling until further notice. If your last working day will be Nov. 3 we have time to bring Doug [Breit] up to speed before we cut you off."

Further, on September 21, 2006, Mr. Cashman requested paid time off (PTO) for September 26, 2006 to undergo a surgical procedure and biopsies related to his disability at Methodist Hospital in Philadelphia, PA.

On September 22, 2006, Mr. Cashman became ill from chemotherapy, and requested paid time off. Wolfe left him a voice mail indicating that he believed Mr. Cashman did not want to handle certain cases.  Mr. Cashman responded advising Wolfe his concern was that dropping complex cases on a new investigator in mid-stream could cause difficulties and negatively impact the outcome and the SIU. Wolfe responded by

email at 6:39pm stating, "That is okay, John. We have a good six weeks until you retire, so there should be plenty of time to handle the majority of your assignments. When we get nearer to Nov. 3, I will take you out of the queue and allow you time to transfer anything that is still pending." Mr. Cashman understood Mr. Wolfe's response as management being satisfied with his performance, and business as usual. There was no more mention of the PIP.

On September 26, 2006, Mr. Cashman had a surgical procedure. As he recovered, he began to reevaluate the decision to retire as he was in need of medical benefits and work. Mr. Cashman called the corporate office toll free number and spoke to several persons. He understood he could rescind the decision to retire at any time before signing the final papers. Mr. Cashman continued to work as usual. There was no more mention of the PIP.

On October 23, 2006, Mr.Cashman stopped all retirement procedures in Benefits Resources per instructions from the corporate office for rescinding the decision to retire. Mr. Cashman then emailed Wolfe and Mansfield, Corporate HR for the Central Region, advising he would not retire and would continue working. Mr. Cashman stated in writing he believed the PIP was discriminatory, related to his age and medical condition, and that he could continue to perform his duties as required without accommodation. Wolfe responded that he needed to consult with HR. Defendant did not investigate the age or disability complaint and instead retaliated against plaintiff by forcing him to retire because he engaged in protected activity or because he opposed unlawful employment practices.

On or about October 27, 2006, a conference call took place attended by Mr. Cashman,  Wolfe in San Francisco and Mansfield, Human Resources from Chicago.  Mr. Cashman asked why he could not continue to work in his job. Wolfe stated that his job was already filled.  Mr. Cashman stated there was a job open as Manager of Investigative Team, which was previously held by Stephen Weiner, who had recently resigned.  Mr. Cashman expressed interest in filling the position.  Wolfe stated, "that position is not open for you either"  and words to the effect that there was no job for Mr. Cashman at CNA.

On October 30, 2006, Mansfield advised Mr. Cashman stating defendant "had honored your original decision to leave CNA" and "…your last day with CNA will be November 3." Mr. Cashman responded in writing, stating he was being retaliated against and forced to retire involuntarily, and "I respectfully intend to remain on duty as an employee until I am instructed that I am no longer employed by CNA.  If there is no position available to me, please clearly state this in your reply."

On November 1, 2006, Mr. Wolfe sent Mr. Cashman an email listing his 43 open files and instructing him to report the status of each one by noon the next day so he could reassign them. On November 2, 2006, Mr. Cashman received a phone message from Mr. Wolfe instructing him to turn in his equipment, but without stating where, when or how, and without stating that Mr. Cashman was terminated.  Also on November 2, 2006, Mr. Cashman emailed Mansfield asking about his status stating, "I have chosen not to retire from CNA at present.  If I am being terminated for any reason, please advise me of this fact…"  Mansfield responded via email at 5:07 p.m. stating, "CNA has honored your

original decision to leave CNA. Your last day will continue to be November 3."
Mansfield instructed Wolfe to process the termination paperwork for Mr. Cashman.

On November 3, 2006, Defendants required Mr. Cashman to turn in the company laptop and ID card. This was done after Mr. Cashman was put in touch with Deborah Nutley, Senior Vice President, Human Resources at CNA, Chicago. Mr.Cashman directly spoke to Nutley and told her that CNA was discriminating against him based on his age and disability.  Nutley ordered Mr. Cashman to give his equipment to Curran of HR Reading, who signed a receipt stating Mr. Cashman's separation was **not voluntary**.

