**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN CASHMAN,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CNA FINANCIAL CORP.,** | : | **NO.  08-5102** |
| **CONTINENTAL CASUALTY CO.,** | : | |
| **Defendants.** | : | |

**<u>MEMORANDUM</u>**

Stengel, J.                                                    January 13, 2012

John Cashman filed a complaint against his former employer Continental Casualty Company and CNA Financial Corporation.[1]  The complaint raises an age discrimination claim pursuant to the Age Discrimination in Employment Act, a retaliation claim pursuant to the ADEA, a retaliation claim pursuant to the Family Medical Leave Act,[2] a discrimination claim and retaliation claim pursuant to the Americans with Disabilities Act, and an age discrimination claim pursuant to the Pennsylvania Human Relations Act. Defendants filed a motion for summary judgment.  For the reasons set forth below, I will grant the motion.

---

[1]  Mr. Cashman has sued CNA Financial Corporation and Continental Casualty Company.  CNA Financial claims it is not a proper defendant because it is a holding company with no employees. Mr. Cashman disputes this claim.  The parties refer to the defendants jointly as "CNA."  I will do the same for purposes of this opinion.

[2]  It is unclear whether Mr. Cashman raises an interference with his FMLA rights and a retaliation claim under the FMLA or raises only a retaliation claim under the FMLA.  Because the parties argue both causes of action in the papers, this opinion will address both causes of action.

I.     BACKGROUND

    A.     John Cashman's Employment at CNA

John Cashman was born on February 7, 1947.[3]  In 1992, Continental Casualty Company hired Mr. Cashman as a claims investigator in its special investigations unit. Statement of Facts at ¶ 5; Response to Statement of Facts at ¶ 5.  In this position, Mr. Cashman conducted investigations for suspected fraudulent claims.  Id. at ¶ 5.  In 1997, he was promoted to team leader.  See Plaintiff's Statement of Facts at Exh. 9.  From 1992 through 2005, Mr. Cashman received performance ratings of "2," for exceeds expectations, or "3," for meets expectations.  In April 2004, Mr. Cashman was diagnosed with bladder cancer and took short-term disability from April 21, 2004 to July 6, 2004.[4]

In September 2005, the special investigations unit was reorganized.  Id. at ¶ 6. The unit was divided into four units: the fraud case management team, the major investigations team, the fraud identification and prevention team, and the special investigations unit intake team.  Id. at ¶ 8.  Mr. Cashman was assigned to the fraud case management team, where he reviewed and oversaw claims forwarded by adjusters.  He

---

[4]  Plaintiff's Statement of Material Facts and Plaintiff's Response to Defendants' Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment at Exh. 1 at 10, Cashman v. CNA Financial Corp., No. 08-5102 (E.D. Pa. filed Nov. 6, 2009) [hereinafter Plaintiff's Statement of Facts].

assessed the claims under the CNA policy requirements to determine whether the claims involved fraud and whether the claims should be sent for investigation.  Id. at ¶ 9-10. Timothy Wolfe managed the fraud case management team.

Mr. Wolfe became Mr. Cashman's supervisor in September 2005.  Statement of Facts at ¶ 11; Response to Statement of Facts at ¶ 11.  Prior to September 2005, Gary Traina supervised Mr. Cashman.  Id. at ¶ 12.  For 2004, Mr. Traina rated Mr. Cashman as a "3."  Id. at ¶ 13-14.  Although Mr. Traina never supervised Mr. Cashman on the fraud case management team, id. at ¶ 15, Mr. Traina had prepared a draft evaluation for Mr. Cashman's performance from January 2005 through September 2005, giving Mr. Cashman a rating of "2."  Statement of Facts at ¶ 86; Response to Statement of Facts at ¶ 86.  Mr. Wolfe changed Mr. Traina's evaluation of Mr. Cashman from a "2" to a "3."  Id. at ¶ 87.

Mr. Cashman's cancer returned in September 2005.  Statement of Facts at ¶ 20; Response to Statement of Facts at ¶ 20.  Mr. Cashman informed Mr. Wolfe about the return of the cancer and gave Mr. Wolfe permission to tell his supervisor James Bonk. Id. at ¶ 21.  Mr. Bonk's reaction was that Mr. Cashman's health came first, and Mr. Cashman should not worry about missing an upcoming presentation in Chicago.  Id.  Mr. Cashman was hospitalized in mid-November 2005 and took vacation time and short term disability leave from December 5, 2005 through January 2, 2006.  Id. at ¶ 23.  CNA designated this leave as Family Medical Leave Act leave.  On January 3, 2006, Mr. Cashman returned to work with no restrictions.  Id.

On April 18, 2006, Mr. Wolfe sent Mr. Cashman an email regarding a new file

assignment.  Mr. Cashman responded:

> I had my 3-month checkup yesterday and unfortunately there was some
> recurrence of small tumor growth.  I am scheduled to have an out patient
> procedure on 4/27/06, 2:30 p.m. [a]t Thomas Jefferson Hospital.  Please
> bear with me if I am preoccupied as this is a set back and a little
> discouraging as you can imagine.  I do not expect to lose any significant
> time as at present this is minor.  I will talk to you tomorrow.

See Plaintiff's Statement of Facts at Exh. 36.