Mr. Cashman believes that the unwarranted PIP of September 19, 2006 was a pretext to induce him to retire early because of his age, 59 and because of his disability, cancer. Mr. Cashman believes, based on Mr. Wolfe's email of September 21, 2006 that his job was filled, and Doug Breit, then age 39, assumed Mr. Cashman's responsibilities and work. Mr. Breit is still employed by the defendant.

 Wolfe was subsequently promoted to SIU Director some time in November 2006 serving as temporary Director and later was promoted to the SIU Director job left vacant after Bonk's resignation.  Wolfe's performance evaluation requires him to meet a goal of 10% voluntary turnover, which includes the use of PIPs to get rid of older, retirement eligible employees.  Traina and Carroll, both over 40, were both placed on PIPs after serving defendants loyally for several years.  Other employees in the Claims Department, which SIU is a subset of, were PIPed, being over 40 years of age, and having met Defendants' expectations consistently.  Defendants' practice of placing older employees on PIP is disproportionately applied to employees over forty. This practice saves the defendant from paying severance per its policies and procedures.

By forcing Mr. Cashman to retire, defendant also saved the cost of higher retirement benefits, had he worked to the age of 65.  (The amount of savings is listed below in the damages section).  Mr. Cashman was pension eligible due to the combination of his age, 59 and service of 13 years, which met the Rule of 65 (age and service equals 65). Defendant employs few exempt employees as FCMs to the age of 65.

Defendants' reason that it placed Mr. Cashman on a PIP due to performance for and that it would not allow Mr. Cashman to rescind the retirement are false and a pretext to force Mr. Cashman to retire because of his age of 59 years, for complaining of age and disability discrimination, and due to his disability, real or perceived, bladder cancer and in violation of the FMLA.  Mr. Cashman has suffered damage to his reputation, lack of sleep, humiliation, embarrassment, mental distress and a loss of self-esteem because of this unlawful conduct.

Defendants actions are intentional, reckless and in knowing disregard for the rights of Mr. Cashman under the ADEA, ADA, PHRA and FMLA.  For several years, Mr. Cashman was a consistent good performer and was placed on a performance improvement plan due to his age, in an effort to force him to retire or leave the defendant's employ.

## II.    DAMAGES

Mr. Cashman has, continuously attempted to reasonably mitigate his damages by seeking comparable employment.  In July 2007, he obtained employment as a Special Agent with the PA Office of Attorney General, Bureau of Criminal Investigation, assigned to Philadelphia Gun Violence Task Force, at the lower salary of approximately $50,000.  Prior to termination, Mr. Cashman was earning $78,000 which would have

continued but for the unlawful age discrimination, together with a variety of compensation, including bonus incentive, pension, 401 (k), medical and dental benefits, disability and life insurance, all of which would have continued to increase in value had he not been unlawfully terminated. Mr. Verzilli estimates Mr. Cashman's economic damages at $464,429 which includes backpay at $131,252 from November 2006 to October 2009; front pay loss at $333,177 from November 2009 to age 68. This includes a future pension loss of $149,277. Defendants estimate economic losses at a total of $316,298, which includes net wage loss and benefits of $119,000 (exclusive of pension) and present value of future net lost wage and benefits of $77,000, and present value of potential lost future pension benefits of $119,754. Further, plaintiff seeks pretrial, post trial interest, damages for negative tax consequences, damages for emotional distress and his attorney fees, which should be reserved for the court at the post trial stage.

## III.   PLAINTIFF'S LIST OF WITNESSES

### A.   LIABILITY

1. Mr. John Cashman, 917 Maple Street, Royersford, PA  19468
   Mr. Cashman has knowledge of his job history, performance, discrimination, economic damages, pain and suffering, and mitigation of damages.