On April 27, 2006 at 5:24 a.m., Mr. Cashman emailed Mr. Wolfe:

> Could you take me out of the Q this afternoon or for any Rushes, anyway.  I
> will be undergoing a medical procedure later this afternoon and do not want
> to blow any assignments.  I expect, I will be OK on Friday and will let you
> know.  I will be working from home.

See Plaintiff's Statement of Facts at Exh. 39.

On May 25, 2006, Mr. Cashman advised Mr. Wolfe that his last biopsy was

positive and his physician wanted to try another course of chemotherapy treatments every

Monday afternoon for six weeks starting June 5, 2006.  Plaintiff's Statement of Facts at

Exh. 46.  Mr. Wolfe replied: "I am sorry to hear that you need more treatments and I

hope the outcome will be positive.  Let me know if you need any special accommodation

while you are attending those sessions."  Mr. Cashman also asserts Mr. Wolfe told him

not to worry and that he would take it into consideration with respect to Mr. Cashman's

performance.  Id. at Exh. 1 at ¶ 45.

In 2006, Mr. Cashman took paid time off days for chemotherapy treatments,

doctor visits, and surgery.  Statement of Facts at ¶ 24; Response to Statement of Facts at ¶

24.  Mr. Cashman maintains Mr. Wolfe continued to assign him work during his paid

4

time off, when he knew Mr. Cashman was undergoing medical treatments.  Response to

Statement of Facts at ¶ 24; <u>see also</u> Plaintiff's Statement of Facts at Exh. 1 at ¶ 20, 21, 35,

39, 43, 52, 53, 56, 101.[5]  Mr. Cashman testified he used paid time off in 2006 rather than

taking an extended leave because Mr. McClarren had taken medical leave and Mr.

Cashman was concerned for his co-workers.[6]  <u>See</u> Statement of Facts at Exh. B at 184:20

- 185:6; Plaintiff's Statement of Facts at Exh. D at 168-69.  Mr. Cashman stated "I trusted

Mr. Wolfe had my best interest at heart and had no idea he would attempt to impact my

performance and employment during the time of my illness."  Plaintiff's Statement of

Facts at Exh. 1 at ¶ 54.

      B.   <u>Alleged Performance Deficiencies</u>

CNA cites instances in which Mr. Cashman allegedly was informed of poor

performance as evidence that Mr. Cashman was placed on an improvement plan because

of his performance.  On September 26, 2005, Mr. Wolfe informed Mr. Cashman he

improperly failed to take action on a claim.  Statement of Facts at D-1 at CNAJCD00201

at 56 of 70.[7]  In late October 2005, Mr. Wolfe informed Mr. Cashman he inappropriately

rejected a file for investigation, the adjuster had disputed the rejection, and the adjuster

---

[5]  When Mr. Cashman emailed Mr. Wolfe during his FMLA leave about the assignments, Mr.
Wolfe emailed the team assigning work and had Mr. Cashman taken out of the queue.

[6]  Mr. McClarren took leave under the FMLA in May 2006.  He was unsure when, or if, he
would be able to return.  His assignments were re-distributed among the members of the fraud
case management team.  He returned in August 2006.

[7]  Mr. Cashman claims (but does not cite evidence) that this claim involved $500 damage to a
car, no buildup of medical, and the claimants were 70 and 54 years old, with no claim history.
He states, contrary to Mr. Wolfe's email, there were photographs in the file, and the claims
settled nine months after the accident.

escalated it to Mr. Bonk.  See Statement of Facts at D-1 at CNAJCD00198 (p. 54 of 70).

The referenced email states: "Please call me in the morning about this file.  The adjuster

is disputing the rejection and has escalated it to Jim Bonk, so we need to discuss."  Id.

CNA states "[i]n another instance, [Mr.] Wolfe received an email from a claim

representative who had complained that [Mr.] Cashman had rejected a file without

consulting with her first."  Statement of Facts at ¶ 32.  This instance, however, is the

same late October instance.[8]  Mr. Cashman presents evidence that CNA did not have a

policy of contacting the claims representative prior to rejecting a claim.  In a November

17, 2005 email, Mr. Wolfe wrote:

> John, FYI . . . this obviously means we will need to allow greater flexibility
> in our application of the protocol.  TJX have already assigned surveillance
> themselves, so I doubt they will want our involvement now, but I will
> confer with CSD.  Please continue to let me know if you are unsure how to
> proceed on any of these questionable cases in the future and I'll be glad to
> take a look.

Plaintiff's Statement of Facts at Exh. 22.  Mr. Cashman also cites evidence the policies

were unclear and that the other team members had problems with the policies.  See

Plaintiff's Statement of Facts at Exh. 22, Exh. 23.

Mr. Wolfe reviewed six files per month for each member of the fraud case

management team.  See Statement of Facts at ¶ 80; Response to Statement of Facts at ¶

80.  He testified he entered the information from the file reviews onto a spreadsheet.  Id.

Mr. Wolfe deleted the spreadsheets and testified he did not know when he deleted them.