2. Timothy Wolfe, CNAF employee, 401 Penn Street, Reading PA 19612
   Mr. Wolfe has knowledge of Mr. Cashman's job performance from 2005 to 2006, disability, performance improvement plan and forced termination and hiring of the younger investigator Douglas Breit.

3. Richard Carroll, former CNAF SIU Manager, PO Box 95, Mohnton, PA 19540, has knowledge of Mr. Cashman's job performance at CNAF from 1992 to 2004 as well as his own termination and PIP.

4. James Bonk, former SIU director, 401 Penn Street, Reading PA 19612.
   Mr. Bonk has knowledge of Mr. Cashman's performance, job history, PIP, forced retirement, and disability.

Case 5:08-cv-05102-LS   Document 52   Filed 11/19/09   Page 14 of 19


5. Betsy Mansfield, CNAF Human Resources employee, Reading, PA. Ms. Mansfield has knowledge of Mr.Cashman's performance improvement plan, retirement under duress and rescission of retirement, as well as Mr. Cashman's disability.

6. Douglas Breit, CNAF employee, 401 Penn Street, Reading PA 19612 (by videotape deposition). Mr. Breit has knowledge of his age, service, performance, hiring and rehiring at CNAF and assumed Mr. Cashman's duties.

7. Ms. Leslie Curran, former CNAF HR Representative, 401 Penn Street, Reading PA 19612.  Ms. Curran is aware of Mr. Cashman's involuntary retirement.

8. Deborah Nutley, CNAF, Sr VP, 333 S. Wabash Street. Chicago Ill 60685. Ms. Nutley is aware of Mr. Cashman's EEO complaint and her discussions with Mr. Cashman prior to the termination.

9. Shelley Liapes, CNAF, Sr. VP, 333 S. Wabash Street. Chicago Ill 60685. Ms. Liapes is aware of Mr. Cashman's EEO complaint and her discussions with Mr. Cashman after the termination.

10. Gary Traina, 2021 Bayside Avenue, Mount Dora, FL  32757, former employee, has knowledge of PIP process, plaintiff's performance and Breit.

11. Art Cain, Jr., 518 Park Hollow Lane, Phila PA  19111, has knowledge of his performance, PIP, SIU.

12.  Michael and Tammy Reif, 10 Pleasure Road, Ephrata PA, 17522, former CNAF Litigation Representative. Mr. Reif is aware of his own PIP, age discrimination, retaliation and termination by CNAF. Mrs. Reif is aware of her termination and complaint of discrimination.

13. Joanne Rittenbaugh, 816 Upland Avenue, Reading, PA  19607, former employee, has knowledge of PIP process as used to force resignation.

14. Joseph Godal, 225 Douglas Street, Reading PA  19601, former employee, has knowledge of PIP/action plan process, management directive for hiring youth.

15. Stuart Hammel, 910 Suellen Drive, Reading, PA  19606, former employee, has knowledge of age discrimination, management directive of hiring youth, and PIP practices.

16. Robert Unterberger, 116 Olde Field Drive, Lititz, PA 17543, former employee, has knowledge of PIP process as used to force resignation.

17. Rose Sheehan, 208 North Quincy Street, Brockton, MA  02302, former employee, has knowledge of PIP process as used to force resignation.

18. Helena Myers, 7 Ivy Circle, Norwood, MA 02062, former employee, has knowledge of PIP process as used to force resignation.

19. Adriana Algieri, 70 Alton Avenue, Greenlawn, NY  11740, former employee, has knowledge of PIP process as used to force resignation.

20. David Miles, 4621 Granite Drive, Middletown, MD 21769 former employee, has knowledge of PIP process as used to force resignation.

21. Stephen Weiner, New York, former CNA, rebuttal witness re plaintiff's qualifications for Major Investigations Unit job and defendants' preference of early retirement of SIU personnel based on age and years of service.


**B.     DAMAGE WITNESSES**

22. Andrew Verzilli, Economist, 610-847-8655, P.O. Box 67, Kintnersville, PA 18930
Mr. Verzilli will testify about Mr. Cashman's economic damages and negative tax consequences.  Curriculum vitae has been submitted to defendants.