Id. at ¶ 83-84.  Mr. Wolfe sent monthly emails to his team members stating their

---

[8]  The emails reference the same claim numbers.

compliance percentage, and listing key issues on which the member should work. The February 2006 email from Mr. Wolfe to Mr. Cashman, discussing Mr. Cashman's January results, stated "[y]ou attained an 84% compliance rating with our requirements. The acceptable standard is 95%, so some improvement is necessary." Statement of Facts at Exh. D-3 at CNAJCDP00135. The email also gave "key issues" for Mr. Cashman to focus on, which included making the file documentation consistent with the guidelines, entering or attaching the investigative report and other information, following up on vendor assignments, and adding vendors as secondary in I-Track. Mr. Cashman challenges the alleged file deficiencies.[9]

Mr. Wolfe sent emails to Mr. Cashman concerning some errors Mr. Cashman made with files. See Statement of Facts at CNAJCDP00056 (requesting Mr. Cashman close files out in I-Track, ensure the correct investigation type is listed, and, for files formerly assigned to others, reassign the files to himself); Id. at CNAJCDP00080 (listing Mr. Cashman's first quarter numbers and requesting he work on his "cycle time and savings and make sure that [he is] identifying files that meet the threshold for DOI

---

[9] For the months leading up to September 2006, Mr. Cashman received monthly emails from Mr. Wolfe detailing his compliance rating and identifying areas of improvement. See Defendants' Statement of Facts at Exh. D at CNAJCDP00487. On February 15, 2006 he received his January file review results. Id. He had an 84.38% compliance rating. Id. In March 23, 2006, he received his February file review results and had an 89.58% compliance rating. Id. at CNAJCDP00489. On April 25, 2010 he received his March file review results and had an 80.21% compliance rating. Id. at CNAJCDP0,0490. On June 2, 2010 he received his April file review results and had a 95.83% compliance rating. Id. at CNAJCDP00492. On June 30, 2010 he received his May file review results and had a 91.69% compliance rating. Id. at CNAJCDP00493. On August 18, 2006 he received his June file review results and had a 91.67% compliance rating. Id. at CNAJCDP00494. On September 18, 2006, he received his July review results and had an 87.5% compliance rating. Id. at CNAJCDP00496. The other team members also received monthly emails.

referrals"); <u>Id.</u> at CNAJCDP00090-92 (stating Mr. Cashman had an 89.85% compliance rating and identifying issues for Mr. Cashman to address); <u>Id.</u> at CNAJCDP00095-98 (notifying Mr. Cashman he could have used a particular surveillance company and informing him he needed to revise the plan of action); <u>Id.</u> at  CNAJCDP000113 (informing Mr. Cashman he had to reject files in the I-track system rather than stating it was a pending closure).  Mr. Cashman alleges the performances issues were manufactured.  <u>See</u> Plaintiff's Statement of Facts at Exh. 35C at 2568, 2580 (spreadsheet shows Mr. Cashman's cycle time was 28 days, not 79 days, and a quarterly spreadsheet shows his cycle time was 39 days, not 79 days).  In addition, Mr. Cashman followed the company policy when he rejected claims, and he notes the I-track system had numerous issues.  <u>See</u> Plaintiff's Statement of Facts at Exh. J at 74, Exh. 34.

In July and August 2006, Mr. Wolfe received complaints that Mr. Cashman failed to properly evaluate and assign a claim, mistakenly rejected an investigation, and failed to handle an urgent matter correctly.  <u>See</u> Defendants' Statement of Facts at Exh. D at CNAJCDP00457, CNAJCDP00458-459, CNAJCDP00 464-470.

C.    <u>Performance Improvement Plan</u>

CNA has a policy governing performance improvement plans.  The policy provides a verbal or written warning "[m]ay be the appropriate first step to notify employees of performance deficiencies.  Used when performance is poor enough to warrant concentrated attention."  Plaintiff's Statement of Facts at Exh. 73.  It states:

> All warnings, verbal or written, should be documented by the employee's manger.
> A warning should be distinguished from regular coaching and feedback.

> Warnings should always be reviewed by [human resources] prior to implementation.
> A copy of the warning should be sent to the employee's personnel file.

Id.  The policy also provides "certain situations warrant a 'first and final' warning, which advises the employee that if the behavior is repeated at any time during their employment with CNA, the employee's employment will be terminated."  Id.  The policy states a performance improvement plan "may be appropriate as a follow-up to a warning if performance or conduct does not improve or may be an appropriate first step."  Id.

Mr. McClarren returned to work from his FMLA leave on August 16, 2006.  On August 17, 2006, Mr. Cashman emailed Mr. Wolfe stating: "I am 'under the weather' and have a Dr. appt. at 1 pm EST in the City.  Please do not assign any late rushes if possible."  See Plaintiff's Statement of Facts at Exh. 57.  On August 18, 2006, Mr. Wolfe sent an email to Mr. Bonk containing Mr. Cashman's June file review and stating: "Jim, FYI . . . John just does not seem to be engaged.  His POAs are seriously flawed and he lacks attention to detail.  I'm afraid that he is just going through the motions."  Plaintiff's Statement of Facts at Exh. 59.  Mr. Bonk responded: "We have been way too patient with this matter.  Schedule a meeting with Betsy and let's move to a [performance improvement plan]."  Id.