22. Mr. Mrs. John Cashman and Denise Cashman 917 Maple Street, Royersford, PA  19468, have knowledge of Mr. Cashman's pain and suffering, emotional distress, with respect to his employment and forced retirement.

Plaintiff reserves the right of rebuttal and to call any of the defendants' witnesses.

**C.     PLAINTIFF'S DESIGNATIONS OF DEPOSITION TESTIMONY FOR TRIAL :**

Plaintiff designates the following witness' depositions in the event they are

unavailable at trial. Plaintiff reserves the right to amend his deposition designations.

1.  James Bonk Deposition Designation Pages

4,7,18, 23, 28, 29-33; 43-45; 48-55, 58, 64-67; 79-85; 88-110, 113-120, 122-139
Exhibits 11, 12, 17,  27, 29, 59, 97, 104, 105, 114

2.  Deborah Nutley Deposition Designation Pages

    4-14, 18-31; 38-39, 41-43, 46-48, Ex. 85, 91, 93

3.  Shelley Liapes Deposition Designation Pages

    5-48:20, 51:17-77, Ex. 82, 84, 85, 94

4.  Elizabeth Mansfield Deposition Designation Pages

    4-5:19; 8:10-169
    Exhibits 3, 14, 24, 68, 69, 70, 71, 72, 73, 78, 79, 80, 82, 83, 84, 85, 87, 88, 89, 90, 93, 95 A,B

5.  Robert Keith (Deposition in Reif v CNAF et al)

    4-25,78-105, Ex 104, 105

6.  Gary Traina Deposition Designation Pages

    5,6, 12-19, 21-23; 25-31; 33, 35-38; 43-44; 47-8; 50-51; 58-59; 62-63; 69-71; 76-83; 88, 90-91, 94-100, 103-105; 110-113; 115
    Ex 96 (Employee history documents, PIPs 7/7/06, 8/28/06)

7.  Douglas Breit: Entire videotape deposition, Exhibits 65 A,B,C


**IV.**   **PLAINTIFF'S SCHEDULE OF EXHIBITS:**  SEE ATTACHED EXHIBIT 1

    hereto. Plaintiff reserves the right to amend through trial.

**V.**   **ESTIMATE NUMBER OF DAYS REQUIRED FOR TRIAL**

    Plaintiff anticipates five days for his case in chief and about seven days for the

    total trial.

## VI.   COMMENTS REGARDING LEGAL ISSUES, STIPULATIONS, AMENDMENTS, OR OTHER APPROPRIATE MATTERS

Plaintiff anticipates that the parties will file several motions in limine.

11/19/09                              Respectfully submitted,
                                      /s/*Carmen R. Matos*

                                      _____
                                      Carmen L Rivera Matos, Esquire, PA I.D. 32795
                                      Anita Alberts, Esq. PA ID 28086
                                      40 East Court Street, 3d Floor
                                      Doylestown, PA 18901
                                      215-345-8550
                                      215-345-8551
                                      crmatoslaw@aol.com
                                      afalawyer@comcast.net
                                      Attorneys for Plaintiff
                                      Mr. John Cashman

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the following legal papers were served upon:

Richard J. Antonelli Esq.                    Anita F. Alberts, Esq.
Rebecca Dick-Hurwitz, Esq.                   40 East Court St, 3d Floor
Babst, Calland, Clements & Zomnir PC         Doylestown, PA  18901
Two Gateway Center, Eighth Floor
Pittsburgh PA 15222


in the following manner:

<u>Legal Papers</u>:                    Plaintiffs' Pretrial Memorandum, Certificate of
                                        Service


<u>Manner</u>:                         ECF



                                        /s/
Date:   November 19, 2009       By:_____
                                        Carmen R. Matos, Esquire
                                        crmatoslaw@aol.com
                                        Attorney for Plaintiff Mr. John Cashman