On September 1, 2006, Mr. Cashman was out sick due to shingles.  Plaintiff's Statement of Facts at Exh 1 ¶ 66.  On September 6, 2006, Mr. Cashman advised Mr. Wolfe he was having biopsies and pre-operation tests related to cancer treatment and may be unable to join a conference call on September 7, 2006.  Id. at Exh. 62.  Mr. Cashman also emailed William Murdock, the recovery operations manager, and requested to be

taken out of the queue for urgent referrals.  Id. at Exh. 63.  Mr. Wolfe was carbon copied on this email.  Id.  Mr. Murdock took Mr. Cashman out of the queue.  Mr. Wolfe emailed Mr. Cashman asking Mr. Cashman to direct similar requests to Mr. Wolfe in the future. Id.  On September 11, 2006, Mr. Cashman emailed Mr. Wolfe that he would be taking eight hours of paid time off that day for a medical reason.  Id. at Exh. 64.

On September 18, 2006, human resources representative Leslie Curran emailed Mr. Wolfe to determine how Mr. Wolfe believed Mr. Cashman would react to the performance improvement plan.  See Statement of Facts at Exh. D at CNAJCDP00850. Mr. Wolfe responded that he was unsure how Mr. Cashman would react.  Id.  The email stated Mr. Wolfe had a conversation with Mr. Cashman ten days ago about failing to treat an investigation as urgent, but Mr. Cashman did not grasp the seriousness of the issue. Id.  It states Mr. Cashman did not like the fraud case manager position, and would prefer to be in the field.  Id.  Mr. Wolfe also states "[h]e may bring up his illness as an excuse, or he may say that the workload was too much as there were periods when we were short-staffed."  Id.

Ms. Curran responded and asked whether Mr. Wolfe believed Mr. Cashman viewed their prior discussions as "coaching" or "warning" sessions, whether Mr. Wolfe expected Mr. Cashman to make the plan, and what Mr. Wolfe's response would be if Mr. Cashman asked for a different role.  See Statement of Facts at Exh. D at CNAJCDP00849.  Mr. Wolfe responded that Mr. Cashman had viewed the talks as coaching sessions but that Mr. Wolfe had warned him ten days prior that a certain action was unacceptable and had provided improvement recommendations in the monthly

emails.  Mr. Wolfe stated he did "not expect him to make this plan because I do not

believe that he really wants to make the effort to be an effective [fraud case manager],

however, if he does make good progress in the key areas I would consider an extension."

Id.  Mr. Wolfe then states "[i]f he asks for a different role then I would simply tell him

that no other role is currently available in our organization.  There are only three field

positions for investigators, in the [m]ajor [i]nvestigations [t]eam, and they are all filled

with staff who have considerable expertise in that area."  Id.  Ms. Curran testified that she

asked Mr. Wolfe about coaching because:

> . . . there is a big difference because managers meet with employees all the
> time and they discuss their performance where they are anticipating putting
> someone on a plan or getting more aggressive with that person in terms of
> their performance, it's imperative that they change the tenor of the
> discussions and let the employee know that they are now being warned that
> their performance is not up to par.  So as they draw people, we have to try
> to make that distinction because we never want an employee to be surprised
> at the fact they're being put on a plan because hopefully they will kind of
> know the way their managers have been speaking to them.  That's why I
> asked that question.

Plaintiff's Statement of Facts at Exh. E at 55-56.

On September 19, 2006, after conferring with Elizabeth Mansfield, the Human

Resources Director, and Mr. Bonk, Mr. Wolfe administered a performance improvement

plan to Mr. Cashman by telephone from Mr. Wolfe's office in San Francisco to Mr.

Cashman's office in Philadelphia.  Mr. Wolfe stated he did not give verbal or written

notice of the performance improvement plan because he "saw fit to deliver the news at

the time that I put him on the [performance improvement plan]."  See Plaintiff's

Statement of Facts at Exh. K at 233-34.

The performance improvement plan listed the specific areas that needed improvement, including ensuring that thorough and complete investigations are conducted, reducing his cycle time and number of open pending cases, ceasing to inappropriately close files in I-Track, and failing to comply with special investigations unit reporting guidelines.  Plaintiff's Statement of Facts at Exh. 72.  It provided expectations for his improvements, including reviewing all files and making sure the documentation is complete, providing a written update of investigative activity to the file, providing a written status to file on active investigations every 15 days, providing accurate data through the I-Track status screen, ensuring that effective action plans are developed, implemented and documented and thorough investigations are completed, and bringing the cycle time and open pending cases to special investigations unit standard levels.  Id.  It provided:

> [I]f you are unable to meet the aforementioned requirements, it may lead to further disciplinary action, including termination of your employment.  In addition, if you are not attempting to meet these objectives, it may lead to my recommendation to terminate your employment prior to the 30 day performance period.

Id.

On September 20, 2006, Mr. Cashman sent an email notifying Mr. Wolfe of his decision to retire effective November 3, 2006.  See Statement of Facts at Exh. D at CNAJCDP000511-513.

On September 21, 2006, Mr. Cashman advised Mr. Wolfe that he needed time off for a medical procedure and biopsies on September 26, 2006.  Plaintiff's Statement of Facts at Exh. 75.  On September 21, 2006, Mr. Wolfe gave Mr. Cashman more

assignments.  When Mr. Cashman questioned the additional assignments due to his

pending retirement, Mr. Wolfe responded "please continue handling new assignments

until further notice.  If your last working day will be [November] 3 we have time to bring

Doug up to speed before we cut you off."  Id. at Exh. 76.  On September 22, 2006, Mr.

Cashman again questioned an assignment because it would be a complex assignment that

would run past his retirement date.  Id. at Exh. 77.  Mr. Wolfe responded that Mr.

Cashman should continue working on the assignments and he would be taken out of the

queue closer to November 3, 2006.  Mr. Wolfe testified that he "trusted [Mr. Cashman] to

handle the files appropriately in the time that he had left at CNA."  Plaintiff's Statement

of Facts at Exh. K at 181.  Mr. Cashman continued to work on his assignments.

Statement of Facts at ¶ 42; Response to Statement of Facts at ¶ 42.[10]  On October 23,

2006, Mr. Cashman sent an email to Ms. Mansfield and Mr. Wolfe rescinding his

decision to retire.  The email states:

> My original decision to retire was made during a period of extreme stress
> caused by an unwarranted work performance review.  I was recovering
> from a stress related illness and facing tests to determine the possible re-
> occurrence of Cancer.  Management was aware that I was treating for this
> condition. . . . I was presented with a [p]erformance [i]mprovement [p]lan
> which I believe may have been prejudicial in relation to my age and
> ongoing medical conditions."

Statement of Facts at D at CNAJCDP000517-518.  On October 23, 2006, Shelly Liapes

sent Ms. Mansfield an email stating: "Do you have any insight into if we are obligated to

---

[10]  On October 2, 2006, Mr. Cashman sent an email to Mr. McClarren stating "I CANNOT
WAIT TO GET OUT OF HERE . . . .  I DON'T CARE WHAT I HAVE TO DO!  I AM
SERIOUS!!!"  See Statement of Facts at Exh. D at CNAJCDP000214-000215.

accept his rescinding of his retirement notice?  He clearly is positioning with this email. .
. ."  Plaintiff's Statement of Facts at Exh. 80.

On October 27, 2006, a conference call took place between Mr. Cashman, Mr.
Wolfe, and Ms. Mansfield.  Mr. Cashman asked why he could not continue to work, and
Mr. Wolfe stated the job had been filled.  Mr. Cashman also asked whether he could
replace Steve Weiner, a management investigations team investigator who had
announced his retirement.  See Statement of Facts at ¶ 50; Response to Statement of
Facts at ¶ 50.  Mr. Wolfe told Mr. Cashman "that position is not open for you either,
there is no job for you at CNA."  Plaintiff's Statement of Facts at Exh. 1 at ¶ 91.  On
October 30, 2006, Ms. Mansfield emailed Mr. Cashman stating: "CNA had honored your
original decision to leave CNA, which you submitted approximately 4 weeks ago and has
taken steps from a business standpoint during that time to reallocate your work and
review process flows.  We again anticipate your last day with CNA will be November
3rd."  See Plaintiff's Statement of Facts at Exh. 88 at 000107.

On October 31, 2006, Mr. Cashman sent another email to Mr. Wolfe and Ms.
Mansfield claiming CNA was attempting to force him to retire, reiterating he had stopped
the retirement process, and stating he had been informed by the corporate office that he
could rescind his retirement.  See Statement of Facts at ¶ 48; Response to Statement of
Facts at ¶ 48.

On November 2, 2006, Mr. Cashman emailed Mr. Wolfe, Ms. Mansfield, and
others stating: "I will consider your insistence that [November] 3rd is my last day as an
involuntary termination. If there is a company regulation that states I must retire and

cannot retract this decision, please advise and I will honor any such regulation."  <u>See</u> Plaintiff's Statement of Facts at Exh. 87.  On November 2, 2006, Ms. Mansfield wrote Mr. Cashman: "As I communicated to you verbally and in my October 30th email, CNA has honored your original decision to leave CNA.  Your last day will continue to be November 3rd."  <u>See</u> Plaintiff's Statement of Facts at Exh. 88 at 000104.  On November 2, 2006, Mr. Wolfe asked Mr. Cashman to turn in his equipment.  <u>Id.</u> at Exh. 89.  On November 2, 2006, Ms. Mansfield reminded Mr. Wolfe to "go into the system and complete the termination paperwork" using Saturday's date, which was November 4, 2006.  <u>Id.</u> at Exh. 90.

II.    <u>DISCUSSION</u>

    A.    <u>Family Medical Leave Act – Interference</u>

Under the FMLA, an employee is entitled to twelve workweeks of leave during a twelve-month period if the employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  To be entitled to FMLA benefits, an employee must provide the employer with notice of his need for the leave.  The notice "need not use any magic words."  <u>Sarnowski v. Air Brooke Limousine, Inc.</u>, 510 F.3d 398, 402 (3d Cir. 2007). "The critical question is how the information conveyed to the employer is reasonably interpreted."  <u>Id.</u>

"The regulations make it the employer's responsibility to tell the employee that an absence will be considered FMLA leave."  <u>Ragsdale v. Wolverine World Wide, Inc.</u>, 535

U.S. 81, 87 (2002) (citing 29 CFR § 825.208(a) (2001)).[11]   The employer's failure to provide individualized notice does not state a cause of action unless the employee was prejudiced by the failure to provide notice.  Ragsdale, 535 U.S. at 89.

The FMLA provides an employer cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  § 2615(a).  It also provides an employer cannot "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  § 2615(a)(2).  The FMLA provides:  "Nothing in this section shall be construed to entitle any restored employee to . . . (B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3)(B).  The regulations provide that an employer is prohibited:

> from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

29 C.F.R. § 825.220(c).

Mr. Cashman argues CNA should have designated the paid time off he took for his chemotherapy treatments, surgery, and doctor visits in 2006 as FMLA leave.  He testified

---

[11]  In Ragsdale, the Supreme Court did not address whether the regulation requiring individualized notice "accords with the text and structure of the FMLA."  535 U.S. at 88.  The dissent in Ragsdale, however, would have upheld the regulation requiring individualized notice.

that he was unaware FMLA leave could be taken on an intermittent basis.  CNA argues it would have placed Mr. Cashman on a performance improvement plan because of his substandard work and FMLA leave would not have protected him from action against substandard work.

Even if CNA should have notified Mr. Cashman that the 2006 leave could receive FMLA protection, Mr. Cashman's interference claim is legally insufficient because he fails to establish prejudice.  The failure to notify Mr. Cashman of his FMLA rights did not result in lost wages or any economic harm.  See Hayduk v. City of Johnstown, 580 F. Supp. 2d 429, 474 (W.D. Pa. 2008) (plaintiff failed to show prejudice where he failed to show he lost compensation or out-of-pocket expenses incurred as a result of the failure to notify).  Therefore, I will grant the defendant's motion for summary judgment as to the FMLA interference claim.

B.      Family Medical Leave Act – Retaliation

To establish a prima facie case of FMLA retaliation, the plaintiff must establish: "(1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave." Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004).

To establish he suffered an adverse employment action, Mr. Cashman must show "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d. 1211, 1219

(D.C. Cir. 2006)).  Courts must "remain mindful that 'it is important to separate significant from trivial harms . . . .'"  Moore v. City of Phila., 461 F.3d 331, 346 (3d Cir. 2006) (quoting Burlington N. and Santa Fe Ry. Co., 548 U.S. at 68).  Determinations about whether acts are materially adverse or simply part of a normal workplace "depend on the totality of the circumstances."  Id.  ("[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario."  (citing Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990))).

    The complaints about Mr. Cashman's performance began in the weeks following Mr. Cashman's notice to Mr. Wolfe that his cancer returned.  When Mr. Cashman took paid time off in 2006 due to doctor visits, chemotherapy, or surgery, Mr. Wolfe continued to give him assignments and included the days he took off when calculating Mr. Cashman's cycle time.  In September 2006, Mr. Cashman received a negative performance evaluation and was placed on a performance improvement plan.  Mr. Wolfe used Mr. Cashman's high cycle time as part of the justification for placing Mr. Cashman on a performance improvement plan.  Negative performance evaluations and "improvement letters" may sometimes constitute an adverse employment decision under the FMLA retaliation provision.  See, e.g., Boandle v. Geithner, – F. Supp. 2d –, 2010 WL 4321573, at *15 (E.D. Pa. Nov. 2, 2010) (finding an adverse action for a retaliation claim could exist where "[a]long with the negative performance evaluation, [an employee receives] an Opportunity to Improve letter affording him 120 days to improve his performance, inform[ing] him that his work would be periodically reviewed, and [telling] him that if he did not improve his performance, he would face termination"); Porter v.

Shah, 606 F.3d 809, 818 (D.C. Cir. 2010) (finding a plaintiff established an adverse

employment action where plaintiff received a "Notification of Unacceptable

Performance," which was placed in the plaintiff's personnel file instead of retained in the

operating unit as was agency custom and was accompanied by a 120-day performance

improvement plan outlining and where the evaluation exposed the plaintiff to "removal,

reduction in grade, withholding of within grade increase or reassignment.").

Mr. Cashman argues this adverse employment action was causally related to the

leave because Mr. Bonk and Mr. Wolfe discussed contingency plans when they first

learned Mr. Cashman would need to go out on leave.[12]   Mr. Wolfe also changed the 2006

evaluation that Mr. Traina had prepared,[13] and Mr. Wolfe used Mr. Cashman's inability

to attend a meeting as justification for hiring a new employee.[14]

---

[12]  In September 2005, after he initially informed Mr. Wolfe that he would need to take leave due
to the return of his cancer, Mr. Wolfe emailed Mr. Bonk.  Mr. Bonk responded:

> I'm really sorry to hear about [Mr. Cashman's] condition.  We may wish to
> consider contingency plans should [he] need to go out on [short term disability].
> Please advise [Mr. Cashman] that his health should obviously come first and not
> to worry about the Chicago meeting.

Plaintiff's Statement of Facts at Exh. 17.

[13]  Mr. Traina, Mr. Cashman's manager from January through September of 2005 had prepared a
draft evaluation for Mr. Cashman in which he rated Mr. Cashman as a "2," for exceeds
expectations.  Mr. Wolfe had changed the evaluation to a "3," for meets expectation, based on
Mr. Cashman's performance from September 2005 through December 2005.

[14]  On May 6, 2006 when Mr. Wolfe sought a new hire for Mr. Cashman's unit, Mr. Wolfe
explained he had two employees with serious health problems, and one employee whose spouse
had serious health problems.  Regarding Mr. Cashman he wrote:

> John Cashman (East Zone) – John suffered with a serious illness in 2004 and
> underwent extensive treatment, but his condition has since returned and he will
> shortly begin a further course of treatments.  This will be his second such course

I disagree.  Mr. Cashman fails to raise a genuine issue of material fact regarding whether he was retaliated against for taking FMLA-protected leave.  Even if the leave in the spring and summer of 2006 should have been designated FMLA leave, Mr. Cashman cannot establish, considering the totality of the circumstances, that the performance improvement plan constituted an adverse employment action.  Although, the cycle days did include days Mr. Cashman was out due to chemo-therapy treatments, the monthly email reports establish Mr. Cashman's performance needed improvement on months when he was not out due to his illness.  Moreover, even if the performance improvement plan was an adverse employment action, Mr. Cashman fails to establish it was causally related to his FMLA leave.  There is no evidence CNA considered Mr. Cashman's leave when making its determination to place him on a performance improvement plan.  Therefore, I will grant CNA's motion for summary judgment regarding Mr. Cashman's FMLA retaliation claim.

C.   Age Discrimination in Employment Act

The Age Discrimination in Employment Act provides:  "It shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).[15]

---

in the past seven months; his health problems prevented him from attending our [special investigations unit] new model kick-off meeting in Chicago in September 2005.

[15] The Pennsylvania Human Relations Act also prohibits age discrimination.  The PHRA provides:

To establish a prima facie case of age discrimination, the plaintiff must establish he:  "(1) was over forty years old at the time of the adverse employment decision; (2) is qualified for the position in question; (3) suffered from an adverse employment decision; and (4) that his employer replaced him with someone sufficiently younger to permit a reasonable inference of age discrimination."  Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005); accord Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 300-301 (3d Cir. 2004); Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir. 2004).  "There is no hard-and-fast rule covering what a plaintiff must show" to establish a prima facie case.  Fasold, 409 F.3d at 185 n.10.  "[T]he precise elements of a plaintiff's prima facie case may vary with the particular circumstances."  Id. (quoting Waldron v. SL Indus., Inc., 56 F.3d 491, 494 n.3 (3d Cir. 1995)).

Mr. Cashman fails to establish he suffered an adverse employment action.  Mr. Cashman maintains CNA discriminated against him because of his age when it placed him on a performance improvement plan, when it refused to accept his rescission of his

---

It shall be an unlawful discriminatory practice . . . [f]or any employer because of the . . . age . . . of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 P.S. § 955(a).  "The same legal standard applies to both the ADEA and the PHRA and therefore it is proper to address them collectively."  Kautz v. Met-Pro Corp., 412 F.3d 463, 466 n.1 (3d Cir. 2005)

retirement, and when it did not allow him to transfer departments.[16]   An adverse

employment action is "an action by an employer that is 'serious and tangible enough to

alter an employee's compensation, terms, conditions, or privileges of employment.'"

Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (quoting Cardenas v.

Massey, 269 F.3d 251, 263 (3d Cir. 2001)).   In the recent Eastern District decision of

Raffaele v. Potter, 2012 U.S. Dist. LEXIS 1552, *13 (E.D. Pa. Jan. 5, 2012), Judge

O'Neill held that because of the "clear precedent within [the Third Circuit], plaintiff's

negative performance evaluations [were] not adverse employment actions."   See also,

Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001)(failing to find adverse

employment action, despite negative evaluations, because plaintiff "was not demoted in

title, did not have his work schedule changed, was not reassigned to a different position

or location . . . , did not have his hours or work changed or altered in any way, and . . .

was not denied any pay raise or promotion as a result of these reprimands"); Acosta v.

Catholic Health Initiatives, Inc., 2003 WL 176978, *15 (E.D. Pa. Jan. 24, 2003)(finding

negative performance review not an adverse action where it did not threaten termination

---

[16]   The defendants' brief in support of the motion for summary judgment stated: "Even assuming for the purposes of this Motion only that Cashman meets the first and third prongs of the McDonnell Douglas analysis, he cannot establish the fourth."   The third prong of the test is that Mr. Cashman suffered an adverse employment action.   At oral argument, however, defendants did argue Mr. Cashman did not suffer an adverse employment action.

Federal Rule of Civil Procedure 56(f) provides: "After giving notice and a reasonable time to respond, the court may: . . .  (2) grant the motion on grounds not raised by a party . . . ."   On January 21, 2011, the parties were ordered to file briefs on whether CNA's placement of Mr. Cashman on a performance improvement plan and its refusal to accept his rescission of his retirement constituted adverse employment actions.

and the review expected the employee to make improvements).[17]   Other circuits have

held that a negative evaluation is not an adverse employment action unless it has some

"tangible effect upon the recipient's employment."  Foster v. Ashcroft, 2006 WL

1995305, at *2 (D.N.J. July 14, 2006) (quoting Turner v. Gonzales, 421 F.3d 688, 696

(8th Cir. 2005)); see also Mickens v. Lower's Companies, Inc., 2009 WL 4911952, *9

(D.N.J. Dec. 14, 2009) (finding negative employment evaluation did not constitute an

adverse action).

Mr. Cashman claims his current and former co-workers warned him that he would

be fired because he had been placed on a performance improvement plan.  This, however,

does not establish that CNA took an adverse action against him.  He resigned

immediately after he was placed on the performance improvement plan.  The plan

indicated he may be terminated after thirty days if he was not making progress, but that

does not establish termination was inevitable.

Similarly, refusing to accept Mr. Cashman's rescission of his retirement was not

an adverse action.  Mr. Cashman did not attempt to rescind his notice of retirement for

four-and-a-half weeks.  Mr. Cashman relies on the retirement plan to support his claim

CNA had to accept his rescission, arguing the plan states "[o]nce your benefits have

begun, you cannot change your election."  The referenced section, however, deals with

when the employee would like his benefits to begin, not whether CNA was required to

---

[17]  Mr. Cashman does not raise a constructive discharge claim.

accept a rescission of a retirement notice.[18]   CNA already had determined how it was going to redistribute his work and had planned for his retirement.

Also, refusing to allow Mr. Cashman to transfer to the management investigations team was not an adverse action.  CNA was not required to give him the position merely because he wanted the position.  See Good v. Fed. Reserve Bank of Cleveland, 2007 WL 2955615, at *8 (W.D. Pa. Oct. 9, 2007) (stating "a lateral transfer, or failure to be given the same, is not a materially adverse employment action sufficient to establish a prima facie case of employment discrimination").

>        D.        The Age Discrimination in Employment Act – Retaliation

To state a prima facie case of ADEA retaliation, the plaintiff must establish he engaged in protected conduct, he was subject to an adverse employment action subsequent to his protected activity, and a causal link exists between the protected activity and the adverse employment action.  See Barber v. CSC Distribution Servs., 68 F.3d 694, 701 (3d Cir. 1995).

To establish he suffered an adverse employment action, Mr. Cashman must show "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from

---

[18]  In the "How Benefits are Paid" section of the Retirement plan, the plan states:

> If the value of your benefit is more than $5,000 there are a number of payment options available from the Retirement Plan.  You can elect to retire up to 90 days in advance of your retirement dates, but no later than 30 days prior to your elected retirement date.  Once benefit payments have begun, you cannot change your election.

Plaintiffs Exh. 126 at 25.

making or supporting a charge of discrimination.'" Burlington N. and Santa Fe Ry. Co., 548 U.S. at 68 (quoting Rochon, 438 F.3d. at 1219).

Mr. Cashman sent notice of his retirement on September 20, 2006, effective November 3, 2006. Mr. Cashman maintains CNA retaliated against him in violation of the ADEA when it refused to rescind his retirement. Mr. Cashman emailed Mr. Wolfe and Ms. Curran on October 23, 2006 and on October 31, 2006 informing them he would like to rescind his retirement notice and stating he believed the poor performance evaluation was unwarranted and "may have been prejudicial in relation to my age and ongoing health conditions." See Plaintiff's Statement of Facts at Exh. 78.

CNA's refusal to accept Mr. Cashman's rescission of his retirement notice is not an adverse employment action. It would not dissuade a reasonable worker from making or supporting a charge of discrimination. Mr. Cashman attempted to rescind the notice thirty-three days after providing notice of his retirement to CNA and eleven days before his retirement was to become effective. CNA did not have a policy that it could not accept the rescission, but it also did not have a policy that required it to accept the rescission.

E.    Americans With Disabilities Act

To establish a prima facie case of discrimination under the ADA, a plaintiff must establish he (1) had a disability, (2) is a qualified individual, and (3) has suffered an adverse employment action because of that disability. Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000); Deane v. Pocono Medical Ctr., 142 F.3d 138, 142 (3d Cir. 1998).

Mr. Cashman has not established he suffered an adverse employment action.  A negative performance review and being placed on a performance improvement plan, without more, is not an adverse employment action.  Foster, 2006 WL 1995305, at *2 (quoting Turner, 421 F.3d at 696); see also Mickens, 2009 WL 4911952; Acosta, 2003 WL 176978, *15.  Similarly, CNA's refusal to accept Mr. Cashman's rescission of his notice of retirement and refusal to transfer Mr. Cashman are not adverse employment actions.

F.      Americans With Disabilities Act – Retaliation

To establish a prima facie case of retaliation under the ADA, the plaintiff must establish: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)).

Mr. Cashman again relies on CNA's refusal to accept his rescission of his retirement.  As with his ADEA retaliation claim, the ADA retaliation claim fails because CNA's refusal to accept this rescission is not an adverse employment action.

G.      Constructive Discharge

CNA argues Mr. Cashman cannot prove a constructive discharge claim.  Mr. Cashman, however, does not raise a constructive discharge claim.  Mr. Cashman claims

he was fired.[19]   Therefore, I do not need to decide whether Mr. Cashman successfully proved a claim for constructive discharge.

III.    <u>CONCLUSION</u>

For the reasons stated above, I will grant CNA's summary judgment motion for the FMLA retaliation and interference claims.  Additionally, I will grant CNA's summary judgment motion for the ADA and ADEA claims.

An appropriate order follows.

---

[19]  CNA alleges CNA Financial is not a proper defendant because it is a holding company with officers and directors, but no employees.  Because CNA's motion for summary judgment will be granted, I need not decide whether CNA Financial is a proper party.